UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Case No.

CARLOS LOUMIET

v.

THE UNITED STATES OF AMERICA,
MICHAEL RARDIN, LEE STRAUS,
GERARD SEXTON, and RONALD
SCHNECK, each in their individual
capacities

      defendants.

_____/

## COMPLAINT FOR DAMAGES

Carlos Loumiet sues defendant, the United States Government, for actions of its agency,

the Office of the Comptroller of the Currency ("OCC"), and also sues Michael Rardin, Lee

Straus, Gerard Sexton and Ronald Schneck (together the "Individual Defendants").

## GENERAL ALLEGATIONS

1.      Mr. Loumiet is an individual who is a member of the Bars of the States of New

York and Florida and has been a citizen of the United States since approximately 1972. Since

1980, Mr. Loumiet has been a resident of South Florida.

2.      Defendant Government is the federal government of the United States of

America, being sued because of the actions of its agency, the OCC.

3.      Defendant Michael Rardin is an examiner at the OCC who was the examiner-in-

chief ("EIC") in charge of Hamilton Bank, N.A., in Miami, Florida ("Hamilton") during 2000 to

2001, and who was also actively involved in the OCC's action against Mr. Loumiet discussed in

this complaint (the "OCC Action").

4.      Defendant Lee Straus is an enforcement attorney at the OCC who was the lead counsel in the OCC Action.

5.      Defendant Ronald Schneck is Director of the Special Supervision and Fraud Division at the OCC and an investigative officer as that term is used in 28 U.S.C. 2680(h) because, at all relevant times, he had the authority to execute searches and to seize evidence. Defendant Schneck was actively involved in the OCC's various dealings with Hamilton from 2000 to 2001, as well as in the OCC Action.

6.      Defendant Gerard Sexton is Assistant Director of the Enforcement and Compliance Division of the OCC and an investigative officer as that term is used in 28 U.S.C. 2680(h) because, at all relevant times, he had the authority to execute searches and to seize evidence. Defendant Sexton was actively involved in the OCC's various dealings with Hamilton from 2000 to 2001, as well as in the OCC Action. Like defendant Straus, defendant Sexton is a veteran, experienced Government enforcement lawyer.

7.      The defendants identified in paragraphs 3 through 6 are at times collectively referred to as the "Individual Defendants."  At all times relevant to this complaint, the Individual Defendants were senior, influential employees of the OCC, with particularly strong say and influence on enforcement matters. Additional individual defendants may be added to this complaint as discovery develops.

8.      Mr. Loumiet sues the Government under the Federal Tort Claims Act (the "FTCA"), and the Individual Defendants under the First Amendment and Fifth Amendment (Due Process Clause) of our Constitution, the decision of the U.S. Supreme Court in *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971), and various other relevant cases, including  *Hartman v. Moore*, 126 S. Ct. 1695 (2006). In *Bivens*, the Supreme Court ruled that individuals working for

agencies of the federal government could be held liable for their violations of a citizen's rights under our federal Constitution. In *Hartman*, the Supreme Court ruled that a prosecution brought by federal agents in retaliation for a citizen's criticism of those agents violates the citizen's right to free speech under the First Amendment of our Constitution. The Supreme Court further stated that when nonretaliatory grounds are insufficient to explain a prosecution, then "retaliation is subject to recovery as the but-for cause of official action offending the Constitution." Further, the Court held that, "When the vengeful officer is federal, he is subject to an action for damages on the authority of *Bivens*." As will be seen below, the OCC's prosecution of Mr. Loumiet— both in its initial charging decision and in the manner the OCC conducted the litigation—was trumped-up and is inexplicable other than as retaliation against Mr. Loumiet for his earlier strong criticism of certain improper behavior of OCC staff, including some of the Individual Defendants who themselves were later actively involved in the OCC Action.

## JURISDICTION AND VENUE

9.      This is an action for damages in excess of US$ 75,000, exclusive of interest and costs.

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 as this is an action brought against the United States under the Federal Torts Claims Act (28 U.S.C. § 2671, *et seq.* and 28 U.S.C. § 1346(b)) for money damages as compensation for injuries that were caused by the wrongful acts of employees of the United States Government while acting within the scope of their offices and employment, and under circumstances where the United States, if a private person, would be liable to Mr. Loumiet. The United States has waived immunity from these claims under 28 U.S.C. § 1346.

11.     This Court also has subject matter jurisdiction as this is a private right under

*Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971), and various other cases, including the decision of the U.S. Supreme Court in *Hartman v. Moore*, 126 S. Ct. 1695 (2006), to redress violations of the First Amendment and Fifth Amendment (Due Process Clause) of our Constitution.

12.     This Court has venue under 28 U.S.C. § 1391 in that the defendant resides in this district, and under 28 U.S.C. § 1402 because all, or a substantial part of the acts and omissions forming the basis of these claims occurred in the District of Columbia.

13.     Mr. Loumiet has fully complied with the provisions of 28 U.S.C. § 2675 of the Federal Torts Claims Act.

14.     Mr. Loumiet timely files this suit, in that he first presented his claims to the OCC on July 20, 2011, and the OCC denied them in writing by mail on January 9, 2012.

## THE OCC ACTION

15.     Franz Kafka and Lewis Carroll would have found rich literary fodder in the OCC Action. As described fully below, the OCC Action was directed by a group of Government officials who—in pursuing their own retaliatory agenda against Mr. Loumiet because he had earlier exercised his Constitutional right to complain about their behavior to the Treasury Office of Inspector General ("OIG")—brought a sham action based on patently ridiculous claims; ignored indisputable facts adverse to their position, or "played ostrich" so as to not face them; intentionally misled the press; threatened punishment that was completely disproportionate to the supposed wrongdoing; knowingly ignored all of the overwhelming factual and legal arguments against their position, including the OCC's own rules and guidelines; made up the law and standards as they went along; disregarded through the end the absolute lack of evidence in support of their position; intentionally took positions contrary to sworn testimony of witnesses

put forward by that same Government; deliberately exaggerated claims against Mr. Loumiet and repeatedly publicly defamed him to the press; knowingly presented false testimony in a judicial proceeding; made a complete mockery of "expert" evidence; violated a series of Bar ethical rules applicable to the conduct of litigation by legal counsel; and vindictively and obstinately continued to pursue a case to its inevitable losing conclusion so as to inflict maximum injury on Mr. Loumiet long after it was clear that the action could not prosper. In short, this was the truly ugly and abusive side of Government regulatory enforcement power. However, Mr. Loumiet does not mean to implicate or disparage the many thousands of fine current and former public servants at the OCC who were not involved in the action described here, or to suggest that all OCC enforcement actions are conducted in this same ghastly manner.

16.     This action arises from an administrative proceeding brought by the OCC against Mr. Loumiet on November 6, 2006. After an approximately three-week trial held in October 2007, the administrative law judge ("ALJ") presiding over the case issued a 56-page Recommended Decision on June 18, 2008 that exonerated Mr. Loumiet on all charges. Thirteen months later, on July 27, 2009, the Comptroller of the Currency issued his Final Decision dismissing all charges against Mr. Loumiet.

17.     On August 26, 2009, Mr. Loumiet sued the OCC under the federal Equal Access to Justice Act (the "EAJA"), to recover legal fees and expenses he had incurred in defending the OCC Action. The ALJ in the OCC Action initially rejected Mr. Loumiet's EAJA claim. Mr. Loumiet appealed that decision to the D.C. Circuit Court of Appeals. On July 12, 2011, the D.C. Circuit unanimously reversed the ALJ's denial of the EAJA claim and awarded Mr. Loumiet's legal fees and expenses, finding that the OCC Action lacked "substantial justification"—a finding that has been held by the courts to be synonymous with "lacking a reasonable basis in

law and fact." Evidencing the same institutional arrogance and lack of respect for the rule of law demonstrated throughout this Complaint, almost one year later the OCC has not paid a cent of the awarded amount.

18.     Under *Hartman v. Moore*, unless "probable cause" for the Government's criminal prosecution can be shown to have existed, retaliation becomes the "but-for" cause behind the Government's behavior. "Probable cause" is widely understood to mean "a reasonable ground to suspect." *See, e.g., Black's Law Dictionary* 1219 (7th ed. 2007). Translating the criminal law concept of "probable cause" to an administrative prosecution such as the OCC Action, the D.C. Circuit already held, as noted above, that after considering all of the OCC's attempted justifications, the OCC Action lacked any reasonable basis in law and fact—i.e., was without "substantial justification."

19.     After the D.C. Circuit's decision, the OCC opposed Mr. Loumiet's request to that same Court for legal fees and expenses he had spent in pursuing his successful EAJA action, including his successful appeal. On January 24, 2012, the D.C. Circuit, per curiam, again ruled for Mr. Loumiet and ordered the OCC to pay him the full amount of fees and costs he was claiming.

20.     Mr. Loumiet now brings this action under the FTCA and the First and Fifth Amendments to our U.S. Constitution for damages defendants have caused him by their tortious and unconstitutional behavior. The OCC's own embarrassing and otherwise-inexplicable behavior and positions in the OCC Action are the best evidence of defendants' improper motives in persecuting Mr. Loumiet.

## THE HAMILTON BANK SAGA

21.     In 2000, Mr. Loumiet was a Principal Shareholder at the law firm Greenberg

Traurig ("Greenberg"), heading both its International and Banking Practices. Mr. Loumiet had

then been practicing successfully as a banking lawyer for about 22 years, and had also taught

banking law-related courses at the law schools at the University of Miami and Yale University

for several years each.

22.     Among Greenberg's clients was a Hispanic-controlled bank based in Miami

named Hamilton Bank, N.A. ("Hamilton"). At the time, on information and belief, Hamilton was

the second largest Hispanic-controlled bank in the continental United States. The bank was 100%

owned by a holding company named Hamilton Bancorp ("Bancorp"). Of Hamilton's 270 or so

staff, on information and belief roughly 250 were Hispanic (mostly of Cuban origin) or black.

Bancorp's and Hamilton's Boards of Directors and its management were largely the same,

primarily consisting of Hispanic individuals. Most of Hamilton's clients were from Latin

America and the Caribbean. Hamilton specialized in short-term trade financing, which

historically has been a very safe form of lending.

23.     Mr. Loumiet over the years had not personally done much work for Hamilton,

though under Greenberg's client origination system he was listed as one of six or seven

originating attorneys given credit for work coming from Hamilton. (At the time, Greenberg did

not have a formula that directly linked work origination to shareholder compensation, so it was

not uncommon for multiple shareholders to claim some credit for a client.)  Hamilton had never

been a large client for Greenberg—the fees Hamilton paid annually represented less than 1% of

Greenberg's revenues, and before 1997, much, much less. In 1997, Greenberg had handled an

initial public offering of stock for Hamilton, and, thereafter, securities law attorneys at

Greenberg had also handled a trust preferred offering, and also continued advising Hamilton on

its periodic securities filings.

24.     As a national bank, Hamilton was regulated by the OCC. Because state banking regulators do not regulate nationally-chartered banks, alone among federal and state bank regulators the OCC is able to act on enforcement matters with respect to the banks it regulates—and the people they employ or with whom they contract—without having to consult another regulator and take into account its views. Until 1998, the OCC gave Hamilton very good examination ratings. In 1998, the EIC for Hamilton was transferred to the OCC's headquarters in Washington, D.C., and replaced with a new EIC, who, among other things, later made the anti-Cuban statements described below. Not long after, the relationship between Hamilton and the OCC began seriously deteriorating.

25.     As reported in the press, in the Fall of 1998, the OCC held a meeting in Miami with the various small national banks headquartered in that city and advised them that they had to decrease their international lending because it was not safe for smaller banks to engage in that business. On information and belief, only Hamilton among the Miami-headquartered national banks resisted this instruction. Again on information and belief, this defiance created additional friction between Hamilton and the OCC.

26.     In the early Summer of 2000, Mr. Loumiet was approached by the then-General Counsel of Hamilton and Bancorp. He wanted Mr. Loumiet to advise the Board of Directors of Hamilton on the possible consequences to them of a Consent Agreement to be entered into between the OCC and Hamilton, which Mr. Loumiet was not previously aware of. Hamilton had negotiated the agreement with the assistance of one of the preeminent bank regulatory law firms in the United States, Arnold & Porter, its lead outside regulatory counsel. Nevertheless, the Hamilton General Counsel wanted Mr. Loumiet to briefly review the proposed agreement and explain to the Board the potential personal liability of members of the Board should this

agreement not be performed, all while not spending much time (or Hamilton money) on it.

Limiting his role further, the Hamilton Bank General Counsel also instructed Mr. Loumiet not to

become involved in the specific provisions of the agreement, which had already been negotiated

at length with the assistance of Arnold & Porter and were essentially agreed to. Over the course

of the two following months or so, Mr. Loumiet, without assistance from anyone else at

Greenberg, spent a total of 8 to 9 hours on this task, meeting with the entire Board once,

speaking with them by conference phone a second time, reviewing two drafts of the agreement,

and ultimately writing a brief comment letter with some general observations to the General

Counsel. (Unbeknownst to Mr. Loumiet, he actually sent his letter after Hamilton had already

signed the agreement with the OCC.) Mr. Loumiet never communicated or consulted with any

member of the Board individually, and Greenberg sent the modest bill for Mr. Loumiet's work

to Hamilton's General Counsel, and Hamilton paid the bill. In one provision out of many in the

draft agreement, Hamilton agreed in the future not to engage in "adjusted price trades."  Mr.

Loumiet was not given any background for the inclusion of this language and, consistent with his

very limited engagement, Mr. Loumiet did not enter into detail.

