# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CARLOS LOUMIET,

      Plaintiff,

    v.

UNITED STATES OF AMERICA, *et al.*,

      Defendants.

Civil Action No. 12-01130 (CKK)

## MEMORANDUM OPINION
(September 12, 2013)

Plaintiff Carlos Loumiet has filed suit against the United States Government for the actions of its agency, the Office of the Comptroller of the Currency ("OCC"), under the Federal Tort Claims Act. Plaintiff has also filed suit against Defendants Michael Rardin, Lee Straus, Gerard Sexton, and Ronald Schneck (collectively "Individual Defendants"), alleging claims under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), as well as various state law tort claims. Presently before the Court are the [10] Motion of the United States to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and the [11] Motion of the Individual Defendants to Dismiss Plaintiff's *Bivens* Claims. Upon consideration of the pleadings[1], the relevant legal authorities, and the record as a whole, the Court finds that Plaintiff's *Bivens* claims against the Individual Defendants must be dismissed pursuant to the statute of limitations, and his tort claims against the Individual Defendants must

---

[1] Complaint, ECF No. [1] ("Compl."); Mot. of the United States to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(1) and 12(B)(6), ECF No. [10] ("Gov't MTD"); Mot. of the Individual Defs. to Dismiss Pl.'s Bivens Claims, ECF No. [11] ("Indiv. Defs.' MTD"); Carlos Loumiet's Opp'n to the Bivens Defs.' Mot. to Dism. Under Fed. R. Civ. P. 12(B)(6) and the United States' Mot. to Dism. Under Fed. R. Civ. P. 12(B)(6) and 12(B)(1), ECF No. [19], ("Pl.'s Opp'n."); Reply Mem. in Supp. of Defs.' Mot. to Dism., ECF No. [21] ("Defs.' Reply").

be dismissed pursuant to the Westfall Act. Accordingly, the [11] Motion of the Individual Defendants to Dismiss Plaintiff's *Bivens* Claims is GRANTED. Furthermore, the Court concludes that Plaintiff's claims for malicious prosecution and abuse of process against the United States Government under the Federal Tort Claims Act must be dismissed pursuant to the discretionary function exception. However, Plaintiff's FTCA claims alleging intentional infliction of emotional distress, invasion of privacy, negligent supervision, and conspiracy may proceed to the extent they are premised on statements made by OCC officials to the press. Consequently, the [10] Motion of the United States to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) is GRANTED-IN-PART AND DENIED-IN-PART. Having ruled on both of these motions, the Court accordingly DENIES Plaintiff's [22] Motion for Oral Hearing on Defendants' Motions to Dismiss.

## I. BACKGROUND

### A. Factual Background

The Office of the Comptroller of the Currency ("OCC") is the federal supervisor, examiner, and enforcing agency for national banks. In 1998, Hamilton Bank, N.A. ("Hamilton"), engaged in "adjusted price trades" or "ratio swaps" of debt instruments without properly recognizing the resulting losses, a form of bank and securities fraud. As the D.C. Circuit summarized the transaction:

> Hamilton invested $22M in Russian debt instruments, which subsequently lost value in the summer of 1998. To conceal the loss, the Bank swapped the Russian debt instruments for other financial instruments. General accounting rules require such swaps to be accounted for as related transactions. By not doing so, the Bank made it appear as if it managed to sell its Russian assets at face value, thereby hiding their highly discounted sales prices.

*Loumiet v. Office of the Comptroller of the Currency*, 650 F.3d 796, 797-98 (D.C. Cir. 2011) (internal citations and quotation marks omitted). In September 1999, OCC examiners discovered

the fraud and the following April, the OCC issued a temporary cease-and-desist order requiring the Bank to take certain remedial measures. *Loumiet*, 650 F.3d at 798. Hamilton's Audit Committee retained an outside law firm, Greenberg Traurig LLP ("Greenberg"), which was tasked with conducting an independent investigation of the alleged fraud. *Loumiet*, 650 F.3d at 798; Compl. ¶ 27. A team of Greenberg attorneys, including Plaintiff Loumiet, reviewed certain documents, interviewed Hamilton officials, and ultimately issued a report to the Bank's Audit Committee on November 15, 2000. Pl.'s Opp'n. at 3. Plaintiff alleges that he was only peripherally involved in the preparation of this report. Pl.'s Opp'n at 3; Compl. ¶¶ 28-30. The November 2000 report found "no convincing evidence" to establish that Bank Executives "intentionally misled" the Bank's outside auditor or the Bank's own Audit Committee. *Loumiet*, 650 F.3d at 798; Compl ¶ 30.

In January 2001, the OCC sent Greenberg a letter responding to the November 2000 report. Pl.'s Opp'n at 3; Compl. ¶ 36. The letter informed the firm that the OCC had obtained sworn testimony from an officer at one of the counterparties to Hamilton in the adjusted price trades. Pl.'s Opp'n at 3. According to the OCC, the officer testified that Hamilton's executives knowingly executed the adjusted price trades, contradicting the report issued by Plaintiff's firm. *Loumiet*, 650 F.3d at 798. The OCC also orally identified six "red flags", facts which tended to show that the Bank's management did knowingly participate in the fraudulent transactions. Pl.'s Opp'n at 4. Plaintiff Loumiet responded to the OCC's letter and addressed the six "red flags" in a follow-up report to the Bank's Audit Committee. This letter reaffirmed the conclusions of his firm's earlier report. Pl.'s Opp'n at 4-5.