      27.     In August of 2000, the Board of Hamilton and Bancorp, without Mr. Loumiet's

involvement, began speaking to another shareholder at Greenberg about the possibility of

Greenberg advising the Audit Committee of Hamilton on an investigation of certain transactions

Hamilton had engaged in October 2008 (the "Transactions"), involving the sale of certain loans

and the simultaneous purchase of other loans. (Greenberg had not participated in the

Transactions as they were made.) The Greenberg shareholder involved had led the securities

offerings Greenberg had handled for Bancorp and provided securities law advice for some time

to Bancorp as called on from time to time. The investigation primarily concerned whether those

purchases and sales were sufficiently closely-linked that they should be treated as an "adjusted price trade" under generally accepted accounting principles (GAAP).  Unfortunately, this determination does not involve a "bright line" test, but depends on all of the facts and circumstances involved. As a result, reasonable men and women may differ on the conclusion to be drawn as regards any particular set of transactions, depending on its facts. The investigation was being conducted at the request of Deloitte & Touche, Hamilton's and Bancorp's auditors. The Greenberg securities shareholder informed Mr. Loumiet of the possible engagement. Mr. Loumiet offered to assist as needed on the banking and banking-law aspects of the matter but also made note that it was important to consider the work done by Mr. Loumiet for the Board that same Summer to make sure there was no conflict. Deloitte also asked that the Board consider Greenberg's independence in handling this matter, which the Board did. Ultimately, a big factor in Greenberg's engagement appears to have been that the investigation had to be done and the report completed by early November, and Greenberg's existing familiarity with Hamilton and Bancorp by virtue of the securities legal work it handled for Bancorp made this more feasible than would have been true for an entirely new law firm. In any event, if an "adjusted price trade" were found, many SEC filings done by Bancorp in the previous 18 months or so would have to be refiled, presumably with Greenberg's assistance. Greenberg was engaged in mid-September. Mr. Loumiet had no involvement in this decision to engage Greenberg.

28.     The investigation that followed over the next six weeks or so was primarily handled by the securities shareholder at Greenberg, with the help of two associates. Greenberg attorneys sought to interview every individual who appeared likely to have pertinent information, but as is often the case in private-sector investigations where there is no way of forcing people to speak, some individuals approached by the Greenberg lawyers refused to talk. While it was

contemplated that Mr. Loumiet would help with any banking law concepts and documents that surfaced, there was relatively little of that work involved. Thus, over a six-week investigatory period, Mr. Loumiet spent a total of about 10 hours, or roughly 1.6 hours a week, on the matter, mostly serving as a resource and occasional sounding board on banking-related issues for those doing the investigating. In fact, the Transactions had already been thoroughly investigated for about 18 months by the OCC, using far greater resources than a law firm like Greenberg could possibly bring to bear, including subpoena powers, the possibility or threat of involving sister law enforcement government agencies, and the international reach of the U.S. Government. Some 15 to 20 OCC examiners, investigators, lawyers and consultants had already investigated the matter before Greenberg. In addition, both Deloitte and Arnold & Porter, as auditors and regulatory counsel for Hamilton, respectively, had also investigated the matter thoroughly before Greenberg. Consequently, by the time Greenberg became involved, the investigative path had already been well-trod.

29.     Originally, the initial drafting of the necessary report was entrusted to a mid-level associate involved in the investigation. By late October, as the deadline for the report loomed, it became apparent the associate was in over his head, so Mr. Loumiet took over the drafting of that report based on information provided to him by the lawyers doing the investigation. The report was completed and sent out on November 15, 2000.

30.     One of the tasks of the report was to try to determine whether three members of Hamilton's senior management, including its Chair and CEO, had lied to Hamilton's Board, Deloitte, Arnold & Porter and the OCC about the Transactions. The OCC, after its investigation, had provided to Deloitte a series of documents that it had culled from Hamilton's files and from the files of other banks involved in the Transactions that the OCC felt were particularly

significant. The Greenberg report expressly discussed each of those documents and attached

them all as exhibits, exactly as received. Ultimately, because of inconclusive facts, the report was

unable to reach a conclusion whether or not the members of Hamilton's senior management had

lied about the Transactions. In fact, that was the same non-conclusion that Deloitte, Arnold &

Porter and the OCC itself (as discussed below) had reached at that point in time, presumably for

the same reasons. However, on review of the report, the OCC did concede that the report was

well-organized and thorough.

   31.  One document attached to the report was a fax that had been sent to both the bank

through which the loan sales had been done, and another bank through which loans had

apparently been purchased. As discussed below, the cover sheet to this fax was to become a focal

point of the OCC's harsh public accusations against Mr. Loumiet, designated by the OCC itself

as the "smoking gun" in its case.

   32.  Two weeks after the Greenberg report was sent out, there was a lengthy pre-

scheduled meeting at OCC headquarters in Washington, D.C. to discuss the situation. In

attendance were numerous representatives of the OCC, members of Hamilton's Board, two

attorneys from Arnold & Porter, representatives of Deloitte, and the securities shareholder and

Mr. Loumiet from Greenberg. By then the Hamilton Board, based on the Greenberg report, had

concluded that the purchases and sales had been sufficiently linked that they should have been

considered part of a single "adjusted price trade," and that the bank therefore had to report a loss

on its books. The exact amount of that loss was a big topic of discussion at the Washington

meeting, with the discussion ranging from US$ 4 million (advocated by some of the Hamilton

Directors) to US$ 24 million (the amount advocated by the OCC).

   33.  At that meeting, the OCC also stated that, of all of the national banks that it

regulated, Hamilton had become its biggest headache. In addition, the topic of Hamilton's access to a Congressionally-mandated OCC ombudsman was discussed. Hamilton had sought access to that ombudsman because it disagreed with instructions from its OCC examiners on the write-down of certain of its loans. At the meeting the senior OCC official present openly stated that Hamilton should stop seeking access to the ombudsman, because that ombudsman would only do what the OCC told him to do anyway. In fact, it is Mr. Loumiet's understanding that the ombudsman was never helpful to Hamilton Bank. At least part of this may have been attributable to the fact that under OCC rules in effect at that time, loans that were the subject of investigation by the OCC could not be considered by the ombudsman. Thus, the OCC could insulate its decision on any given loan from review by the Congressionally-mandated ombudsman by the tactic of simply designating the loan as subject to investigation even after the ombudsman had already been approached on the particular loan.

34.     Also noteworthy is that, at the Washington meeting, both Mr. Loumiet and his fellow Greenberg shareholder expressly asked if the OCC had any additional information on the issues Greenberg had investigated and addressed in its report, to which the OCC's very clear response was, "no."  A couple of weeks later Deloitte asked the OCC the same question, and was also told, "no."  In fact, during the OCC's action against Mr. Loumiet years later, it became apparent that the OCC did have significant additional information that it simply did not share with Greenberg, while misleading Greenberg (and Deloitte) that the information did not exist. At the Washington meeting, when asked directly about Hamilton management, all the OCC stated was that it could not "strongly endorse" that management.

35.     As already suggested, a couple of weeks after the D.C. meeting, Hamilton's Board agreed to write down its books by US$ 22 million, an amount very near to the US$ 24

million the OCC had advocated, to reflect the "adjusted price trades." This required Bancorp's securities filings from late 2008 and on to be revised and resubmitted. After the write-down was completed, Hamilton remained a "well-capitalized" bank under OCC standards at the beginning of 2001.

36.     Since he had heard nothing more from the OCC after the meeting in D.C. at the end of November, by mid-January Mr. Loumiet assumed that this matter had been concluded. Then, unexpectedly, a letter arrived from the OCC describing a deposition it had taken of an official at a counterparty-bank involved in the Transactions that directly contradicted what Greenberg had been told by the least senior of the three Hamilton officers whom the OCC suspected of wrongdoing. To make matters even more confusing, the deposition statements of the counterparty-bank official also directly contradicted what that person's own lawyer, a partner at a major Wall Street law firm, had told the Greenberg investigators the previous Fall, statements that had actually been included in the Greenberg report. Mr. Loumiet promptly reached out to the Hamilton officer whose truthfulness was being challenged to see if he would change his story in light of this contradictory deposition. The officer did not and, eventually, at Mr. Loumiet's insistence, that Hamilton officer signed a sworn Affidavit prepared by Mr. Loumiet confirming what that Hamilton officer had told Greenberg investigators the previous Fall, which directly conflicted with the deposition testimony the OCC had described to Mr. Loumiet. (Mr. Loumiet prepared the sworn Affidavit to make sure there was no wiggle room: if the Hamilton officer signed it, either he or the counterparty-bank official had to be wrong on at least some facts.)  At the same time, Mr. Loumiet tried to get the lawyer of the counterparty-bank official to explain the contradiction between his own statements included in the Greenberg report, and his client's sworn deposition to the OCC. The lawyer never gave an explanation; to

this day, the contradiction between client and counsel remains unexplained. Following Bar ethical rules, Mr. Loumiet also asked that counsel for access to his counterparty-bank client, but that access was denied. Mr. Loumiet, of course, had no way of compelling the counterparty-bank official or the lawyer to speak to Greenberg.

37.    Mr. Loumiet, the Greenberg securities shareholder, and two Deloitte partners visited OCC headquarters in Washington, D.C. a second time in early February 2001. This time, Mr. Loumiet and the other three were ushered into a meeting in the smaller conference room with several OCC officials, one of whom read them excerpts from the counterparty-bank official's deposition to the OCC. Since they were concerned that excerpted, redacted language taken out of context can sometimes be misleading, both Mr. Loumiet and the other Greenberg shareholder asked if, within the confines of that same room, they could just look at—not even take with them—the deposition from which the extracts were derived. The OCC officials refused; the visitors were not allowed to even touch the folder that contained the deposition. Later, at the same meeting, the OCC also advised the Greenberg shareholders of six "red flags" that the OCC wanted Greenberg to use to reconsider its earlier conclusions.

38.    On returning to Miami, the securities shareholder spoke to the Hamilton Board and then informed Mr. Loumiet that a new report had to be written taking into account the sworn statement by the counterparty-bank official as well as the OCC's "red flags." Moreover, since the securities shareholder was very busy redoing past Bancorp securities filings and putting together the annual report for that company, Mr. Loumiet would have to lead this effort. Mr. Loumiet suggested having other Greenberg shareholders handle the matter instead, but it was pointed out to him that the only two shareholders who knew the case were Mr. Loumiet and the unavailable securities shareholder, and that it would be costly and unfair to the client to now bring in

additional senior attorneys with no background in the matter.

39.     Further complicating matters was that a securities class action had been filed in January against Bancorp, Hamilton, the Boards of both, as well as the three Hamilton officers who had principally been involved in the transactions Greenberg had investigated in the Fall. Without Mr. Loumiet's involvement in any manner, Hamilton had approached a litigation shareholder at Greenberg to represent all of the defendants. When he subsequently found out about this, Mr. Loumiet discussed with that shareholder making sure, before undertaking the matter, that all legal conflicts arising from Greenberg's work for the Audit Committee were resolved in the course of opening the file. Greenberg, like all major law firms, had established internal conflicts clearance procedures when new matters were undertaken, and it was traditionally up to the senior attorney opening a matter to make sure conflicts were resolved. (The undisputed first-hand testimony at Mr. Loumiet's trial was that any conflict was in fact waived, and the ALJ so found in her Recommended Decision.)  Further, Mr. Loumiet understood that Greenberg at that point simply planned to handle on behalf of all of the defendants the early procedural stages in any class action—for example, challenging class certification—which could be done collaboratively on behalf of all the defendants and did not require a determination of any particular defendant's behavior, or conflicts among them on substantive issues that would have to be addressed before a responsive pleading relating to the merits would have to be filed months later. This would leave to a later date a decision as to whether separate counsel was appropriate for the different defendants, once the early procedural stages passed and before the merits of the action were reached. Nevertheless, thereafter Mr. Loumiet kept away from that litigation matter, except for a couple of occasions when the litigation shareholder, on his own initiative and as an intended courtesy to Mr. Loumiet, informed him at what early procedural stages the litigation

was (e.g., we've asked for an extension of time and are filing a motion challenging the class). By mutual agreement, there was no discussion of the substance of the matter between the two shareholders.

40.     By this time, Mr. Loumiet knew that he would be leaving Greenberg for another law firm not long after that same Spring, together with a group of younger shareholders who worked with Mr. Loumiet. He also knew that the OCC matter would remain at Greenberg after he left, because it was primarily a securities law (disclosure) matter that had come in through the securities shareholder, who would continue to handle it, with Arnold & Porter acting as bank regulatory counsel. Similarly, the class action (with which Mr. Loumiet, as noted, had no involvement) would remain at Greenberg in the hands of the litigation shareholder. In addition, as already noted, Hamilton had never been a significant personal client of Mr. Loumiet. Altogether, Mr. Loumiet had little reason or desire to continue his involvement in the OCC matter. However, after giving the matter some thought, Mr. Loumiet reluctantly concluded that he could not just walk away and leave the client hanging.

41.     Unlike an auditor's investigations and reports, there is no published guidance for lawyers on how to conduct an Audit Committee investigation, or how to write the ensuing report. There are neither "generally accepted accounting principles" nor published standards by a governing body of the legal profession on how a lawyer should proceed in these situations. The matter is therefore largely left to the judgment of the attorney involved. Since the OCC had not suggested that Greenberg had missed any information in its investigation other than the statement from the counterparty-bank official who would not speak to Greenberg, Mr. Loumiet believed the crux lay in resolving the factual dispute between the most junior of the three Hamilton officers, who occupied a mid-level position at the bank, and the counterparty-bank

official. However, since that official and his lawyer declined to speak to Greenberg, and the

OCC, despite requests from Mr. Loumiet and the securities shareholder, appeared to be doing

nothing to persuade them to do otherwise, Mr. Loumiet felt his best choice was to focus on the

Hamilton officer and try to break him down. As noted, Mr. Loumiet himself had earlier been

unable to do so, so he believed it was time to bring in bigger guns. Mr. Loumiet did not believe

that the Hamilton bank officer was a particularly strong person and it did not make sense to him

that, if that officer was lying, he would continue to do so under a tough grilling, given his

relatively modest salaried position at the bank. So, Mr. Loumiet arranged an interview at

Hamilton's offices where the Hamilton bank officer, voluntarily unaccompanied by counsel,

underwent a lengthy barrage of questions from the head Arnold & Porter partner involved, the

Greenberg securities shareholder, and another Greenberg litigation shareholder who was a

former senior federal prosecutor, the latter with express instructions from Mr. Loumiet to break

the Hamilton bank officer down. Together, these three attorneys had then been practicing for

about 70 years. Mr. Loumiet deliberately was not present to allow the three other lawyers to do

their best without any influence from Mr. Loumiet. After several hours, the three attorneys

emerged and informed Mr. Loumiet that they had been unable to even dent the Hamilton

officer's story.