In March 2001, Plaintiff wrote to Treasury Inspector General Jeffrey Rush and other Treasury Department officials, expressing concerns about the OCC's enforcement action against

the Bank. Pl.'s Opp'n at 5. Plaintiff claimed that during his participation in the OCC investigations, he became aware of improper conduct by OCC examiners, including conduct by three of the Individual Defendants. Plaintiff requested an independent investigation by the Office of Inspector General ("OIG") into what he described as "highly unusual and disturbing" behavior by OCC staff, including allegations that OCC examiners, including Defendant Rardin, made racist comments in dealing with Hamilton's Hispanic employees, and disregarded their own agency's regulations and precedents. Pl.'s Opp'n at 5. In April 2001, Plaintiff sent the Treasury Secretary and the OIG a second letter, again expressing concerns regarding the OCC's regulatory actions. *Id.* On July 18, 2001, the Treasury Inspector General notified Plaintiff that the OIG had "considered the information and argument [he] presented, and . . . concluded that it does not provide a basis for the Office of Inspector General to consider further investigation . . ." Gov't MTD, Exhibit 3. On December 14, 2001, Plaintiff filed a lawsuit against the OCC in the Southern District of Florida alleging that the OCC's supervisory actions were motivated by anti-Hispanic bias. *Hamilton Bank, N.A. v. OCC*, Case No. 01-cv-4994 (S.D. Fla.). This case was voluntarily dismissed in 2002.

On January 11, 2002, after concluding that Hamilton was operating in an unsafe and unsound manner, the OCC closed the Bank and appointed the Federal Deposit Insurance Corporation as its receiver. Pl.'s Opp'n. at 6; *Loumiet*, 650 F.3d at 798. Subsequently, a grand jury indicted three of the Bank's senior officers for bank and securities fraud in connection with the adjusted price trades. *United States v. Masferrer*, 514 F.3d 1158, 1160-61 (11th Cir. 2008). The former CFO and President pled guilty and were sentenced to 28 months in prison, while the Bank's CEO was convicted and sentenced to 30 years in prison. *Id.* at 1161. Ultimately, the Eleventh Circuit affirmed the conviction of the Bank's CEO. *Id.* at 1165.

On November 6, 2006, the OCC initiated an enforcement proceeding against Plaintiff, pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") of 1989, Pub. L. No. 101-73, 102 Stat. 183 (codified in scattered sections of Title 12 of the U.S. Code). Compl. ¶ 16; *Loumiet,* 650 F.3d at 799. The action, brought by the OCC's Enforcement and Compliance Division, alleged that Plaintiff was an "institution-affiliated party" ("IAP") who, as part of his role in the independent investigation of Hamilton, had "knowingly or recklessly . . . breach[ed his] fiduciary duty," and as a result "caused . . . a significant adverse effect" on the Bank. *Loumiet*, 650 F.3d at 798 (quoting 12 U.S.C. § 1813(u)(4)). The OCC sought a $250,000 monetary penalty against Plaintiff and sought to permanently ban him from representing FDIC-insured banks. Pl.'s Opp'n. at 7. Plaintiff claims that this prosecution as well as the surrounding actions by OCC officials were made in retaliation for his letters expressing concern over bias within the OCC. *Id.* During the ensuing three-week bench trial, Plaintiff alleges that the Individual Defendants aggressively pressed unsubstantiated charges and made false statements to the press covering the proceeding, both of which caused substantial damage to his reputation and career. Compl. ¶ 15; Pl.'s Opp'n. at 7-12. Plaintiff similarly alleges that the Individual Defendants violated various standards of professional conduct in pursuing this action, including concealing evidence. *Id.* Ultimately, on June 18, 2008, an Administrative Law Judge ("ALJ") recommended complete dismissal of the Division's claims. Compl. ¶ 16. On July 27, 2009, the Comptroller, reviewing the ALJ's recommendation, agreed dismissal of all claims against Loumiet was appropriate, but on different grounds from the ALJ. *Id.*

Following the Comptroller's dismissal of the administrative proceeding, on August 26, 2009, Plaintiff filed an application with the ALJ for attorney's fees under the Equal Access to Justice Act ("EAJA"), 5 U.S.C. §504. Compl. ¶ 17; *Loumiet*, 650 F.3d at 799. On July 20, 2010

the ALJ issued a recommended decision denying the application. *Id.* Plaintiff appealed the denial of his EAJA claim to the D.C. Circuit, which unanimously reversed the agency's determination, concluding that "the Comptroller was not 'substantially justified' in bringing the underlying administrative proceedings against Loumiet." *Loumiet*, 650 F.3d at 797.

### B. Procedural History

July 20, 2011, Plaintiff presented his administrative claim to the OCC, demanding $4 million in damages and other relief. Compl. ¶ 110. Plaintiff alleged that the OCC initiated and conducted the enforcement action against him in retaliation for his earlier criticism of the agency. *Id.* ¶ 8. The OCC denied his claim on January 9, 2012, and Loumiet subsequently commenced this action on July 9, 2012. *Id.* ¶ 110. In addition to his FTCA claims, Plaintiff seeks damages against four senior OCC employees under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) for violations of his First and Fifth Amendment rights. Compl. ¶¶ 137-142. He also brings tort claims against these officials. *Id.* ¶¶ 113-136, 143-147. These officials, each sued in his individual capacity, are Michael Rardin, Lee Straus, Gerard Sexton, and Ronald Schneck (collectively, the "Individual Defendants"), whom Plaintiff alleges were closely involved in the OCC action against him. *Id.* ¶¶ 3-7.

## II. LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(1)

To survive a motion to dismiss pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject matter jurisdiction over its claim. *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C.Cir.2007). In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."

*Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C.Cir.2003) (citations omitted). "At the motion to dismiss stage, counseled complaints, as well as pro se complaints, are to be construed with sufficient liberality to afford all possible inferences favorable to the pleader on allegations of fact." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1106 (D.C.Cir.2005). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F.Supp.2d 163, 170 (D.D.C.2007) (citations omitted).

## B. Federal Rule of Civil Procedure 12(b)(6)

The Federal Rules of Civil Procedure require that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 1964–65; *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986). Instead, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citing *Twombly*, 550 U.S. at 556).

In evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F.Supp. 914, 915 (D.D.C.1994). Further, the Court is limited to considering the facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C.Cir.1997).

A defendant may raise the affirmative defense of statute of limitations in a Rule 12(b)(6) motion when the facts that give rise to the defense are clear from the face of the complaint. *See Smith–Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998). The court should grant a motion to dismiss only if the complaint on its face is conclusively time-barred. *Id.; Doe v. Dep't of Justice*, 753 F.2d 1092, 1115 (D.C. Cir. 1985).

### III. DISCUSSION

#### A. Claims Against Individual Defendants

##### i. *Bivens* Claims

Plaintiff asserts damages claims against four OCC employees under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff claims that the OCC's decision to pursue an enforcement action against him was in retaliation for his public criticism of the agency. He specifically alleges that the OCC prosecuted him in retaliation for complaints to the Treasury Inspector General about ostensibly racist comments and behavior by OCC staff, in violation of his First and Fifth Amendment rights.

In *Bivens*, the Supreme Court "established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." *Carlson v. Green*, 446 U.S. 14, 18 (1980). The Court has described a *Bivens* action as "the federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983." *Hartman v. Moore*, 547 U.S. 250, 254 n. 2 (2006). *Bivens* itself recognized a right of action under the Fourth Amendment, and the Court has subsequently expanded this doctrine to two other contexts. *See Davis v. Passman*, 442 U.S. 228 (1979) (holding that the Fifth Amendment's Due Process Clause created a right of action for damages where a woman had been discharged from her employment with a congressman because of her gender); *Carlson*, 446 U.S. 14 (holding that a prisoner could seek damages from prison officials for Eighth Amendment violations). In addition, the Court has more recently assumed without deciding that *Bivens* actions are permissible under the First Amendment. *See Hartman*, 547 U.S. at 252 (establishing pleading standards in *Bivens* actions based on allegedly retaliatory prosecution for speech critical of government agency). The D.C. Circuit has also recognized a right to recover under *Bivens* for retaliation that runs afoul of the First Amendment. *Haynesworth v. Miller*, 820 F.2d 1245, 1255 (D.C. Cir. 1987) ("We agree that the [plaintiff's] retaliatory prosecution constitutes an actionable First Amendment wrong redressable under *Bivens* . . . ."), *overruled in part on other grounds by Hartman*, 547 U.S. at 256.

Nevertheless, *Bivens* is not an automatic remedy, and "[b]ecause implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability 'to any new context or new category of defendants.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001)). Indeed, the Court has made clear that in determining whether to imply a *Bivens* remedy in a particular context, a court should ask two questions: (1)

"whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages" and (2) "even in the absence of an alternative" whether "any special factors counsel[] hesitation before authorizing a new kind of federal litigation." *Wilkie v. Robbins*, 551 U.S. 337, 550 (2007) (internal citations and quotation marks omitted). On this second question, "[o]ne 'special factor' that precludes creation of a *Bivens* remedy is the existence of a comprehensive remedial scheme." *Wilson v. Libby*, 535 F.3d 697, 705 (D.C. Cir. 2008) (footnote omitted).

Here, Defendants argue that the comprehensive remedial scheme created by the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") of 1989, Pub. L. No. 101-73, 103 Stat. 183 (codified in scattered sections of Title 12 of the U.S. Code), is the sort of special factor precluding a *Bivens* remedy for Plaintiff. Indiv. Defs.' MTD at 10. Plaintiff, by contrast, argues that FIRREA falls short of the comprehensive remedial scheme needed to block his *Bivens remedy.* Pl.'s Opp'n at 20-34.

This Court need not decide the question of whether FIRREA constitutes the sort of comprehensive remedial scheme that would preclude a *Bivens* remedy for Plaintiff in this context, because even if such a remedy existed, Plaintiff's *Bivens* claims for retaliation are barred by the statute of limitations.

The statute of limitations in a *Bivens* claim represents a combination of federal and state law. "When a federal action contains no statute of limitations, courts will ordinarily look to analogous provisions in state law as a source of a federal limitations period." *Doe v. U.S. Dept. of Justice*, 753 F.2d 1092, 1114 (D.C. Cir. 1985). Here, neither party contests the application of the three-year general District of Columbia statute of limitations. *See* D.C. Code §12-301(8) (three-year statute of limitations applies to actions "for which a limitation is not otherwise

specifically prescribed").  *See also McDonald v. Salazar*, 831 F.Supp.2d 313, 319 (D.D.C. 2011) (applying three-year limitations period to *Bivens* retaliation and due process claims), *aff'd in part*, 12-5023, 2012 WL 3068440 (D.C. Cir. July 20, 2012).  However, while state law provides the applicable statute of limitations, federal law controls when a *Bivens* claim accrues.  *Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("the accrual date of a §1983 cause of action is a question of federal law that is *not* resolved by reference to state law.").  Accrual occurs "when the plaintiff has a complete and present cause of action."  *Id.* (citations omitted) (internal quotation marks omitted).  *See also Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994) ("The claim accrues when the plaintiff knows or has reason to know of the harm.") (internal quotation marks omitted); *Nasim v. Warden, Md. House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) ("Under federal law a cause of action accrues when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action.").