42.     Some time after that session, Mr. Loumiet began assembling a second report,

which was sent out on March 14, 2001. Again, there was no blueprint for the task. The first part

of the report compared at length the statements from the counterparty-bank official with those of

the Hamilton bank officer, tried to reconcile them, and ultimately concluded a few were

irreconcilable. The second part took each of the OCC's six "red flags" and listed all of the known

facts supporting or challenging them. Ultimately, the report concluded that while the

Transactions had been very poorly handled by Hamilton officers, there was not enough evidence to conclude that the three had intentionally lied. However, like the predecessor report, this report also did not conclude that they had told the truth. Before being sent out in final form, the report was reviewed by Arnold & Porter (who suggested changes softening the language of the report in places, many of which Mr. Loumiet rejected), Deloitte and the Greenberg securities shareholder. The report went out in the names of both Mr. Loumiet and that shareholder.

43.       As was the case with the prior Greenberg report, the report was delivered to the Hamilton Audit Committee and Board of Directors, and Mr. Loumiet heard no dissatisfaction from either. In each case, Greenberg billed for its work(which totaled US$ 210,000 for the 20 weeks or so of work on both reports ) in due course and the bill was paid without comment by Hamilton.

44.       By this time, Mr. Loumiet was committed to leaving both Greenberg and this matter behind in a few short weeks. In the additional weeks after the letter was received from the OCC in mid-January describing the counterparty-bank official's surprising deposition to the OCC, Mr. Loumiet's continued involvement with Hamilton had exposed Mr. Loumiet to a series of incidents that showed OCC staff behaving in a very disturbing manner. Before becoming involved in the Hamilton OCC matter, Mr. Loumiet had generally had good experiences working with the OCC in matters relating to national banks. In fact, Mr. Loumiet had worked well with the OCC on a variety of matters, including the extension of the *Deposit Guaranty* statewide branching precedent to Florida in the late 1980s, and Mr. Loumiet considered the OCC to be enlightened in terms of certain of its policies—for example, on nationwide banking and new powers (insurance and others) for national banks. However, Mr. Loumiet cannot remember having ever before dealt with the Special Supervision and Fraud Division of the OCC, which by

early 2000 had taken over responsibility for Hamilton, with defendant Rardin serving as

Hamilton EIC, or ever having been involved in a contested enforcement action brought by the

OCC's Enforcement and Compliance Division.

45.     Mr. Loumiet had already been dismayed by the OCC's admission at the meeting

in late November at OCC headquarters that the OCC ombudsman was an agency rubber stamp.

In the period from mid-January to mid-March 2001, when the second Greenberg report was

issued, Mr. Loumiet learned of additional very disturbing OCC behavior at Hamilton. For

example, Mr. Loumiet learned that OCC representatives had repeatedly told seemingly pointless

lies to Hamilton officers and others. In addition, OCC staff on various occasions had either

ignored the law or, disregarding their own prior precedents, reinterpreted it in a manner that then

suited their immediate objectives. Mr. Loumiet also learned that the principal Arnold & Porter

partner in charge of Hamilton had been threatened that, if he did too good a job representing

Hamilton in its various disputes with the OCC, he had better "watch his back" every time he

walked into OCC headquarters in Washington, D.C. (This threat was confirmed by that attorney

in a sworn deposition given in the action later brought by the OCC against Mr. Loumiet.) Since

this partner's practice was a D.C.-based bank regulatory practice revolving in large part around

national banks, and since he was himself a former OCC official, Mr. Loumiet did not take this

threat lightly. The OCC had also sought to pressure the Deloitte officials in Miami working on

the Hamilton matter by contacting Deloitte representatives responsible for that firm's national

banking practice, which was very significant. When combined with the OCC's repeated

disregard for precedent and its corresponding proclivity to make rules up as suited it along the

way, Mr. Loumiet saw these ham-handed actions as a troubling disregard for the rule of law by

the OCC representatives involved.

46.     The OCC's behavior was troubling enough. However, that behavior was compounded by overtly anti-Hispanic behavior and language by OCC officials at Hamilton, whose staff, as noted, was probably 90% or so minority. The then-OCC EIC at Hamilton in 1999 (the predecessor to defendant Rardin) told Hamilton employees that he had been forced to leave his native Miami-Dade County because of the arrival of the Cubans. (Many, if not most, of Hamilton employees were Cuban.) Unfortunately, the OCC has had a troubled relationship with the Hispanic community in our country for many years. On information and belief, there are some 5 national banks in the U.S. in total currently owned or controlled by Hispanics, out of a total of approximately 1,800 national banks altogether—or about 4/10ths of 1%—even though Latinos now represent more than 1/6th—or almost 17%—of our nation's population. Mr. Loumiet did not believe that this percentage disparity is attributable to Hispanics somehow being culturally less suited for the banking industry, or less interested in it, than non-Hispanics. Mr. Loumiet does not know of any senior Hispanic official at the OCC, in its almost 150-year history. The history of American banking is littered with the carcasses of Latino-owned or controlled national banks closed by the OCC—many in South Florida—in numbers way disproportionate to the total number of such banks that have existed, when compared to the corresponding numbers for national banks generally. Moreover, Mr. Loumiet was told at the time that the OCC had a history of internal racial issues, having been the subject of a Consent Decree with the Justice Department in the 1970s and 1980s over this precise issue. Until Hamilton, while Mr. Loumiet had heard second-hand of OCC difficulties with the Latino community, he had never had to face the situation directly, so he had simply ignored the situation. Now it was in Mr. Loumiet's face.

47.     As a result, Mr. Loumiet was faced with a quandary: whether and how to blow the

whistle on the behavior of OCC representatives. There were many good reasons for Mr. Loumiet to simply turn his head and pretend he did not see. Mr. Loumiet was a prominent and established banking attorney with a significant practice, to whom the OCC itself, at the trial that would follow some five years later, would ironically refer on the trial record as "pre-eminent," "leading," "distinguished" and "learned". (This all while publicly accusing Mr. Loumiet of "concealing crimes," "suppressing material evidence," "purposely" covering up the Hamilton officers' misconduct, and the like; Mr. Loumiet could only wonder at trial what superlatives the OCC could possibly have used to describe Mr. Loumiet had it not been prosecuting him and attempting to ban him *for life* from representing any FDIC-insured institution.) At the time, Mr. Loumiet generally prided himself on his good relationship with U.S. bank regulators generally. Moreover, as already noted, Hamilton had never been an important client of Mr. Loumiet's, and he knew he would be leaving his current law firm in a manner of weeks and that Hamilton was unlikely to be a significant client of his at his new firm. As a veteran regulatory lawyer, Mr. Loumiet also knew that reporting a regulator's misbehavior was likely to only hurt hid relationship with the agency involved on a going-forward basis. In addition, Mr. Loumiet was warned by another regulatory lawyer who had much greater experience than he in dealing with the OCC Divisions involved that these were "mean, nasty, vindictive" people, who would do whatever they could in the future to get back at him. The then-existing threats against the Arnold & Porter partner simply reinforced this point. Mr. Loumiet thought long and hard about just shutting up and going along.

48.     Given the eventual personal consequences of his actions, as described below, which he candidly did not anticipate when he acted, Mr. Loumiet has many times since second-guessed himself for not doing just that. Perhaps Mr. Loumiet was ultimately compelled to blow

the whistle by his deep-rooted belief, based on his own life experience as a young immigrant from a homeland where the rule of law at one point devolved to whatever the uniformed man with the gun standing in front of you said, that there is no rule of law unless the Government itself is the first to respect it. Perhaps it was that Mr. Loumiet also believes that if the Bar does not stand up when necessary and call the Government to task for ignoring the rule of law, who in our society will do so? Certainly, an important factor was that Mr. Loumiet had already discerned a worrisome, increasing anti-Hispanic sentiment and backlash as the U.S. Latino population grew dramatically in the 1980s and 1990s, and Mr. Loumiet simply was not willing to put up with overt anti-Hispanic behavior from the Government as well while remaining silent. Some combination of these factors ultimately persuaded Mr. Loumiet that he should blow the whistle on the OCC behavior involved.

49.     The next concern was, to whom and how to blow the whistle? Mr. Loumiet simply wanted someone in a position of authority to look into the situation and take appropriate steps, without necessarily generating any publicity. The obvious person was the Comptroller himself, since the behavior at issue had been that of his staff. However, that did not seem right, since by law the same Comptroller would be the final decision-maker in the various pending Hamilton administrative actions, and Mr. Loumiet did not want to affect (or appear to be trying to affect) the outcome of those actions. (To Mr. Loumiet, the OCC's behavior at Hamilton was not legally, morally or logically linked to the merits of any administrative action involving that bank, any more than police brutality is justified by the merits of any arrest the police officer may be making.) So instead, Mr. Loumiet wrote to the Office of Inspector General ("OIG") at the Treasury Department, whose statutory functions include assuring that all of the agencies and bureaus within that Cabinet department, including the OCC, and their employees, comply with

the law. On March 26, 2001, Mr. Loumiet wrote to the Treasury Inspector General, avoiding any

mention of Hamilton, but complaining about OCC staff behavior at an unnamed national bank in

some detail. Because the letter was a public document, Mr. Loumiet did not reveal in the letter

all of the troublesome OCC behavior (such as the threats against Hamilton's lead regulatory

lawyer). To make sure that the OCC did not think that Mr. Loumiet was acting surreptitiously, he

copied the General Counsel of the OCC on the letter.

50.     On an afternoon in late April 2001, there was a third meeting at OCC

headquarters in Washington, D.C. relating to Hamilton's ongoing problems with the OCC. At

that meeting, the Board of Hamilton and Bancorp was given approximately 20 minutes, while

required to remain in a OCC conference room, to "voluntarily" agree to comply with a series of

onerous OCC requirements which were sprung on them for the first time at that meeting, without

even a prior hint. No discussion or even minimal change to the requirements was allowed—it

was take it or leave it, "as is."  Moreover, the alternative to its agreement, the Board was told,

was that those same requirements would be imposed unilaterally by the OCC by Cease and

Desist Order that same afternoon, while the Board was flying home. Particularly since Bancorp

was a publicly-traded entity, it was impossible for the Board to deliberate and act in 20 minutes

on the complicated issues presented, without any background or consultation with third parties or

advisors (other than the few present) and without leaving OCC headquarters, and still meet its

fiduciary duties to its shareholders. As a result, the Board declined to act, and the OCC imposed

the requirements that same afternoon by unilateral Order. The OCC imposed the requirements

without providing any explanation for them to the Board, and without explaining the urgency for

their implementation in this rushed manner. In addition, the OCC prohibited Hamilton from

discussing even with its own affected clients what had happened. Among the various

requirements the OCC imposed on Hamilton was that it immediately, overnight, and without delay, sever and discontinue doing all business with a long list of customers, including the Panamanian Consulates in the U.S., some of which had been its customers or more than 10 years, without explanation for why it was yanking their banking relationship literally overnight and with no time allowed for them to migrate that relationship elsewhere—this, regardless of any consequences from that sudden, drop-dead rupture either to Hamilton or to those clients or their business, and without any allegation that those selected clients were themselves engaged in any wrongdoing. The single visible common denominator for all of these clients was that they were Spanish-speaking. Mr. Loumiet found this additional OCC behavior—which again did not seem to him to comport with due process, and again smacked of bias against the Hispanic community—profoundly troubling, so, after returning to Miami, Mr. Loumiet sent the Treasury Inspector General a follow-up letter denouncing aspects of that third meeting.

51.     On May 1, 2001, Mr. Loumiet changed law firms, moving from Greenberg to Hunton & Williams LLP. Unexpectedly and ironically, one of the very first congratulatory messages he received was an e-mail from the former OCC EIC at Hamilton who had been "kicked upstairs" to Washington, D.C. in 2008, before Hamilton's serious conflicts with the OCC began. Mr. Loumiet had met this OCC official and even once, years before, had lunch with him, but Mr. Loumiet was frankly surprised at the warmth of the e-mail.

52.     In late Spring 2001, the senior OCC official who had stated at the late November 2000 meeting that the OCC ombudsman was but a rubber stamp, ceased to occupy her post. Her statement had been singled out and recounted in Mr. Loumiet's March 26, 2001, letter to the Treasury OIG. On information and belief, Mr. Loumiet's two letters to the Treasury OIG caused severe embarrassment to various OCC Special Supervision and Fraud, and Enforcement and

Compliance, officials who had been involved in the OCC behavior relating to Hamilton that those letters criticized, including prominently, and in senior roles, defendants Rardin, Schneck and Sexton. Further, Mr. Loumiet's communications stood out because they were highly unusual since, as already suggested, given the vast power that OCC officials wield over anyone in any way involved with a national bank, as explained below, it is extremely rare for anyone to challenge those officials' behavior. Even though the OCC has several thousand employees to draw on, several of those same officials—e.g., defendants Rardin, Sexton and Schneck—would be directly and actively involved in the decision to sue Mr. Loumiet five years later, as well as in the actual conduct of that litigation. This lack of concern for their own personal conflict in bringing and pursuing that action would render the OCC's conflicts charges against Mr. Loumiet in that action, as discussed below, ironic.

53.     In late June of 2001, three months after Greenberg's second and last report, the OCC issued an examination report for Hamilton. Normally, those reports are privileged and confidential. However, in this case the OCC later, on its own, chose to use that examination report in its trial of Mr. Loumiet, thereby waiving any examination privilege relating to Hamilton. Nowhere in that lengthy examination report is there any suggestion that the three senior Hamilton officials had lied to or misled the OCC or anyone else in connection with the transactions investigated by Greenberg. While the report, not surprisingly, was generally highly critical of Hamilton management, it praised the leadership and inspirational value of the Chair and CEO of Hamilton, suggesting that he resign as CEO but remain as Board Chair. It seems inconceivable to Mr. Loumiet that if in June 2001, after some two years of investigating the subject transactions, and with the benefit not only of the Greenberg reports, but also the additional information the OCC had gathered, the OCC itself had concluded that the three

Hamilton officers involved had repeatedly lied, including under oath, the OCC under any circumstances would have recommended that the most senior of those officers remain as Chair of Hamilton's Board. This means that like Greenberg, Deloitte and Arnold & Porter, as of June 2001, the OCC had not been able to conclude that those three individuals had acted in an intentionally wrongful manner. In an amazing example of "do as I say, not as I do," this fact would not prevent the OCC from prosecuting Mr. Loumiet years later for having failed to reach the "right" conclusion on this issue in the Greenberg reports.