Here, Loumiet's *Bivens* claims under the First and Fifth Amendments accrued when he knew or had reason to know of the Individual Defendants' retaliatory action.[2]  *See Mata v. Anderson*, 635 F.3d 1250, 1253 (10th Cir. 2011) ("First Amendment retaliatory-prosecution claims accrued when [plaintiff] knew or had reason to know of the alleged retaliatory prosecution"); *Elliott Reihner Siedzikowski & Egan, P.C. v. Pa. Employees Benefit Trust Fund*, 29 Fed. Appx. 838, 840 (3d Cir. 2002) (First Amendment retaliation claim accrues once a plaintiff possesses "the critical facts that he has been hurt and who has inflicted the injury.")

---

[2] Plaintiff's First and Fifth Amendment *Bivens* claims are premised on identical allegations that Defendants violated Plaintiff's constitutional rights "both in their frivolous attack on Mr. Loumiet's constitutionally-protected right to communicate with his client free of Government intimidation and punishment, and because that attack was driven by a desire to retaliate against Mr. Loumiet."  Compl. ¶¶ 138, 141.  Neither party argues that Plaintiff's First and Fifth Amendment claims, given their identical factual basis, should have different dates of accrual, and the Court does not address this possibility.

(quoting *United States v. Kubrick*, 444 U.S. 111, 122 (1979); *Harris v. S. Huntington Sch. Dist.*, No. 06–CV–3879, 2009 WL 875538, at *9, 2009 U.S. Dist. LEXIS 27392, at *25 (E.D.N.Y.2009) (stating that "the point of accrual is not when plaintiff utters the alleged protected speech, but rather when he suffers retaliatory action as a result of that speech"); *Shub v. Westchester Cmty. College*, 556 F.Supp.2d 227, 242-43 (S.D.N.Y.2008) (stating that "[u]nder federal law a First Amendment retaliation claim accrues once a plaintiff knows or has reason to know of the injury that forms the basis of the action."); *Toscano v. Borough of Lavallette*, No. 04-CV-4412, 2006 WL 1867197, at *3, 2006 U.S. Dist. LEXIS 48653, at *10 (D.N.J. June 30, 2006) (stating that First–Amendment retaliation claims accrue "when an alleged retaliatory act occurs."). From the outset of Defendants' OCC action against him, Plaintiff had reason to believe the action was in retaliation for his previous complaints to the Treasury Inspector General about ostensibly racist comments and behavior by OCC staff. Indeed, Plaintiff claims that from the time they filed their action against him "[t]he defendants' retaliatory animus was (and is) obvious." Pl.'s Opp'n. at 7. Indeed, if as Plaintiff contends, merely "examining the charges readily demonstrates that defendants were acting out of retaliatory animus," *id.* at 8, then he was surely on notice of his claim at the time of the OCC's filing. The OCC filed its Notice of Charges against Plaintiff on November 6, 2006. Plaintiff did not commence this action until July 9, 2012, meaning that any claim which accrued prior to July 9, 2009 is barred by the three-year statute of limitations applicable here. To the extent that Plaintiff admits that the retaliatory nature of the proceeding against him was "obvious" from the outset of the OCC prosecution and that he was aware of his injury, his potential *Bivens* claim accrued well before July 9, 2009.

To be sure, in *Hartman v. Moore*, the Supreme Court held that in retaliatory prosecution claims brought pursuant to *Bivens*, the absence of probable cause "must be pleaded and proven"

"as an element of a plaintiff's case." 547 U.S. at 256. Yet, here, if as Plaintiff's contends, the absence of probable cause was self-evident from the outset of the prosecution, Plaintiff could have easily pled such an element. Indeed, as Plaintiff notes, "'probable cause' is widely understood to mean 'a reasonable ground to suspect.'" Compl. ¶ 18 (quoting *Black's Law Dictionary* 1219 (7th ed. 2007)). Moreover, even if there was insufficient evidence to support a pleading of probable cause at the time of the OCC's filing of its Notice of Charges, Plaintiff admits that the lack of probable cause became even more patent well before July 9, 2009. Indeed, as Plaintiff notes "[a]fter Mr. Loumiet dared to call attention to their misbehavior, defendants knowingly ginned up a prextextual enforcement action to persecute him for alleged wrongdoing that never occurred, as an Administrative Law Judge ("ALJ") employed by defendants' own agency concluded years later." Pl.'s Opp'n at 1. The ALJ's opinion, recommending that the charges against Mr. Loumiet be dismissed, and providing strong evidence of the absence of probable cause, was issued on June 17, 2008. *Id.*, Exhibit A (ALJ Decision). Yet Plaintiff did not file this suit until more than four years later. Accordingly, his action falls outside the statute of limitations.

In arguing that the statute of limitations does not bar his *Bivens* claims, Plaintiff conflates the tort of malicious prosecution with his *Bivens* claims alleging retaliatory prosecution. Plaintiff argues that his *Bivens* claims for retaliatory prosecution did not accrue until the OCC dismissed all its charges against him on July 27, 2009, just as the tort of malicious prosecution does not accrue until the action terminates in the plaintiff's favor. Pl.'s Opp'n. at 35-36. However, considering this same question, the Tenth Circuit has held that the accrual dates for *Bivens* claims alleging retaliatory prosecution are not identical to those for malicious prosecution tort claims. In *Mata*, the court noted that while a "malicious prosecution claim, which requires

13

favorable termination as an element, does not accrue until the alleged malicious prosecution terminates in favor of the plaintiff" "[u]nlike a malicious prosecution claim . . . a First Amendment retaliatory-prosecution claim does not require a favorable termination of the underlying action." 635 F.3d at 1252-53. Rather, as noted, the claim accrues when a plaintiff knows or has reason to know that the prosecutorial action is retaliatory.