54.     In the Summer of 2001, Mr. Loumiet was approached by a former Big 4 accountant in Miami who had become CEO of a small national bank in Arkansas by the name of Sinclair National Bank, many of whose customers were less-affluent African-Americans and Hispanics. Sinclair was in the midst of its own battles with the OCC, which, according to sworn Affidavits from Sinclair representatives, included some troublesome racial behavior by OCC staff. Sinclair already had other Washington counsel, and had already sued the OCC through that counsel. Nevertheless, Sinclair's CEO and its Board Chair wanted Mr. Loumiet to also represent the bank in this matter before the OCC. After giving the matter some thought, Mr. Loumiet declined the representation, since he did not want to risk any possibility of the two instances of alleged racism—Hamilton and Sinclair—being treated as one. Sinclair was closed by the OCC in September 2001.

55.     Also in the Summer of 2001, Mr. Loumiet was invited to Washington to meet with an attorney of the Treasury OIG to discuss the two letters he had written to that office. Mr. Loumiet thought that meeting went very well, and that there was genuine concern at the Treasury OIG about the OCC's troubling behavior. Moreover, some time after returning to Miami, Mr. Loumiet received a letter from the Office of Legal Counsel at the OCC, whom he had copied on

the original letters, stating that the proper authority to look into the incidents described in those letters was, in fact, the Treasury OIG. Nevertheless, not long after Mr. Loumiet received another letter from the Treasury OIG stating, without explanation, that it would not be looking into those matters. It was only years later, in the course of discovery for his trial, that Mr. Loumiet would learn that a meeting to discuss those letters had taken place between representatives of the OCC and the Treasury OIG. At that meeting, the OCC officials persuaded their counterparts from the OIG that it was not necessary for them to look into the matters, since the OCC itself would do so. Of course, OCC never did and the matter was swept under the proverbial rug.

56.     Also in the Summer of 2001, Hamilton engaged CIBC, an investment bank, to seek a possible sale of Hamilton. However, through the Summer and Fall of 2001 the situation at Hamilton continued to deteriorate as the OCC progressively required the bank to write down its assets to the point where, under the federal Prompt Corrective Action statute, its capital had been sufficiently reduced so that it could be seized. Since the OCC ombudsman was not available for challenge of any write-downs, Hamilton was largely at the mercy of its OCC examiners. Some of the write-downs occurred under unusual circumstances. For example, after closing the OCC's examination of the bank for the quarter ended June 30, 2001, defendant Rardin on his own some time later overnight retroactively wrote down the bank's books effective June 30 by an additional US$ 12 million because the bank unexpectedly recovered in early July that exact same amount on loans that had been previously written off. Because of this and other behavior reflecting the extraordinary hostility that had by then developed between Hamilton and the OCC, Deloitte resigned as auditor for Hamilton in October 2000, citing the inability to perform its job under those circumstances. Not long before its closing, Hamilton filed in federal court a lengthy verified civil rights complaint against the OCC which Mr. Loumiet co-signed along with two

well-known litigation partners at the firm where he then practiced. That complaint summarized much of the OCC's inappropriate behavior at Hamilton. Before it ever responded to the complaint, the OCC closed Hamilton in early 2002 and appointed the FDIC as receiver for the bank. On information and belief, that complaint, and Mr. Loumiet's involvement in it, further angered defendants Rardin, Schneck and Sexton, who had been senior OCC officials actively involved in, and responsible for much of, the behavior it described.

57.     Hamilton was seized on January 11, 2002, slightly more than a year after the Audit Committee and Board agreed to write down the bank's books by US$ 22 million because of the "adjusted price trades." Hamilton was one of only 11 FDIC-insured banks closed nationwide in all of 2002. On the day before Hamilton was seized, Mr. Loumiet was involved in negotiations to sell Hamilton's assets and liabilities to another national bank based in Miami for US$ 40 million and some contingent return on assets. Had those negotiations been completed and successful, there would have been no need to close Hamilton, and its shareholders would have received some return, albeit a modest one, on their investment. In addition, no loss to the FDIC insurance fund would have resulted. The OCC was aware of this effort when it closed Hamilton.

58.     The FDIC receivership of Hamilton, which lasted approximately four years, was ultimately reported to have produced a loss of US$ 127 million to the FDIC insurance fund. For whatever reason, rather than Hamilton's being sold as a combination of liabilities and performing loans when it was seized, as is normally the case when a bank in this country is closed, at the time of Hamilton's closure only most of its deposit liabilities and three of its branch offices were transferred to a successor bank (the remaining six branches were closed). Hamilton's assets, primarily loans, some two-thirds of which were short-term, trade-related loans, which as already

noted historically have widely been viewed in the banking industry as safer than other types of

longer-term loans, were retained by the FDIC as receiver. At the time Hamilton was seized, those

assets were reported to be about US$ 1.2 billion. Many of those assets were relatively small

credits to debtors from abroad, meaning that collection of the credits could ultimately involve the

great inconvenience of having to pursue debtors in foreign jurisdictions. Once Hamilton was

closed, its receivership estate ceased being a source of potential renewed or additional funding

for borrowers, eliminating one major incentive that borrowers have, as a practical matter, to

service their loans. Moreover, when Hamilton went under, many of its borrowers were left

without financing on existing or proposed transactions, causing them inconvenience and loss.

When, combined with these considerations, those debtors learned that the FDIC as receiver,

rather than chasing them in foreign countries, would accept deeply discounted payments in

satisfaction of their outstanding loans, even very affluent borrowers from abroad wound up

paying only a modest percentage of what they owed in settlement of their Hamilton loans. In

addition, the customary FDIC fire sale of bank assets produced significant losses even on

performing loans made to U.S. borrowers; for example, the block sale of a portfolio of US$ 140

million in performing loans to excellent corporate borrowers in Florida by itself produced more

than one-half of the FDIC fund's estimated total US$ 127 million in losses on Hamilton.

   59.  After Hamilton was seized, the FDIC launched its usual receivership

investigations to determine who might have liability to it. As is often the case, this led to

"agreed" fines and settlements with a series of officers and Directors at Hamilton. The FDIC also

looked at the Transactions, including into the possible liability of Greenberg and its attorneys

(including Mr. Loumiet) relating to the investigation and two reports. In the course of its

investigations, the FDIC obtained, and later shared with the OCC, all documents (including e-

mails) at Hamilton relating to Greenberg, and vice-versa.

60.     Under federal law, when a bank fails and costs the FDIC insurance fund more than US$ 100 million, the Treasury OIG must prepare a report to Congress assessing the collapse, including the performance of Government regulators involved. In the case of Hamilton, the Treasury OIG issued a report highly critical of the way the OCC had handled the Hamilton situation, though not for any of the grounds brought to the attention of the OIG by Mr. Loumiet in his letters. In fact, the report failed to make any mention of Mr. Loumiet's two letters to the OIG, or of the civil rights complaint filed against the OCC in December 2001, or anything discussed in those writings. This seems particularly noteworthy in that those letters and complaint were precisely about the conduct of the OCC staff at Hamilton, that as noted, was the general subject of the Treasury OIG's report. Incredibly, the OIG's report discussed all other litigation between the OCC and Hamilton, omitting only this particular complaint. In other words, besides never investigating the merits of the matters described in the two letters or in that complaint, the Treasury OIG did not feel any need to even mention those matters in its report to Congress.

61.     On information and belief, from even before Hamilton was seized, defendants Rardin, Sexton and Schneck, all embarrassed and angered by Mr. Loumiet's whistle-blowing, began discussing how to retaliate against him for his temerity, and continued doing so as events unfolded from 2002 to 2006. In fact, all three of these defendants were actively involved in the case brought by the OCC against Mr. Loumiet and described below. Again on information and belief, largely at the instigation of those defendants, in the Summer of 2005 Mr. Loumiet received a "15-day letter" asking Mr. Loumiet, Greenberg and the securities shareholder involved in the Hamilton matter why the OCC should not commence an action against them

relating to the Hamilton investigation and the two Greenberg reports. Counsel to Greenberg, Mr. Loumiet and the other shareholder responded with a lengthy submission. The OCC never responded to the points raised in that submission, but simply ignored them, even though many of the same arguments contained in that submission would be equally valid years later, when raised at Mr. Loumiet's trial, and would eventually appear in the administrative law judge's Recommended Decision. In other words, the entire process of giving the potential accused an opportunity to respond before a decision was taken to proceed or not—due process—was a sham, no more real than the earlier meaningless ombudsman process had been for Hamilton.

62.     In early 2006 Greenberg settled the FDIC action. As part of that settlement, Mr. Loumiet was asked to exchange releases with the FDIC, and did so.

## THE OCC SUES MR. LOUMIET

63.     The Individual Defendants caused the OCC to notify that an administrative action would be brought against Greenberg, the securities shareholder and Mr. Loumiet in the Summer of 2006.

64.     In the early Fall of 2006 in Washington, D.C., OCC officials met with Greenberg's counsel, who sought to persuade the OCC not to proceed individually against Mr. Loumiet and the securities shareholder. After all, it was Greenberg, not those shareholders, that had been hired by Hamilton; those attorneys had acted solely as employees of Greenberg on all matters relating to Hamilton, and they had never acted in a personal capacity or individually received any benefits from Hamilton or anyone connected to it. The response from defendant Sexton was that the language used in the Greenberg reports had "gone too far," and therefore Mr. Loumiet and the securities shareholder themselves "had to pay."

65.     When he learned of this statement, Mr. Loumiet was shocked because he strongly

32

believes that, as later eloquently stated by the court in *Vinluan v. Doyle*, 60 A.D. 3d 237, 251

(N.Y. App. Div. 2009), and as highly pertinent to this case, "A prosecution which would …

potentially inflict punishment for the good faith provision of legal advice is, in our view, more

than a First Amendment violation. It is an assault on the adversarial system of justice upon which

our society, governed by the rule of law rather than individuals, depends."

66.     Federal courts have held for years, without seeing the need for much discussion in

upholding such a self-evident point, that the Government cannot interfere except under extreme

circumstances with an individual's right to speak to an attorney. *See, e.g.*, *Martin v. Lauer*, 740 F

2d 36 (D.C. Cir. 1984). However, an individual's protected right to speak to his attorney is worth

little if the attorney in responding does not enjoy similar protection, but can be punished by the

Government because it—not the client—does not approve of how the attorney responds.

Essentially, that was the situation at issue in connection with the Greenberg reports. In 2001, the

U.S. Supreme Court held that attorney speech to clients was, in fact, protected speech, when it

held that, under the First Amendment, Congress could not condition financial support to The

Legal Services Corporation on its attorneys' not giving certain types of advice that Congress

disliked. *Legal Services Corporation v. Velazquez*, 531 U.S. 533 (2001). (In that decision the

Court specifically referred to *the attorney*s' First Amendment rights in speaking to their clients.)

Thus, by the time this action was under consideration several years later, the precedent that an

attorney's communications with his client were protected from Government sanction by the First

Amendment for what he said was established. The OCC simply chose to ignore this First

Amendment protection throughout this proceeding, even though it was raised early and often by

Mr. Loumiet. In fact, in the briefing at the D.C. Circuit level in connection with Mr. Loumiet's

later successful action for legal fees and expenses under the Equal Access to Justice Act (EAJA),

the OCC declined to take any position at all on this fundamental Constitutional question, knowing that there was nothing it could say that would not either elicit widespread public criticism and rejection or, alternatively, condemn its own behavior in bringing and prosecuting this case. As to the FDIC Act's "institution-affiliated party" statute under which the OCC proceeded against Mr. Loumiet, as discussed immediately below, nothing in that statute or its legislative history suggests that Congress intended for bank regulators to ignore the Constitution in bringing enforcement actions under the statute, not that Congress could so authorize anyway under the terms of the First Amendment itself.

67.     It was now even more obvious that the various charges that the OCC was threatening to bring against Mr. Loumiet, discussed below, were trumped-up, contrived and pretextual. The statute under which the OCC was proceeding was the FDIC Act's "institution affiliated party" (IAP) statute, 12 U.S.C. 1818(e) (2011). As relevant to this complaint, that statute allows federal bank regulators to punish outside service providers to FDIC-insured institutions, including accountants and lawyers, who have been hired as "independent contractors" by a bank, through a federal administrative proceeding. (Of course, in his case, it was Greenberg, and not Mr. Loumiet, who had been contracted, a point that the OCC also simply chose to ignore. In effect, the OCC took the position that under that statute it may punish not only any company or firm hired by a national bank, of which there are likely tens of thousands in this country, but also any employee of any such entity, of whom there are likely millions.) This punishment is above and beyond, and independent of, any damages the FDIC as receiver might collect from the advisors. As applicable to outside service providers, the statute expressly contains three noteworthy safeguards intended to protect against excessive Government enforcement. The first is that the provider must have been "conducting the affairs of the bank."

(See discussion below.) A second is that the wrongdoing charged has been committed with "scienter'—i.e., either knowingly or recklessly—that is, with "conscious disregard." (The OCC in the past has lobbied Congress to modify the statute to allow it to pursue persons for mere negligence, because, it has claimed, the higher standard of culpability is too difficult to prove; and it was frequently apparent throughout the proceeding against Mr. Loumiet that the OCC had simply chosen to ignore that higher culpability standard Congress had set and subsequently refused to alter.) Third, that the wrongdoing have caused more than "minimal financial loss" to, or have had a "significant adverse effect" on, the institution involved. The IAP statute not only permits potentially huge fines to be imposed, but also allows the regulator to ban the "independent contractor" involved from rendering any further services to any FDIC-insured bank for life, or for such shorter period as the regulator might propose. Obviously, to anyone dependent on the banking industry for a living, the statute is a huge club that renders that person very vulnerable to the wielding federal bank regulator. In fact, just being pursued publicly under the statute is enough to destroy a person's career in banking. While the three standards that the statute imposes should theoretically protect the accused individual to some degree, as will be seen from Mr. Loumiet's own case, a regulator can simply allege that the standards are met and force a resisting individual into a long and costly (economically, psychologically and reputationally) administrative proceeding where the regulator ultimately need make no serious effort to establish that those conditions were met. Where bank regulators act in bad faith, the best that an accused individual can hope for is a Pyrrhic victory.