All but one of the cases cited by Plaintiff for the proposition that his claims did not accrue until the OCC dismissed its charges against him involve malicious prosecution and accordingly do not affect the Court's analysis. Pl.'s Opp'n at 35-36. Moreover, the only case identified by Plaintiff as support for his argument that First Amendment retaliatory prosecution claims do not accrue until the charges have been dismissed is a district court opinion from outside this circuit adopting the recommendation of a magistrate judge. *See Haagensen v. Pennsylvania State Police*, No. 08-CV-727, 2009 WL 790355, at *4 (W.D. Pa. 2009). That opinion concluded that the absence of probable cause could not be shown until the charges against the plaintiff had been dismissed. *Id.* The Court does not find the reasoning in *Haagensen* persuasive. Although a conviction may ultimately establish probable cause for a prosecution, "[t]he fact that the accused was acquitted after trial by a magistrate or court is properly regarded as immaterial in determining the existence or nonexistence of probable cause." *Restatement (Second) of Torts* § 667(2), cmt. d. Dismissal of the underlying case is accordingly not required for a claim of retaliatory prosecution to accrue, and Plaintiff's *Bivens* claim accrued prior to the OCC's dismissal of his action on July 27, 2009.

Plaintiff argues that requiring him to bring his *Bivens* action prior to the OCC's dismissal of his action would result in the action being dismissed as a collateral attack or simply unripe. Pl.'s Opp'n at 36. Plaintiff provides no further explanation and cites no case law in support of

this proposition, and the Court is uncertain how such a suit would be deemed a collateral attack. Similarly, the Court is unclear how such a claim, if properly pled, would be deemed unripe, given that the allegedly retaliatory action has already occurred.

Plaintiff also argues that even if the statute of limitations does bar his claim, he should receive the benefit of the doctrine of equitable tolling.[3]  Pl.'s Opp'n at 37.  However, the Supreme Court has held that, unless inconsistent with federal law, state law governs the issue of whether a limitations period should be tolled.  *Wilson v. Garcia*, 471 U.S. 261, 269 (1985) ("the length of the limitations period, and closely related questions of tolling and application, are to be governed by state law.").  Here, District of Columbia case law precludes equitable tolling of the applicable statute of limitations.  *See Sayyad v. Fawzi*, 674 A.2d 905, 906 (D.C. 1996) (per curiam) (rejecting equitable tolling of D.C. Code §12-301(8) under principle of "strict adherence to statutes of limitations."); *Melara v. China North Industries, Corp.* 658 F.Supp.2d 178, 181 (D.D.C. 2009) (noting resistance to application of equitable tolling under District of Columbia law).  Plaintiff points to no reason why this policy against tolling conflicts with federal law, and thus, pursuant to District of Columbia law, the Court will not apply equitable tolling here.

Finally, Plaintiff argues that resolution of statute of limitations questions is inappropriate for a motion to dismiss because the question of accrual hinges on "matters of fact not suitable for a motion to dismiss."  Pl.'s Opp'n at 35.  Plaintiff provides little explanation for this claim and indeed strangely notes a mere one paragraph later that the question of accrual is a matter of law. *See id.* ("even if the Court were to entertain limitations questions now, Mr. Loumiet's claim did not accrue – *as a matter of law* – until the defendants dismissed the OCC action.") (emphasis

---

[3] Although Plaintiff argues that his failure to comply with the statute of limitations in the FTCA context can be excused under the argument that Defendants' actions constitute a continuing tort, *see* Pl.'s Opp'n. at 49-53, Plaintiff has not raised this argument with respect to his *Bivens* claims.

added).  Furthermore, Plaintiff fails to identify any factual dispute affecting the accrual of the limitations period here.  Consequently, the Court concludes that it may decide the statute of limitations defense asserted by Defendants in their motion to dismiss, and that pursuant to this defense, Plaintiff's *Bivens* claims must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### ii.        State-Law Tort Claims

Plaintiff also asserts several common law tort claims against the Individual Defendants. Defendants argue that such claims must be dismissed pursuant to the Westfall Act, 28 U.S.C. § 2679(d)(1), as the Director of the Torts Branch of the Department of Justice's Civil Division – a designee of the Attorney General – has certified that the Individual Defendants were acting within the scope of their employment at the time of the incidents out of which Plaintiff's claims arose.  *See* Indiv. Defs.' MTD, Exhibit 1 (Westfall Certification).  Plaintiff has not responded to, and therefore concedes, the Defendants' argument that his common law tort claims against the Individual Defendants are barred under the Westfall Act.  *See Hopkins v. Womens's Div., Gen. Bd. Of Global Ministries*, 238 F.Supp.2d 174, 178 (D.D.C. 2002) (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

### B.  FTCA Claims

Plaintiff also asserts various claims under the Federal Tort Claims Act against the federal government, claiming that the OCC's decision to pursue an enforcement action against him constituted retaliation for his public criticism of the agency.  Specifically, Plaintiff brings claims against the Government for Intentional Infliction of Emotional Distress (Count I), Invasion of Privacy (Count II), Abuse of Process (Count III), Malicious Prosecution (Count IV), Negligent

Supervision (Count V), and Civil Conspiracy (Count VIII). Compl. ¶¶ 113-136, 143-147. The Federal Tort Claims Act establishes district court jurisdiction and waives federal sovereign immunity in suits against the United States "for injury or loss or property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