68.     Compounding the threat created by the IAP statute is that the proceeding involved is conducted before an ALJ, and is an administrative proceeding. Unlike "real" Article 3 federal judges, federal ALJs are hired on a renewable (or not) contract basis by the Cabinet department

or agency whose cases they hear. (In Mr. Loumiet's case, the ALJ was employed by the Treasury Department, which the OCC forms part of.)  As to the nature of administrative proceedings, because as explained below the ultimate decision is taken not by them, but by the head of the federal agency involved, ALJs tend to be reluctant to rule based on dispositive legal issues; and particularly as concerns evidentiary matters, the proceedings are far less defined than in federal court actions as to what may be taken under consideration. (For example, in the case against Mr. Loumiet, the OCC claimed privileges—such as that certain documents were "secret," or were protected by a very broad and undefined "investigation" privilege—that would be highly unlikely to apply in a federal District Court action and that limited what OCC-produced documents and evidence Mr. Loumiet could present in the administrative proceeding.) Moreover, as already suggested, the ultimate decision-maker in the case is not the ALJ, who at least has some training as a judge and an inclination to seeing justice done, even though the Government agency involved pays his or her salary. Instead, while the ALJ hears the evidence and presents a recommended decision, it is the head of the agency himself, whose staff is prosecuting the accused and who at times is far more invested in the decision to prosecute than any reasonable person would deem appropriate for a supposedly "impartial" judge, who makes the final decision. Moreover, it is usually the agency's staff that write the final decision for the agency head, who is understandably too busy to sit down at a keyboard and start drafting. It is within that agency head's discretion to ignore the ALJ's recommended decision, subject to appeal to a federal Court of Appeals by the accused should the agency head's final decision be "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  5 U.S.C. § 706 (2)(A).

69.     Beyond the obvious risk of unfairness inherent in the process, the accused is in a

fight where his opponent has far greater resources and can take as long as necessary to exhaust the accused's resources and pound him into submission. When you combine both factors, small wonder that one experienced banking lawyer who handled such matters told Mr. Loumiet at the time that more than 90% of contested administrative proceedings involving federal bank regulators are won by the regulators.

70.     Greenberg was legally responsible for the behavior of its attorneys at Hamilton because they were its employees, and the same principle applies to the OCC's responsibility for its own staff. However, no principle of law made Mr. Loumiet liable for work done by other Greenberg attorneys on this matter. This was particularly true in the case of a statute such as the IAP statute, which requires knowledge or "conscious disregard" (i.e., "recklessness") by the accused. Neither of these standards can logically be met vicariously. As will be seen, this did not stop the OCC from repeatedly attempting to hold Mr. Loumiet responsible for other Greenberg attorneys' alleged misbehavior, while offering no legal basis for doing so.

71.     Once the decision to bring suit was finally made by the OCC, Greenberg elected to settle, on information and belief, in order to avoid the costs protracted litigation with the OCC would have on the firm's banking practice. Again on information and belief, the securities shareholder was then required by Greenberg to also settle, since his continuance in the case would have effectively meant Greenberg's continuance in it as well. Both agreed as part of the settlement to cooperate with the OCC. As a result of the settlement, Mr. Loumiet ceased to be represented by counsel and was left on his own. The OCC set a deadline of October 31, 2006, for Mr. Loumiet to settle. In mid-to-late October 2006, Mr. Loumiet, in a last-minute effort to convince the OCC that its case was entirely without merit, sent the OCC a lengthy letter explaining why its proposed case against him made no sense, again citing many of the reasons

that would appear in the ALJ's Recommended Decision almost two years later. The OCC never responded.

72.     Mr. Loumiet alleges and will establish at trial that in deciding to bring and in bringing the action against him, the OCC, unduly influenced by defendants Rardin, Sexton and Schneck, failed to follow its own internal stipulated rules and procedures for such a decision and the prosecution of such an action.

73.     As already suggested, the Notice of Charges filed against Mr. Loumiet failed to differentiate what he had done from what other Greenberg lawyers had done, in essence blaming Mr. Loumiet for the behavior of other Greenberg attorneys and making it appear as if Mr. Loumiet had been involved in and responsible for all of that behavior. However, the actual charges against Mr. Loumiet were based on five supposed behaviors by him, subsumed under the broad umbrellas of "breach of fiduciary duty" and engaging in "unsafe and unsound banking practices": 1) that he had reached the "wrong" conclusion in the two Greenberg reports as to the truthfulness of the Hamilton officers; 2) that he had failed to conduct a proper investigation; 3) that there were five statements in the two reports that were "materially false and misleading"; 4) that he had been involved in an impermissible conflict of interest; and 5) that he had "suppressed material evidence" in the form of a "missing" fax cover sheet.

74.     Taking these charges sequentially, the one relating to Mr. Loumiet's failure to reach the "right" conclusion in the two Greenberg reports was, as noted, particularly ironic because the OCC as of its mid-June 2001 Examination Report—issued three months after the second Greenberg report—as discussed above had similarly failed to reach that same conclusion, notwithstanding a far longer investigation and with far greater powers and resources. In fact, it was not that the Greenberg reports had reached the "wrong" conclusion; it was that, like the

OCC, they had been unable to reach a conclusion at all. Nevertheless, it was apparent that the OCC was angry at Mr. Loumiet and his colleagues for failing to do the OCC's job for it by reaching the conclusion the OCC itself wished it had reached. Prosecuting Mr. Loumiet individually for this faulty "non-conclusion" also ignored that while Mr. Loumiet was the principal author of the two reports, they were a joint effort contributed to and approved by several Greenberg attorneys, and also prior to publication had been commented on without significant objection by Deloitte (the long-term auditors of Hamilton and Bancorp) and as concerned the second report, Arnold & Porter, regulatory counsel to Hamilton, both of which had their own fiduciary duties to Hamilton and had already looked at the matter extensively. Beyond this, a prosecution based on someone's reaching the "wrong" factual conclusion obviously raises troublesome Free Speech issues. This was not the type of legal conclusion to which there was a right or wrong answer based on statutes, regulations or case law; this was a situation where reasonable individuals could differ on what the assembled facts showed. Of course, the power to punish is the power to control. It therefore seems rather pointless and hypocritical to extol Free Speech if the Government can, instead of punishing the speech itself, punish Americans for the conclusions they reach through their thought processes—a necessary precursor to speaking. A final irony is that the OCC, which had deliberately misled Mr. Loumiet by telling him and his Greenberg colleagues that the OCC knew of no other pertinent information that what was reflected in their first report while deliberately withholding information from them, would then sue Mr. Loumiet for not reaching the "right" conclusion in reliance on the information he did have.

75.    The first thing to note about the second charge—that Mr. Loumiet had conducted a faulty investigation— is that allowing the Government to punish citizens because it does not

like the way they investigate facts before reaching a conclusion obviously creates another tremendous gap in First Amendment protection. Of what importance is it that under the First Amendment the Government cannot punish you for the conclusions you reach, or the way you express them, if the Government can instead punish you for, in its opinion, doing an inadequate job in the fact-gathering and organizing that necessarily precedes both that conclusion and speech? Moreover, as noted above, the Greenberg time sheets clearly showed that Mr. Loumiet had played a very small role in the investigation that had led to the initial Greenberg report in the Fall of 2000, so it was far from clear why Mr. Loumiet should be held responsible personally for that investigation. In point of fact, out of the thousands of pages reviewed, the numerous witnesses interviewed and facts analyzed in the course of the Greenberg investigation, the matter ultimately devolved at trial to the OCC's claim that the Greenberg investigators had failed to appreciate the significance of how a handful of the debts purchased had been treated on some of Hamilton's internal reports after their purchase. (It should be noted that this issue, at the time, had also apparently been overlooked by Deloitte, Arnold & Porter and the OCC itself, since it was never raised until after the enforcement action against Mr. Loumiet began.) In other words, on reflection, what may have been most disturbing and telling about this charge was the OCC's willingness to impose extremely severe sanctions on Mr. Loumiet—including a *lifetime* ban on representing FDIC-insured banks—over a very minor issue supposedly "missed" in the investigations conducted by the Greenberg attorneys and all others. (This predisposition should be of grave concern to anyone conducting a similar investigation of a national bank at any time in the future; fail to "properly" value in the OCC's opinion any relatively minor fact produced in the total investigation, and that may be used as an excuse to impose severe personal sanctions.) Finally, this charge was, again, "ironic" in light of the OCC's having intentionally misled the

Greenberg lawyers as to the information the OCC itself had: how do you rationalize punishing someone for supposedly failing to "properly" appreciate all of the information at his disposal, while deliberately and misleadingly concealing from him other information that could be pertinent?

76.     The third charge had to do with five allegedly "materially false and misleading" statements contained in four sentences in the two Greenberg reports. The two reports together were 41 single-spaced pages long, and comprised some 550 sentences. The OCC did not claim the reports as a whole were materially false and misleading, but only those five separate, unrelated statements. Moreover, the OCC did not allege that those five statements were any more significant than statements contained in the other 546 or so sentences whose accuracy was not questioned, or that those five statements had actually misled anyone or caused anyone to do anything. There is abundant judicial authority in related speech areas such as defamation and obscenity logically holding that statements may not be judged in isolation without taking into account their over-all context. The OCC attempted no such thing. As discussed below, to challenge several of the statements the OCC even had to ignore prior relevant sworn Government testimony, even though that testimony was expressly brought to its attention. Moreover, to attack the statements the OCC also had to, and intentionally did, ignore its own then-well-established distinctions between how securities acquired by a bank after being underwritten as loans (IULs), and securities purchased by a bank's Treasury Department on established markets, are treated on a bank's books. After analyzing and rejecting the OCC's charges, the ALJ in her Recommended Decision reached the following impeccably logical, though masterfully understated, conclusion: "That five sentences out of two lengthy legal memoranda totaling 40 pages may, when taken out of context, appear in isolation to be inaccurate, does not, under the circumstances, evidence a

breach of Respondent's duty of care or candor."

77.     The fourth charge had to do with a supposed unresolved legal conflict of interest that Mr. Loumiet had suffered as a result of Greenberg's having undertaken the class action litigation in January 2001 while he continued the work for the Audit Committee commenced the previous Fall. Mr. Loumiet had not been involved in the arrival of that case at Greenberg, did not at the time perceive an unwaivable legal conflict (neither did the ALJ in her Recommended Decision), had understood that conflicts had been cleared by his firm, had consciously stayed out of that case once undertaken, and had concluded that, as the ALJ would later observe in her Recommended Decision, his ethical duty of loyalty to the client would not be served by dropping work he had already been involved in for some time because his law firm was choosing to undertake other work with the knowledge, consent and conflict waiver of the client. At trial, the undisputed evidence was that the conflict situation had been discussed and waived, and the ALJ so found.

78.     The fifth and final charge was based on the OCC's widely-publicized "smoking gun" in the case against Mr. Loumiet— the "material" evidence he had supposedly "suppressed"—i.e., the infamous "missing" fax cover sheet. Just days before the trial defendant Straus, knowing that there was no evidence whatsoever to support his defamatory statement, told the press that this "missing" fax cover sheet would be Mr. Loumiet's "downfall." Then, in his Opening Statement at trial he melodramatically tore a piece of paper from a sheath he held in his hands and tossed it to the ground to dramatize how Mr. Loumiet, according to the OCC, had ripped off and discarded the fax cover sheet to make the loan purchase and sale transactions look separate. As intended, the press just lapped it up. So what happened once the press left after the first day of proceedings, and the trial continued?  The undisputed evidence at trial showed: 1)

that it was *the OCC itself* that had removed that fax cover sheet when it turned the fax over to

Deloitte, who then gave it to Greenberg leading to its attachment as an exhibit to the first

Greenberg report in the same manner received, without the cover sheet *the OCC itself* had

removed; 2) that Mr. Loumiet never saw that fax cover sheet until after the OCC turned it into

the "smoking gun" in this action; 3) that it was a young associate, not Mr. Loumiet, who attached

the exhibits to the first Greenberg report, with no interference by Mr. Loumiet; 4) that the same

point evidenced by the fax cover sheet—that one bank in these transactions had served only as an

intermediary, and the loan purchases and sales had been done through the other bank alone—

was touched on in at least six different places in the two Greenberg reports, meaning there was

no possible reason to omit the cover sheet; 5) that a couple of exhibits behind in the same

Greenberg report was another fax to both banks, this time **with** its cover sheet, which showed the

same thing that the first fax, together with cover sheet, showed; and 6) that the transmission

information on the fax itself made it easy to tell that both banks had received the same fax. No

evidence whatsoever was ever introduced supporting the OCC's widely— and publicly—

broadcast, defamatory version of what Mr. Loumiet had "intentionally" done. While the ALJ

found in Mr. Loumiet's favor on this issue in her Recommended Decision, she did not mention

all of the details that were particularly embarrassing for the OCC, including that it was OCC

representatives themselves who had sent missing the "smoking gun" in the first place. Mr.

Loumiet derived some small satisfaction when, at Closing Argument months later, before an ALJ

trying very hard to maintain a straight face, Mr. Loumiet's own counsel exactly mimicked the

press-grabbing, theatrical behavior of the OCC counsel in his Opening Statement, while pointing

out all of the obvious problems cited above with this supposed "smoking gun."