In their motion to dismiss, the Government first argues that all of Loumiet's claims except for his claim of malicious prosecution are barred by the FTCA's two-year statute of limitations. Gov't MTD at 9-12. Under the FTCA, a tort claim against the United States is barred unless it is presented in writing to the appropriate federal agency "within two years after such claim accrues . . . ." 28 U.S.C. § 2401(b). In this case, Loumiet filed his administrative claim with the OCC alleging various tort claims on July 20, 2011, meaning any claims which accrued prior to July 20, 2009 are barred under the FTCA's statute of limitations. The Government concedes that Loumiet's malicious prosecution claim did not accrue until July 27, 2009 when the OCC enforcement action terminated in his favor. However, it argues that Loumiet's claims for intentional infliction of emotional distress (Count I), invasion of privacy (Count II), abuse of process (Count III), negligent supervision (Count V), and conspiracy (Count VIII) accrued before July 20, 2009 and are accordingly barred by the statute of limitations. While termination of a prosecution in plaintiff's favor is an element of malicious prosecution, it is not required for any of Plaintiff's remaining claims. The Government argues that Plaintiff had sufficient information to know of his injury with respect to these remaining torts well before July

20, 2009. Gov't MTD at 10-11. Indeed, the allegations by Plaintiff with respect to these torts refer specifically to events that occurred prior to July 20, 2009. *Id.*

While recognizing the general rule that an FTCA claim accrues when a plaintiff "has discovered both his injury and its cause", *United States v. Kubrick*, 444 U.S. 111, 120 (1979), Plaintiff argues that the continuing tort doctrine should apply here. Pl.'s Opp'n. at 49-53. Under the continuing tort doctrine, "when a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases." *Page v. United States*, 729 F.2d 818, 821 (D.C. Cir. 1984) (applying the doctrine to an FTCA claim). "This continuing-tort doctrine, which becomes relevant only when the tortious conduct is ongoing, is to be distinguished from the rule applicable when the plaintiff's *injury* continues or is manifested after the tortious conduct has ceased." *Id.* at 822 n. 23 (emphasis added). "Since usually no single incident in a continuous chain of tortious activity can fairly or realistically be identified as the cause of significant harm, it seems proper to regard the cumulative effect of the conduct as actionable." *Id.* at 821-22 (internal citations and quotation marks omitted). When, as the court noted in *Page*, "the injury claimed by [plaintiff] [is] gradual, resulting from the cumulative impact of years of allegedly tortious [action]" the continuing tort doctrine applies. *Id.* at 822. Pursuant to this doctrine, Plaintiff argues that his claims did not accrue, and the statute of limitations did not begin to run, until the alleged retaliation against him ceased on July 27, 2009 with the OCC's dismissal of charges.

"Although [the continuing tort] doctrine is most commonly applied when the acts are 'by nature of a repetitive character and [when] . . . no single act can be identified as the cause of significant harm, it is not limited to such circumstances. Rather, the theory applies even to a series of acts that are not inherently 'of a repetitive character' and even when a plaintiff was

sufficiently aware of the harm caused to file an administrative complaint challenging the defendant's conduct." *Rochon v. F.B.I.*, 691 F.Supp. 1548, 1563 (D.D.C. 1988). The D.C. Circuit has identified the prosecution of an allegedly frivolous lawsuit as the sort of gradual harm triggering the continuing tort doctrine. "[T]he commencement of a lawsuit is only the first link in a chain of conduct that does not end until the complaining party ceases prosecution of the suit." *Whelan v. Abell*, 953 F.2d 663, 674 (D.C. Cir. 1992) (citing to *Page* as support for this proposition). "[A] lawsuit is a continuous, not an isolated event, because its effects persist from the initial filing to the final disposition of the case. . . . A defendant subject to a lawsuit is likely to suffer damage not so much from the initial complaint but from the cumulative costs of defense and the reputational harm caused by an unresolved claim." *Id.* at 673.

Here, Plaintiff alleges that his prosecution by the OCC constitutes a continuing tort, because he continued to be injured by the Government's retaliatory action throughout the course of the OCC proceeding from 2006 to July 27, 2009. This Court agrees, given the D.C. Circuit's statement in *Whelan* that a lawsuit constitutes a continuing harm which proceeds to the final disposition of the case.

The Government's attempts to distinguish *Whelan* are unavailing. First, the Government argues that *Whelan* was a case involving private parties and did not address the FTCA. Defs.' Reply at 10. Admittedly, *Whelan* involves common law tort claims under District of Columbia law. Yet this fact only makes Plaintiff's argument for the doctrine's application stronger. The continuing tort doctrine is stricter, and much less favorable to plaintiffs, under District of Columbia law that what the D.C. Circuit has recognized under the FTCA. *See Richards v. Duke University*, 480 F.Supp.2d 222 (D.D.C. 2007) (noting that District of Columbia courts "have rejected the expansive application of the continuing tort doctrine exemplified in *Page*") (quoting

*Beard v. Edmondson and Gallagher*, 790 A.2d 541, 547 (D.C. 2002). A decision recognizing that a lawsuit represents a continuing harm under the narrower context of District of Columbia tort claims strongly suggests that the same action would represent a continuing tort under the more expansive version of the doctrine the D.C. Circuit has applied in FTCA claims.