79.     These five, then, were the essential behavior for which Mr. Loumiet was

prosecuted by the OCC. Beyond the sheer absurdity of the charges themselves, there was the fact that the OCC never tried to establish that the challenged behavior—supposedly grievous enough to warrant a *lifetime* ban on Mr. Loumiet's pursuing his career — had ever caused *anyone to do anything*. No member of Hamilton's Audit Committee or Board was called to say that those bodies or any of their members had ever perceived any impropriety by Mr. Loumiet, or had relied on his "misbehavior" in any decision or action taken. In other words, the OCC felt free to completely disregard the actual attorney-client relationship that was at the core of the alleged misbehavior, and punish Mr. Loumiet in the abstract for behavior the OCC, not the client, deemed inappropriate. Even worse, the OCC had evidence in its possession that even if the Greenberg reports had reached a different conclusion on the issue of the three officers' truthfulness, it could well have made little difference to Hamilton's Board. Specifically, the OCC had in its possession, but of course did not bring up before the ALJ—claiming that it was "secret"—a deposition given by the Vice-Chairman of Hamilton's Board of Directors where the OCC directly asked him, twice, what the Board would have done had the Greenberg reports concluded that the three officers had lied. His response was that the Board would have hired another law firm and sought a second opinion. Consequently, the OCC prosecuted Mr. Loumiet for behavior that not only could not be shown to have disappointed the client in any way, or caused anyone to do anything (other than concluding, as the OCC had desired, that an "adjusted price trade" had occurred), but that the relevant information the OCC had in hand indicated would likely have made no difference had it instead been perfectly to the OCC's particular tastes.

80.     Compounding the frivolity of the charges and the fact that Mr. Loumiet's alleged misbehavior had influenced no one, were the sanctions that the OCC sought to impose on Mr. Loumiet—a fine of US$ 250,000 and a *lifetime* prohibition on representing FDIC-insured banks.

Mr. Loumiet at the time the OCC sued him had been representing FDIC-insured banks as a very important of his livelihood for more than 28 years. In our country there is abundant judicial authority that the Government's banning a citizen from pursuing his livelihood, much less for life, is a very serious sanction that should not be lightly imposed. The OCC ostensibly sought to punish Mr. Loumiet in this way for behavior described in the preceding paragraphs that no objective human being could possibly conclude warranted such extreme punishment. In fact, Mr. Loumiet during the course of the litigation surveyed all of the instances since the beginning of 2000 where the OCC had sanctioned individuals, and provided to The Florida Bar and the OCC a chart of that survey's results. The chart showed that the rare times when comparable sanctions had been imposed by the OCC on any person had involved situations of outright fraud on a financial institution by the penalized individual, for example, by a loan officer setting up shell company borrowers, making loans to them and pocketing the money for himself. No individual not on a vendetta could possibly compare this type of behavior to the charges against Mr. Loumiet, yet the sanctions sought were equally severe.

81.     This, then, was the situation that Mr. Loumiet faced in late October 2006. He knew that the charges against him were frivolous, but also that the full weight of a large federal Government agency, with its unlimited resources, was about to come crashing down on him. He knew that the administrative forum where this would all be fought was the OCC's home turf, that the OCC had unlimited staying power, that much of his legal practice and livelihood would disappear once the action began and became known, and that he would be on his own, Greenberg and his fellow former shareholder having settled. He also knew that at best he would win a hollow victory, since—regardless of outcome—the very fact that he had been prosecuted by a federal Government agency would likely never be lived down, and that—if he lost—his career

would be difficult to salvage. He knew that not just he, but his wife and children, would suffer. All of the moral and philosophical considerations he had faced 5 1/2 years before, when deciding whether or not to blow the whistle on the OCC's bad behavior at Hamilton, as described above, were again present, but this time the consequences of his decision were much, much heavier and far more immediate.

82.     The settlement deadline came and went. On November 6, 2006, the OCC filed the Notice of Charges against him. The action was assigned to an ALJ who years earlier had ruled against Hamilton, and for the OCC, in one of the various administrative actions the two had fought, which simply heightened Mr. Loumiet's anxiety. Aside from— as already noted— deliberately confusing Mr. Loumiet's role in the various activities conducted by Greenberg for Hamilton with that of other Greenberg lawyers, so as to make Mr. Loumiet appear more culpable, the Notice accused Mr. Loumiet of intentionally misbehaving, when the OCC knew fully well that there was not a shred of evidence that Mr. Loumiet intentionally did anything wrong. Utilizing such defamatory words to describe Mr. Loumiet's behavior as "concealed crimes," "suppressed material evidence" and "purposely" covering up officers' misconduct, when the OCC knew there was no basis to think he had done any of it, the Notice was vindictively intended to damage his reputation and career to the maximum extent possible. (In fact, the incident described above and discussed in the second Greenberg report, concerning the grilling of the Hamilton bank officer arranged by Mr. Loumiet in an attempt to break him down, in and of itself showed conclusively that Mr. Loumiet had not been trying to conceal anything.) In reality, the OCC would make **no** effort whatsoever in the proceeding to establish that Mr. Loumiet had ever knowingly done anything wrong.

83.     Indicative that the defendants knew from the outset that their harshly-worded

46

claims against Mr. Loumiet were meritless was the way defendants handled publicity at the time they filed suit against Mr. Loumiet. While defendants widely publicized their settlements with Greenberg and the securities shareholder, contrary to standard OCC practice they gave no publicity whatsoever to their filing of a Notice of Charges against Mr. Loumiet. It was only some six weeks later, when an enterprising reporter, having read of the settlement with Greenberg and the securities shareholder and wondering what had happened with Mr. Loumiet—the other Greenberg shareholder involved in the matter—through Freedom of Information Act requests to the OCC learned of the Notice of Charges that had been filed against Mr. Loumiet and wrote a lengthy story on the filing, that the OCC publicly admitted the suit. On information and belief, this delay in making the suit against Mr. Loumiet public until there was no alternative was attributable to defendants' knowing from the beginning that their claims against Mr. Loumiet were frivolous.

84.      Prominent in the legislative history of the IAP statute that the OCC was using to prosecute Mr. Loumiet, was the Congressional intent that the statute not be used to pursue outside attorneys who had acted in good faith. Notwithstanding all of the harsh language used to describe Mr. Loumiet's behavior by the OCC in the Notice of Charges and in other public statements, the OCC never suggested at trial that Mr. Loumiet had ever acted other than in good faith. This created a dichotomy where, for press and public consumption, Mr. Loumiet was depicted as evil, while in the proceeding itself, when the press was not present, he was graciously described before the court as "eminent," "leading," "distinguished" and "learned," as already noted. Leaving aside this additional "ironic" behavior by the OCC, the immediate point is that, in prosecuting Mr. Loumiet, the OCC paid as little heed to the Congressional instruction that attorneys acting in good faith not be sued under the IAP statute, as it had to the statutory

requirement that it set up a fair ombudsman process for national banks. In addition, in February

2008, some three months after Mr. Loumiet's trial had been completed, the D.C. Circuit held in

the case *Grant Thornton LLP v. Office of the Comptroller of the Currency*, 514 F. 3d 1328 (D.C.

Cir. 2008), that the accounting firm, Grant Thornton, which had conducted an audit of another

failed national bank, did not qualify as a IAP because as an outside auditor it could not be said to

have "conducted the affairs of the bank."  Since all Mr. Loumiet had done was briefly represent

an audit committee in an internal investigation— a much lesser activity than auditing a bank—

Mr. Loumiet immediately sought dismissal of the action against him on the basis of this direct

legal authority. Instead of accepting this direct authority, the OCC, without any valid reason for

doing so, opposed dismissal. (In his Final Decision 17 months later dismissing all charges

against Mr. Loumiet, the Comptroller agreed without much discussion that the holding in *Grant

Thornton* applied to Mr. Loumiet as well.)

85.     Typical of the deliberately damaging misinformation that the OCC in bad faith

disseminated publicly about Mr. Loumiet was that he had been driven to misbehavior by his

"greed" to share in profits from US$ 1.6 million in fees that Greenberg collected from Hamilton

and Bancorp in 2001 and 2002. This accusation was contained both in the Notice of Charges and

in subsequent press releases and statements to the press by representatives of the OCC's

Enforcement and Compliance Division prosecuting the action against Mr. Loumiet, among other

OCC representatives. (Those press releases contained other defamatory statements as well, such

as the statement that Mr. Loumiet had intentionally removed and concealed the missing

"smoking gun" fax cover sheet.) In fact, since Mr. Loumiet had left Greenberg at the end of

April 2001, before any of those profits were distributed, this was just plain wrong. Contrary to

the OCC's assertion, Mr. Loumiet, rather than being driven by "greed" to share in those profits,

had knowingly and voluntarily left any compensation related to those profits behind when he left Greenberg at the end of April 2001. This was a fact that the OCC knew and that could be found out by simply asking Greenberg, which, as part of its settlement with the OCC, was committed to cooperating with the OCC. Moreover, notwithstanding being told by Mr. Loumiet early on that the statement was simply not true, the OCC maliciously continued to repeat it publicly, even in its press release on the eve of trial. Of course, once trial began only a few days later, the OCC made no effort to prove this flat-out-wrong defamatory statement.

## THE PROSECUTION OF THE CASE

86.     If the premise and charges for the OCC's action against Mr. Loumiet were silly and morally offensive, then equally or more so was the way the OCC handled the litigation. One cannot review the prosecution of the case by the OCC and not see immediately the pretextual way the OCC handled a case that the Individual Defendants and others at the OCC knew all along had no merit, but that they intended to drag out as long as possible so as to exact revenge on Mr. Loumiet.

87.     In March of 2007 Mr. Loumiet, wrote to the OCC legal counsel pointing out that the former President of Hamilton had given sworn testimony that he and fellow conspirators had lied to those who had investigated those matters internally at Hamilton. Since that had to mean the Audit Committee, it also had to include Greenberg (and Mr. Loumiet) as the counsel that had conducted that committee's investigation. The response from the OCC was that this made no difference. Subsequently, Mr. Loumiet provided the OCC with numerous pages containing sworn testimony by Government witnesses in another proceeding that supported the accuracy of the allegedly "materially false and misleading" five statements in the two Greenberg reports. Consistent with the reality demonstrated over and over in this proceeding that the facts in this

case simply made no difference to its agenda against Mr. Loumiet, the OCC simply proceeded with its case.

88.     As an example of the silliness of this case, the first two persons that the OCC deposed (after Mr. Loumiet himself) could not remember ever meeting or dealing with Mr. Loumiet, making them hugely irrelevant in a case where the issue was Mr. Loumiet's own knowing or reckless behavior. (Evidencing the difficulties that a private-sector investigation can encounter, one of them was the former Assistant Treasurer of Hamilton at the time the Transactions occurred, who admitted having told the investigating Greenberg lawyers—who did not include Mr. Loumiet—who had contacted him after he had left the bank for other employment, that he had nothing to say.)  By the time discovery was concluded, the evidence against Mr. Loumiet, to be very charitable to the OCC, was circumstantial and minimal, to the extent it existed at all. As a result, in the absence of any significant direct evidence, the OCC decided to prosecute its case relying overwhelmingly on defendant Rardin, its own former EIC at Hamilton, and on two paid "expert" witnesses. As to defendant Rardin, prior to assuming the function of EIC at Hamilton, he had been EIC at Peoples National Bank of Commerce, then the only African-American owned bank in Miami-Dade County, which had been closed by the OCC in September 2009, and in connection with that closing had received an award from the OCC. As Hamilton EIC subsequently, he had been very involved in the misbehavior at Hamilton that Mr. Loumiet had criticized, as well as, by his own admission, in the OCC's decision to prosecute Mr. Loumiet, so that his testimony could not be deemed "objective" from any perspective. The two paid expert witnesses were a criminal law professor who was to testify principally as to the investigation conducted by Greenberg; and a professor of legal ethics who was to testify principally on the alleged conflicts.

89.     When Mr. Loumiet sought discovery from the OCC in order to defend himself, he was told that the OCC had 145,000 pages of documents that complied, and that Mr. Loumiet would have to pay US*$ 29,000*—20 cents per page—in *copying costs* in order to obtain discovery from the OCC. This, in an action brought *by* the OCC *against* Mr. Loumiet. The result was a hearing where the ALJ ordered the OCC to make all of these documents available to Mr. Loumiet's counsel on a disc, allow counsel to review the documents and select the ones it wished to have copied, and have Mr. Loumiet pay only for the copying of those select documents.

90.     Mr. Loumiet unsuccessfully sought to introduce into the administrative action against him the issues of bias and retaliation by the OCC discussed above. He also sought to have the ALJ address the obvious and troubling First Amendment issues also discussed above, again to no avail. The ALJ declined to allow Mr. Loumiet to explore in the proceeding the OCC's behavior at Hamilton and the way the decision to prosecute Mr. Loumiet had been taken. Similarly, the ALJ expressed no view on the First Amendment issues raised by Mr. Loumiet.

91.     After the inevitable press reports came out trumpeting the OCC's language that Mr. Loumiet had "suppressed material evidence," "concealed crimes," and "purposely" covered up the Hamilton officers' misconduct, the Florida Bar in late January 2007, on its own launched an investigation into the behavior by Mr. Loumiet that had provoked such scandalous language from an agency of our Government, presumably on the mistaken assumption that such harsh words would not be lightly used by such a supposedly responsible federal agency. The press found out about the investigation, and of course, blared it prominently. In response to the investigation, Mr. Loumiet sent the Bar three letters in the Spring of 2007, explaining why the case against him was ridiculous. Mr. Loumiet heard nothing until June 2007, when counsel for the Bar telephoned Mr. Loumiet and told him that this was the strangest case of alleged

misbehavior by a Bar member that he'd ever encountered, and that the Bar was suspending its own investigation until the OCC's administrative action was completed. The press later reported that three days after the Comptroller voluntarily dismissed the action against Mr. Loumiet, the Bar closed its own suspended investigation.

92.     Knowing that the OCC would otherwise simply bleed and outlast him, Mr. Loumiet from the outset insisted that this matter go to trial as soon as possible, without any extensions of time whatsoever. As a result, the case went to trial in October 2007, 11 months after the action was initially brought.