The Government next argues that *Whelan* reserved the question of whether an administrative proceeding could constitute a continuing tort. Defs.' Reply at 10. For this proposition, they rely on the following sentence: "We need not decide whether the prosecution of an administrative proceeding (such as the Maryland Securities Commission investigation which is conducted independently by the agency once a complaint is filed, can constitute a continuing tort *on the part of the complainant*, because we agree with appellants that the ongoing prosecution of a lawsuit (such as the Putty Hill litigation) can suffice." *Whelan*, 953 F.2d at 673 (emphasis added). Read in context, this sentence has little application here. The italicized text, which the Government selectively omits from its quotation, suggests that the court was reserving the question of whether an administrative proceeding initiated at the urging of a third-party complainant could represent a continuing tort *by that complainant*. The court was *not* recognizing a potential argument concerning whether an administrative proceeding, unlike a lawsuit, could constitute the basis for a continuing tort.

Arguing that the OCC prosecution of Loumiet does not constitute a continuing tort, the Government cites *Mittleman v. United States Dep't of the Treasury*, 919 F.Supp. 461 (D.D.C. 1995). Defs.' Reply at 10-11. This Court finds *Mittleman* inapposite here. In *Mittleman*, the plaintiff could point to no injurious acts by the defendants that occurred or continued during the statute of limitations period. Rather, plaintiff simply claimed continuing damage from the injurious acts outside the limitations period. *Id.* at 466-67. As the court there properly

recognized, "[t]he fact that [plaintiff] may continue to suffer damages does not transform the alleged wrongful conduct into a continuing tort." *Id.* at 467. This is consistent with the D.C. Circuit's explication of the doctrine in *Page. See* 729 F.2d at 822 n. 23 ("This continuing-tort doctrine, which becomes relevant only when the tortious conduct is ongoing, is to be distinguished from the rule applicable when the plaintiff's injury continues or is manifested after the tortious conduct has ceased."). Accordingly, the Court concludes that pursuant to the continuing tort doctrine, Plaintiff's FTCA claims need not be dismissed on statute of limitations grounds.

The Government next argues that because Plaintiff's claims are founded on the discretionary decision of OCC officials to commence an enforcement action against him, the Government is immune to liability under the discretionary function exception to the FTCA. 28 U.S.C. § 2680(a). The Court agrees in part, concluding that some, but not all of Plaintiff's FTCA claims must be dismissed pursuant to the discretionary function exception.

The discretionary function exception provides that the FTCA's waiver of sovereign immunity shall not apply to:

> [a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* This exception, as its name suggests, "covers only acts that are discretionary in nature", *United States v. Gaubert*, 499 U.S. 315, 322 (1991), which the Supreme Court has described as those acts that "involv[e] an element of judgment or choice." *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'" *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536). If a court determines

that "the challenged conduct involves an element of judgment", it must next decide "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* at 322-23. (quoting *Berkovitz*, 486 U.S. at 536). In this vein, the Supreme Court has stated that the exception "protects only government actions and decisions based on considerations of public policy." *Berkovitz*, 486 U.S. at 537. Nevertheless, if applicable, "the discretionary function exception immunizes even government abuses of discretion." *Shuler v. United States*, 531 F.3d 930, 935 (D.C. Cir. 2008). "Discretionary function determinations are jurisdictional in nature." *Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995). Accordingly, if the exception applies, this Court must dismiss for lack of subject-matter jurisdiction.

The Government argues that Plaintiff's FTCA claims are barred under the discretionary function exception because they revolve around the OCC's decision to prosecute him, a discretionary decision founded in public policy. Gov't MTD at 12-19. As the D.C. Circuit has noted, "[p]rosecutorial decisions as to whether, when, and against whom to initiate prosecution are *quintessential examples* of governmental discretion . . . and, accordingly, courts have uniformly found them to be immune under the discretionary function exception." *Gray v. Bell*, 712 F.2d 490, 513 (D.C. Cir. 1983) (footnote omitted) (emphasis added). *See also Moore v. Valder*, 65 F.3d 189, 197 (D.C. Cir. 1996) ("Deciding whether to prosecute" and the manner of prosecution are "quintessentially discretionary."). The D.C. Circuit has stated that this principle extends to an administrative agency's enforcement actions. *Sloan v. U.S. Dept. of Hous. and Urban Dev.*, 236 F.3d 756, 760 (D.C. Cir. 2001) ("HUD's decision to suspend plaintiffs, which began a course of administrative proceedings regarding possible debarment" protected by discretionary function exception).

As Plaintiff points out, a crucial antecedent question before deciding that the OCC's decision to prosecute Plaintiff falls within the discretionary function exception is whether the Government had the authority to bring an administrative enforcement action against Plaintiff. Pl.'s Opp'n. at 57-60. As the D.C. Circuit has observed, "a decision cannot be shielded from liability if the decisionmaker is acting without actual authority. A government official has no discretion to violate the binding laws, regulations, or policies that define the extent of his official powers." *Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, 1196 (D.C. Cir. 1986). Accordingly, a government employee "acting beyond his authority is not exercising the sort of discretion the discretionary function exception was enacted to protect." *Id.* The question here is whether OCC employees prosecuting Loumiet were acting beyond their authority and in violation of the binding, laws, regulations, or policies that defined the extent of their official powers. As support for this argument, Plaintiff points to the D.C. Circuit opinion awarding him attorney's fees on the basis that the OCC's prosecution was not "substantially justified." Pl.'s Opp'n. at 58. Plaintiff argues that this result shows that Defendant was "acting beyond [its'] authority" in prosecuting him. The Court disagrees. The D.C. Circuit did not conclude that the OCC was "violat[ing] the binding laws, regulations, or policies that define[d] the extent of [its] official powers." Rather, the court concluded that the OCC had failed to meet its burden of proof in prosecuting Loumiet. *See Loumiet*, 650 F.3d 796, 800 ("the Agency's evidence here . . . falls short of the necessary quantum of proof"); *id.* at 801 ("there is no record evidence of the loan's causation."). Under Plaintiff's narrow view of the discretionary function exception, a large number of failed prosecutions would fall outside the bounds of its protection, potentially chilling prosecutors in the exercise of their discretion.