93.     Prior to trial, Mr. Loumiet moved to exclude the "expert" testimony of the criminal law professor, on the basis that his criminal investigative experience was irrelevant to the handling of an Audit Committee investigation such as had taken place at Hamilton. In his pre-trial deposition the professor had freely acknowledged that he knew little if anything about banks, banking transactions or operations, banking law, corporations, corporate law, corporate transactions or corporate governance, accounting, the practice of commercial law or the field of securities law, and had never represented a corporation, Audit Committee or Board of Directors. All of this made him a thoroughly unqualified choice to comment as an "expert" on how a law firm such as Greenberg should have handled the representation of an Audit Committee of a bank owned by a publicly-traded holding company. Given the million-plus members of the Bar in the United States, a not-insignificant number of whom have at some time conducted corporate investigations, the apparent inability of the OCC to find someone who had actually done something similar and who was willing to criticize Greenberg and Mr. Loumiet, spoke volumes. The ALJ agreed that the professor was not qualified to testify as an "expert" on what Greenberg attorneys should have done, and the professor's proposed testimony was excluded on the basis of

*Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny. In his Final

Decision dismissing the charges against Mr. Loumiet, the Comptroller attacked the ALJ for this

decision, of course not mentioning why the professor had been deemed unqualified, then

proceeded to discuss at length the testimony the professor *would* have given on the Greeneberg

investigation (in which, as noted,Mr. Loumiet had played a small role) had he been allowed to

testify. Among other things, this ignored the hornbook-law fact that an expert witness is free to

change his testimony at any time prior to giving it at trial, as the OCC's own expert on ethics in

fact did in this case in changing the basis of her opinions, as discussed below, as well as the

elemental due process concept, reflected in the OCC's own rules of evidence, that a decision in a

judicial proceeding may rely only on evidence admitted at trial and to which the accused has

therefore had the opportunity to respond. It did, however, allow the OCC to further bad-mouth

Mr. Loumiet publicly in the Final Decision as a parting shot.

94.     Of course, since the OCC's entire case against Mr. Loumiet was contrived from

the outset, the exclusion of this "expert" made no difference to the OCC. Instead, it offered at

trial as an "expert" on Greenberg's conduct of the investigative phase defendant Rardin, whose

behavior Mr. Loumiet had criticized years earlier in his letters to the OIG and who also admitted

at trial to having been actively involved in the OCC's decision to sue Mr. Loumiet. All of this

quite likely established new lows in American jurisprudence in terms of an "expert" witness'

supposed objectivity and impartiality (though see the discussion below as to the testimony from

the professor of legal ethics). Beyond this, defendant Rardin was not a lawyer, admitted he did

not have experience in hiring or employing lawyers, and did not pretend to be expert on what

lawyers do. In terms of the Greenberg investigation that Mr. Loumiet had had little involvement

in, defendant Rardin proceeded to remarkably testify under oath, among other extraordinary

things, that there is a "universal standard" on how investigations related to banks must be conducted, which supposedly Greenberg had violated. That standard, though supposedly "universal"—i.e., applicable to all banks and all persons—*had never before (nor since)* been mentioned *anywhere* by *anyone* else. According to defendant Rardin, the universe could ascertain the standard it must meet by piecing together even-today-unidentified sections of the Comptroller's Manual for National Bank Examiners. The ALJ summarily dismissed this "universal" standard as being of the EIC's "own design," noting that it was "uncodified, in part unwritten, not previously publicized, and neither adopted by any professional entity nor known to be regularly employed by one." It is, of course, profoundly disturbing to see a senior Government official just making up sworn testimony on a witness stand.

95.     As another example of his inventiveness on the witness stand, in an effort to establish that the Greenberg reports had had a "material adverse effect" on Hamilton, defendant Rardin also opined that had those reports concluded that the Hamilton officers had lied, one or more of them would have been removed. Of course, as the D.C. Circuit noted in its later opinion in Mr. Loumiet's EAJA action against the OCC, defendant Rardin provided no support whatsoever for that proposition. What the D.C. Circuit decision did not mention was that the only evidence the OCC then had relevant to this statement , as noted above, was the deposition from the former Vice-Chairman of Hamilton saying the exact opposite, a deposition that, as noted, the OCC did not allow to be presented at the trial against Mr. Loumiet.

96.     Realizing how monumentally silly and indefensible defendant Rardin's "universal standard" for bank investigations was, in its post-hearing brief the OCC changed tack and advanced another perhaps even more remarkable theory. According to the OCC's brief, its role as regulator of national banks under the National Bank Act allows it to set the standards as to

how lawyers provide services to national banks, to do so *after-the-fact*, and to punish those attorneys who fail to observe those unknown standards. This, according to the OCC, justified its sanctions against Mr. Loumiet. Of course, due process allows none of this.

97.    As noted above, the IAP statute being used to prosecute Mr. Loumiet requires that the misbehavior of the accused have caused more than "minimal financial loss" or a "significant adverse effect" to the bank. In the case of Hamilton, there was no evidence that *anyone* at the bank had done *anything* in reliance on the Greenberg reports other than agree with the OCC that an "adjusted price trade" had occurred. As a result, the OCC concocted the theory that the fees paid to Greenberg itself for its work had been the more than "minimal financial loss" required. Again not surprisingly, this theory does not appear to have ever been advanced before by anyone else anywhere. Beyond this, even if one accepts the proposition that a service provider's fee for services actually rendered could itself constitute the type of "loss" the IAP statute required, the OCC never made the least effort to explain why US$ 210,000 (the total fees paid Greenberg) constituted a more than "minimal financial loss" for a bank with assets of some US$ 1.2 billion. In fact, the OCC in this proceeding remarkably took the position that a loss as small as US$ 5,000 sufficed, regardless of the size of the bank involved. There was no suggestion, much less evidence, at trial that the fee had been excessive for the work done—other than the fact that *the OCC itself* at trial loudly declared the reports "worthless"—or that the services contracted for had not been provided. Once again raising the question whom a banking lawyer truly serves, the client or the Government, the OCC's position simply amounted to its ignoring the view of Hamilton's Audit Committee and Board, for whom the services had been rendered, as to the worth and value of the reports, and substituting for that view its own dissatisfaction. Obviously, by converting the service provider's fee itself into the required more than "minimal financial

loss," the OCC's position, from an enforcement perspective, conveniently made it possible to ignore one of the safeguards against abusive prosecution carefully built into the IAP statute itself by Congress. In the end, after the ALJ rejected the OCC's charges, even the Comptroller himself made the point in his Final Decision of expressly rejecting this position as unfounded. This did not prevent the OCC from raising the point to the D.C. Circuit in the subsequent action successfully brought by Mr. Loumiet to recover legal fees and expenses. Of course, the D.C. Circuit dismissed the argument there as well.

98.     Turning to the supposed conflict of interest, at trial the OCC did not call any Hamilton Board member or officer (including internal lawyers) to testify as to the supposed conflict, and all of the first-hand evidence at trial established that oral waivers of the conflict— which was what Florida Bar rules then required—had been obtained. Instead, the OCC as its witness on the issue of conflicts produced a professor of legal ethics who provided "expert" testimony that can only be described as having been at times surreal—as if related to events in some alternative universe—given how disconnected it was with the evidence actually presented at trial.

99.     To begin with, although no reason for the "assumption" was ever offered, the ethics professor's pre-trial expert report was based almost entirely on "assumed" significant social interaction by the Fall of 2000 between the Board Chairman of Hamilton and Mr. Loumiet. Since no evidence or explanation of any kind was presented by the OCC to support such an assumption, one can only wonder to what extent this "assumption" was based on the fact that both individuals were Cuban-American, both from South Florida, a few years apart in age, and spoke Spanish, including occasionally to each other. Of course, on this ethnic basis Mr. Loumiet would have "significant social interaction" with literally many thousands of other

Hispanics in South Florida. However, perhaps most remarkable about this "assumed significant social interaction" was that when the FDIC had taken Mr. Loumiet's deposition years before—a deposition the OCC had in hand all along, used to depose and cross-examine Mr. Loumiet in this case, and even introduced into evidence at trial—some of the very first questions asked were about the extent of social interaction between Mr. Loumiet and the Board Chair back in 2000, to which Mr. Loumiet responded that it had been essentially non-existent. Even knowing this response, the OCC, without any evidence to the contrary, allowed its expert to "assume" an unfounded and troubling "foundation" for her pre-trial expert report that it knew to have no support.

100.    The ALJ at the outset of the ethics Professor's trial testimony interrupted to note that she had read the Professor's pre-trial expert report, that it was almost entirely based on that assumption, and that there was simply no evidence on the record supporting this "assumed significant social interaction." At that point, the Professor pirouetted, announced without explanation that she was abandoning that foundation altogether, and segued to a supposed important business relationship between Greenberg, Mr. Loumiet as a lawyer at Greenberg, and Hamilton, as the basis for her expert opinions to be expressed at trial. Following that, the Professor opined that Greenberg had been the *de facto* outside General Counsel to Hamilton in 2000, even though there was not a single statement or piece of paper anywhere from anyone at Hamilton or Greenberg introduced in support of that conclusion. On information and belief, Greenberg received no more than 10% or so of the total legal fees paid by Hamilton to outside law firms for 1999 and 2000, based on the numbers in the publicly-filed annual reports of Hamilton Bancorp itself for those years. Those percentages hardly suggest that Greenberg was then Hamilton's *de facto* outside General Counsel. Along these same lines, against all data and

evidence actually produced at trial, and without relying on any financial or other information

from within Greenberg or Hamilton, the Professor opined that Hamilton was already an

important client (in size of business) for Greenberg in the early Fall of 2000, when the

investigation was undertaken. (Of course, as noted earlier, the actual numbers showed

otherwise.)

101.    The Professor, against all of the Greenberg time sheets and other relevant

evidence actually produced at trial, opined, based on the fact that Mr. Loumiet's name appeared

first out of alphabetical order on the "from" line in the initial Greenberg report, where all three

Greenberg attorneys who had been most active were named, that Mr. Loumiet had really been in

charge of the investigation that preceded that initial report. This test, on its own, seems an

outrageously flimsy foundation for an "expert" opinion. However, in this case it also ignored the

obvious fact that Mr. Loumiet's name appeared **second** in the second Greenberg report issued

March 14, 2001, even though Mr. Loumiet was unquestionably in charge of the process at that

point in time. (Somehow one doubts the Professor would have applied the same alphabetical

order test and concluded that whoever's name appeared first in that second report must have

been in charge at that point in time as well.)

102.    Similarly, against the later sworn testimony at trial from current and former

Greenberg shareholders that at that law firm there was no such thing as a "Relationship

Partner"—i.e., a single partner responsible for and involved in all aspects of a client

relationship—and without any evidence from within either Hamilton or Greenberg to support her

conclusion, the "expert" opined that Greenberg in 2000 and 2001 had "Relationship Partners"

because, according to her, big law firms *do*. (Perhaps the Professor knew this by virtue of having

worked as a first-year associate at a law firm for one year some 30 years before, immediately

upon graduating from law school.)  Not only that, but she *could tell* that Mr. Loumiet was that

"Relationship Partner" at Greenberg for the Hamilton relationship, again on the basis of no

visible evidence. It followed, in her expert opinion that Mr. Loumiet *had to have been* involved

in all aspects of the relationship between Greenberg and Hamilton. From there, it was an easy

(though completely false) syllogism to conclude that Mr. Loumiet *must have been* actively

involved in Greenberg's being engaged to undertake the class action for Hamilton in January

2001—again on the basis of no evidence, and against the sworn testimony from the former

Greenberg litigation shareholder who actually brought the matter into the firm and led it. Not

surprisingly, the Professor also opined against all of the first-hand evidence produced at trial that

there had been no conflicts waivers obtained by Greenberg from Hamilton.

103.    There was also a truly extraordinary exchange when the Professor—claiming that

in Mr. Loumiet's brief intervention (8 to 9 hours total over four months) in the Summer of 2000

on the Consent Agreement, as discussed above, Mr. Loumiet had actually represented not the

Hamilton Board, but its individual members—sought to explain to a visibly incredulous ALJ,

who specifically interrupted her testimony to question her on the issue, that an attorney can

represent a person even though there are no apparent manifestations of such representation, no

individual communications take place, no confidential personal information is ever exchanged,

and neither the person nor the lawyer thinks or intends that to be the case.

104.    The same Professor additionally maintained that, under Florida Bar ethical rules,

an attorney representing a client has to be free to mislead a court by presenting facts and

positions the attorney knows not to be true. This assertion on its face contravenes Florida Bar

Rule of Professional Conduct Rule 4.3.3, entitled "Candor Toward the Tribunal." And so on and

so on, culminating with the unforgettable statement that the Professor's expert opinions in her

pre-trial report would not change regardless of what first-hand testimony might be produced at trial by individuals who had actually been involved in these matters  or, stated another way, facts be damned.

105.    The ALJ made short shrift of the ethics Professor in her Recommended Decision, finding her testimony "logically perplexing," "contradicted by the great weight of the evidence," and that therefore, it "cannot be credited." The OCC's presentation of its absurd "expert" testimony in this case went against all norms followed by reasonable lawyers in the use of such testimony. It is impossible to justify presenting such absurd testimony, and going through this ridiculous, expensive "expert" exercise at all, other than, again, to inflict maximum injury to Mr. Loumiet, who had to engage his own expert to respond. If "expert" testimony is not driven by substantial actual facts proven at trial, what possible value and justification can it have legally, morally and economically? Overall, it again seems "ironic" that, in a case where the OCC sued Mr. Loumiet for having reached the "wrong" conclusion in the Greenberg reports, their "expert" witnesses were so free reaching their own wrong conclusions at trial based on no significant evidence, and often (as the ALJ herself noted) against the great weight of the evidence.

106.    In short, the desire of certain officials at the OCC to retaliate against Mr. Loumiet for the embarrassment he had caused them drove the OCC to bring an action that it knew had no merit, based on charges that were both monumentally silly and completely out of proportion to the extremely harsh penalties sought to be imposed, then conduct the action in a manner befitting its utter lack of merit, while demonstrating profound disrespect for judicial process and legal ethics generally. Small wonder that the D.C. Circuit was able to conclude, without dissent, that the OCC's action against Mr. Loumiet had lacked "substantial justification,"or stated another way, lacked any reasonable basis in law and fact, or under Florida law would be called

"frivolous." However, while the OCC's case itself was always vengeful fantasy, its deleterious effect on Mr. Loumiet's life, including on a banking legal practice he had built over many years, was all too real. Until the OCC sued him, Mr. Loumiet had never been the subject of any public filing or complaint in almost 29 years of practicing law, and was respected in his profession, as evidenced by 16 consecutive years of receiving the highest rating possible from his colleagues in South Florida for both quality and ethical behavior in the Martindale-Hubbell Legal Directory. Once the OCC's suit became known, Mr. Loumiet's practice—particularly in the banking field— largely evaporated, as banks and other clients and prospective clients, mistakenly believing, like the Florida Bar, that there must be some substance to such powerful, inflammatory words from an agency of the Government aimed at a member of the Bar, stayed away. In the four years after the OCC filed its action, Mr. Loumiet's income dropped significantly, and Mr. Loumiet fell six partnership levels at his then law firm. Based on national statistics, those were precisely the years of his practice that should have been Mr. Loumiet's peak earning years as a lawyer. Mr. Loumiet suffered significant economic damages as a result. Mr. Loumiet also suffered severe emotional distress as a result of the OCC's years-long vendetta and misconduct, as described above.