The Court similarly rejects Plaintiff's argument that the OCC prosecution violated various Constitutional provisions, congressional mandates, statutory mandates, ethical rules, and the OCC's internal policies and procedures. Pl.'s Opp'n. at. 61-64. The Supreme Court has stated that the discretionary function exception does not apply if a "federal statute, regulation, or policy *specifically prescribes* a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536 (emphasis added). Here, none of the provisions cited by Plaintiff *specifically prescribe* a course of action for OCC employees to follow in their prosecutorial action. Indeed, many of the provisions cited by Plaintiff, namely the ethical rules, represent generalized principles for professional responsibility and can hardly be read as specific proscriptions.[4]

Nevertheless, the D.C. Circuit has cautioned that even "in an area of governmental functions, such as those involving decisions of a prosecutor, where courts traditionally have been quick to find immunizing discretion, we must examine carefully the allegations made to determine whether they are sufficiently separable from protected discretionary decisions." *Gray*, 712 F.2d at 515. Where "such separability exists, then the conduct of the prosecutor may be actionable under the FTCA." *Id.* Indeed, "[a]lthough the decision whether or not to prosecute clearly falls within the FTCA's discretionary function clause . . . there can be cases where the conduct of the prosecutor . . . is removed sufficiently from the decision to prosecute so that the discretionary function clause would not provide any protection." *Id.* By way of example, the *Gray* court noted, that "participation by prosecutors in illegal searches and seizures during the course of an investigation, or the dissemination of defamatory information to the media, easily

---

[4] The same can be said of Loumiet's argument that the OCC's action violated a congressional mandate. As Loumiet points out, the legislative history for FIRREA states that it was not Congress' intent "to subject attorneys to agency enforcement actions for those good faith activities falling within the traditional attorney-client relationship." H.R. REP. 101-54, pt. 2 at 467 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 263. Plaintiff argues that this is a policy that "specifically prescribes" the OCC's action here, prosecuting him for his good-faith activities as an attorney. Pl.'s Opp'n. at 61-62. Yet again, the Government has not violated this policy, it has merely failed to meet its burden of proof in showing Loumiet acted in bad faith. Such a failure does not mean the decision to prosecute was not discretionary or was prohibited by statute.

could be dissociated from the discretionary decision to prosecute." *Id.* The standard the *Gray* court identified is whether "the harm alleged . . . is distinct from the harm caused by the ultimate prosecution itself." *Id.* However, "where the 'allegation of improper . . . conduct is inextricably tied to the decision to prosecute' . . . the discretionary function exception applies and preserves governmental immunity." *Moore*, 65 F.3d at 196-97 (quoting *Gray*, 712 F.2d at 516).

Accordingly, to the extent Plaintiff's claims are "inextricably tied" to the decision to prosecute, they must be dismissed under the discretionary function exception. Here, the harms alleged by Plaintiff divide generally into two categories: the harm suffered from the prosecution and the harm suffered from the statements made by the prosecuting OCC officials to the press. *See* Compl. ¶¶ 113-136, 143-147. While claims premised on the decision to prosecute Loumiet are barred under the discretionary function exception, as the court noted in *Gray*, "dissemination of defamatory information to the media, easily could be dissociated from the discretionary decision to prosecute." 712 F.2d at 515. Indeed, such statements can be seen as "a discrete activity, sufficiently separable from protected discretionary decision to make the discretionary function exception inapplicable to this allegation." *Moore*, 65 F.3d at 197. Construing the allegations in the complaint in the light most favorable to Plaintiff, Loumiet's claims for intentional infliction of emotional distress, invasion of privacy, negligent supervision, and conspiracy allege harms caused by statements made by OCC officials to the press. *Cf. Sloan*, 236 F.3d at 762 (looking to complaint for allegations of harm and noting that "[t]he complaint does not allege any damages arising from the investigation itself, but only harm caused by the suspension to which it assertedly led."). The Government has not argued that statements made to the press are "inextricably tied" to the decision to prosecute, nor that these statements are themselves protected by the discretionary function exception. Accordingly, the Court permits

these claims to proceed to the extent they allege harm from the OCC officials' statements to the press. By contrast, Loumiet's claims for abuse of process and malicious prosecution only allege harms caused by the prosecution. Consequently, these claims are dismissed pursuant to the discretionary function exception under Fed. R. Civ. P. 12(b)(1).[5] Furthermore, to the extent Loumiet's claims for intentional infliction of emotional distress, invasion of privacy, negligent supervision, and conspiracy allege harms suffered from OCC officials' decision to and conduct in prosecuting him, they are also dismissed.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that the [11] Motion of the Individual Defendants to Dismiss Plaintiff's Bivens Claims is GRANTED. Furthermore, the Court concludes that the [10] Motion of the United States to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) is GRANTED-IN-PART AND DENIED-IN-PART. Having ruled on both of these motions, the Court similarly DENIES Plaintiff's [22] Motion for Oral Hearing on Defendants' Motions to Dismiss.


Dated: September 12, 2013


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge

---

[5] Because the Court dismisses Loumiet's claims for abuse of process and malicious prosecution pursuant to the discretionary function exception, it does not address the Government's argument that these claims should be dismissed under the FTCA's "law enforcement proviso." Gov't MTD at 19-23.