107.    Again "ironically" in light of the ethical charges brought against Mr. Loumiet, as demonstrated by the foregoing description of the charges brought against Mr. Loumiet and the manner in which the case against him was conducted, in bringing and prosecuting this case defendants Straus and Sexton—both experienced trial lawyers who knew better—intentionally violated a series of ethical rules in the ABA's Model Rules of Conduct, and presumably of their State Bar rules of professional conduct as well, some on more than one occasion. The ethical rules violated include:

    a. Rule 3.1 on bringing a proceeding, as well as on asserting or controverting an issue in a

proceeding, without a basis for doing so that is not frivolous;

b. Rule 3.3(a)(1), on making a false statement of fact or law to a tribunal; and subsection (3) on offering evidence that the lawyer knows to be false;

c. Rule 3.4(b), on counseling a witness to testify falsely;

d. Rule 3.4(d), on failing to make a reasonably diligent effort to comply with a legally proper discovery request;

e. Rule 3.4(e), generally, in numerous respects and instances;

f. Rule 3.6 on public communications with a substantial likelihood of materially prejudicing an adjudicative proceeding ; and

g. Rule 4.1(a) on making a false statement of material fact to a third person in the course of representing a client.

108.    The Counts numbers 1 through 7 that follow, which are against the Government, are based on Florida law and meet this FTCA requirements. Counts 8 and 9 are constitutional claims against the Individual Defendants:  Count 8 is based on the First Amendment, *Bivens*, *Hartman*, and other similar cases; and Count 9 is based on *Bivens* and the Fifth Amendment (Due Process). Mr. Loumiet seeks no damages from the OCC's decision to intervene Hamilton, or does not ask this Court to hold that it was unwarranted. Mr. Loumiet instead asks this Court to decide on this case something that a federal court is extremely qualified to judge and which does not depend on finding that the OCC acted inappropriately at Hamilton. In fact, Mr. Loumiet only sets forth facts about Hamilton as background for his retaliatory prosecution claims. Further, even the Comptroller himself has conceded that Mr. Loumiet, as an outside lawyer who did not meet the statutory tests, was not an IAP under applicable federal banking laws. Therefore, the OCC had no statutory right whatsoever to do what it did to Mr. Loumiet, since it had no

enforcement jurisdiction over him whatsoever as a non-IAP. In this case, the situation is analogous to an OCC official driving over a customer of a bank in a truck; nothing in federal banking law gives the OCC the authority to either run over a bank customer or bring an enforcement action against an individual who is not an IAP. Mr. Loumiet challenges the Government to point to a single forum provided by federal banking law where claims relating to a retaliatory enforcement action can be brought; federal banking laws do not provide any such remedy. It is because there is no such alternative forum, and because the question "what for" can be easily answered in this case—"for" retaliatory prosecution— that allowing a *Bivens* action in this case is completely consistent with the Supreme Court's decision in *Wilkie v. Robbins*, 1275 S.Ct. 2588 (2007). There are many millions of persons employed in our nation's 8,000 or more banks and even more millions, like Mr. Loumiet, in service providers to those banks. In what might best be described as an *Alice in Wonderland* result, extending *Sinclair v. Hawke* to this scenario would place millions of bank employees and employees of providers of services to banks in a Constitutional position inferior to all other persons working in our nation's private sector, as well as even to federal prisoners, all of whom have at least some Constitutional rights that they may assert under *Bivens* against overreaching federal Government officials. It should be added that, as already suggested above in the context of the First Amendment, Congress has never suggested anywhere that in enacting the banking laws it meant to take away or in the least bit reduce the Constitutional rights of any of the untold millions of persons touched by our banking laws, or that a right to bring a *Bivens* claim by those persons would interfere in any way with the Congressional framework for banking.

109.    In December 2010, Mr. Loumiet filed a Freedom of Information Act request with the OCC for all communications, e-mails, memos and correspondence, external or internal,

mentioning the words "Loumiet" and "Hamilton" from 2000 until the filing of the OCC's action against Mr. Loumiet on November 6, 2006. That request was turned down without a single responsive document being provided.

110.    On July 20, 2011—less than two years after the Comptroller's Final Decision on July 27, 2009—Mr. Loumiet filed with the OCC the six-months' notice of claims required by law before filing a FTCA action. On January 9, 2012, the OCC wrote back rejecting Mr. Loumiet's claims. Less than six months have elapsed since that rejection. As a result, all conditions precedent to the filing of the FTCA claim have been met, waived or otherwise performed.

111.    Because the defendants' behavior failed to comply with the internal rules and procedures of the OCC itself, and also grossly offended the First and Fifth Amendments to our Constitution, the "discretionary activity" exclusion under the FTCA does not apply.

112.    Mr. Loumiet has engaged the law firm Rivero Mestre to prosecute his claims here and has agreed to compensate them for the reasonable attorneys' fees and costs they incur in this case.

## COUNT I—INTENTIONAL
## INFLICTION OF EMOTIONAL DISTRESS
### [Against the Government and Individual Defendants]

113.    Mr. Loumiet repeats and restates paragraphs 1 through 8 and 15 through 112 as if fully set forth here.

114.    Representatives of the OCC acted recklessly or intentionally in bringing charges against Mr. Loumiet and pursuing those charges when they had no basis in fact or law.

115.    Individual Defendants were instrumental in the OCC's legal action against Mr. Loumiet. The conduct of the OCC and the Individual Defendants was extreme and outrageous

because the charges had no basis in fact or law and were brought with the ulterior purposes to

retaliate against Mr. Loumiet and harm his reputation.

116.    The defendants' misconduct caused Mr. Loumiet severe emotional distress

because of their malicious, extreme and outrageous conduct detailed above.

WHEREFORE, Mr. Loumiet demands judgment against the Government and Individual

Defendants for damages to be proven at trial to compensate for the severe emotional distress

caused to Mr. Loumiet.

## COUNT II—INVASION OF PRIVACY
### [Against the Government and Individual Defendants]

117.    Mr. Loumiet repeats and restates paragraphs 1 through 8 and 15 through 112 as if

fully set forth here.

118.    The OCC and Individual Defendants invaded Mr. Loumiet's privacy by making

public through the Notice of Charges and their statements to the press and press releases, private

facts that would not otherwise have become public concerning Mr. Loumiet's representation of

Hamilton.

119.    The facts disclosed would be offensive to any reasonable person.

120.    Given that the OCC knew its charges against Mr. Loumiet were without merit

from the outset, no privilege attaches to its actions.

WHEREFORE, Mr. Loumiet demands judgment against the Government and Individual

Defendants in the amount indicated in paragraph 148 below.

## COUNT III—ABUSE OF PROCESS
### [Against the Government and defendants Schneck and Sexton]

121.    Mr. Loumiet repeats and restates paragraphs 1 through 8 and 15 through 112 as if

fully set forth here.

122.    In bringing the OCC action, the OCC made an illegal, improper or perverted use of process against Mr. Loumiet.

123.    As was known to the OCC and defendants, the OCC action was baseless from the outset. The defendants filed and prosecuted the meritless OCC action with the ulterior purposes of retaliation and inflicting as much injury as possible on Mr. Loumiet.

124.    Mr. Loumiet has suffered damage as the result of the defendants improper abuse of process.

WHEREFORE, Mr. Loumiet demands judgment against the Government and defendants Schneck and Sexton in the amount indicated in paragraph 148 below.

## COUNT IV—MALICIOUS PROSECUTION
### [Against the Government and defendants Schneck and Sexton]

125.    Mr. Loumiet repeats and restates paragraphs 1 through 8 and 15 through 112 as if fully set forth here.

126.    The OCC and the Individual Defendants maliciously commenced and prosecuted its action against Mr. Loumiet.

127.    In bringing the OCC action, the OCC made an illegal, improper or perverted use of process against Mr. Loumiet. As was known to the OCC and defendants, the OCC action was baseless from the outset and the defendants had no probable cause. The defendants filed and prosecuted the meritless OCC action with the malicious ulterior purpose of retaliation and inflicting as much injury as possible on Mr. Loumiet.

128.    Mr. Loumiet obtained a bona fide dismissal of the OCC action in favor of him.

129.    Mr. Loumiet has suffered damage as the result of the defendants improper abuse of process and malicious prosecution.

WHEREFORE, Mr. Loumiet demands judgment against the Government and defendants

Schneck and Sexton in the amount indicated in paragraph 148 below.

**COUNT V—NEGLIGENT SUPERVISION**
**[Against the Government]**

130.     Mr. Loumiet repeats and restates paragraphs 1 through 8 and 15 through 112 as if fully set forth here.

131.     The OCC owed a duty to Mr. Loumiet to adequately supervise its employees.

132.     During the course of the Individual Defendants' employment, Mr. Loumiet notified the OCC of, or the OCC should have become aware of, problems with the Individual Defendants' unfitness, including, but not limited to, the problems alleged in paragraphs 49 and 52, among others.

133.     Despite knowledge of the Individual Defendants' unfitness, the OCC failed to take further action such as investigation, discharge, or reassignment.

134.     The OCC's failure to investigate or take corrective action was unreasonable.

135.     But for the OCC's negligent failure to supervise the Individual Defendants, they would not have been able to retaliate against Mr. Loumiet when he sought the intervention of the Treasury OIG.

136.     Mr. Loumiet has been harmed by the OCC's negligent supervision of the Individual Defendants.

WHEREFORE, Mr. Loumiet demands judgment against the Government in the amount indicated in paragraph 148 below.

**COUNT VI—VIOLATION OF**
**MR. LOUMIET'S FIRST AMENDMENT RIGHTS**
**[Against the Individual Defendants]**

137.     Mr. Loumiet repeats and restates paragraphs 1 through 8 and 15 through 112 as if fully set forth here.

67

138.    The Individual Defendants intentionally violated Mr. Loumiet's First Amendment rights both in their frivolous attack on Mr. Loumiet's constitutionally-protected right to communicate with his client free of Government intimidation and punishment, and because that attack was driven by a desire to retaliate against Mr. Loumiet. As the D.C. Circuit Court of Appeals determined last year, the prosecution of Mr. Loumiet was without "substantial justification" —i.e., without "any reasonable basis in law and fact."

139.    The Individual Defendants' constitutional violations caused harm to Mr. Loumiet.

WHEREFORE, Mr. Loumiet demands judgment against the Individual Defendants in the amount indicated in paragraph 149 below.

## COUNT VII—VIOLATION OF MR. LOUMIET'S FIFTH AMENDMENT DUE PROCESS RIGHTS
### [Against the Individual Defendants]

140.    Mr. Loumiet repeats and restates paragraphs 1 through 8 and 15 through 112 as if fully set forth here.

141.    The Individual Defendants intentionally violated Mr. Loumiet's Fifth Amendment rights both in their frivolous attack on Mr. Loumiet's constitutionally-protected right to communicate with his client free of Government intimidation and punishment, and because that attack was driven by a desire to retaliate against Mr. Loumiet. As the D.C. Circuit Court of Appeals determined last year, the prosecution of Mr. Loumiet was without "substantial justification"—i.e., without "any reasonable basis in law and fact."

142.    The Individual Defendants' constitutional violations caused harm to Mr. Loumiet.

WHEREFORE, Mr. Loumiet demands judgment against the Individual Defendants in the amount indicated in paragraph 149 below.

## COUNT VIII—CIVIL CONSPIRACY
### [Against Government and Individual Defendants]

143.     Mr. Loumiet repeats and restates paragraphs 1 through 8 and 15 through 112 as if fully set forth here.

144.     Representatives of the OCC, including the Individual Defendants, agreed and conspired to do an unlawful act or to do a lawful act by unlawful means, that is, to retaliate against Mr. Loumiet, ruin his reputation and career, commit the various torts as set forth in this Complaint, and therefore trample on his Constitutional rights as set forth in this Complaint.

145.     Representatives of the OCC, including Individual Defendants committed overt acts in further of their conspiracy, including, but not limited to, the acts detailed in paragraphs 61 (the 15-day letter), 61 (the charges), 16 (the lawsuit), and 85 (statements to the press).

146.     The defendants' conspiracy was, in fact, executed and led to the commission of all the other torts charged in the counts of this Complaint.

147.     The conspirators illegal agreement, and their acts in furtherance, harmed Mr. Loumiet.

WHEREFORE, Mr. Loumiet demands judgment against the Government and Individual Defendants in the amount indicated in paragraph 149 below.

## DAMAGES

148.     For the FTCA claims under Counts 1 through 5 above, Mr. Loumiet requests damages against the Government and Individual Defendants in the amount of US$ 4 million, representing estimated losses over the 15 or so years from November 6, 2006 until Mr. Loumiet turns 70. Mr. Loumiet also requests reasonable attorneys fees and costs to the extent allowable by law.

149.     For the Constitutional claims under Counts 6, 7, and 8 above, Mr. Loumiet

requests damages against the Government and Individual Defendants for compensatory and punitive damages in such amount as the jury deems appropriate.

## **JURY**

150.    Mr. Loumiet requests a jury trial on all issues so triable.

Dated July 9, 2012

Respectfully submitted,

RIVERO MESTRE LLP
*Attorneys for Carlos Loumiet*
2525 Ponce de Leon Boulevard
Suite 1000
Miami, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
Email: jmestre@riveromestre.com
arivero@riveromestre.com
cwhorton@riveromestre.com


By:  ____/s/ Jorge A. Mestre_____
        JORGE A. MESTRE
        D.C. Bar No. 998301
        ANDRES RIVERO
        Florida Bar No. 613815
        CHARLES E. WHORTON
        Florida Bar No. 46894