**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CARLOS LOUMIET,

     *Plaintiff,*

     v.

UNITED STATES OF AMERICA, *et al.*,

     *Defendants.*

Civil Action No. 12-1130 (CKK)

**MEMORANDUM OPINION**
(June 13, 2017)

Plaintiff Carlos Loumiet filed suit against the United States Government for the actions of its agency, the Office of the Comptroller of the Currency ("OCC"), under the Federal Tort Claims Act ("FTCA"), and against Defendants Michael Rardin, Lee Straus, Gerard Sexton, and Ronald Schneck (collectively, the "Individual Defendants"), alleging claims under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), as well as various state-law tort claims. In a series of rulings, the Court previously dismissed all of Plaintiff's claims at the motion to dismiss stage. Plaintiff appealed to the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), which remanded for this Court to consider two issues: *first*, as to Plaintiff's FTCA claims, "whether [Plaintiff's] complaint plausibly alleges that the OCC's conduct exceeded the scope of its constitutional authority so as to vitiate discretionary-function immunity;" and *second*, as to Plaintiff's *Bivens* claims, "the remaining defenses raised but not yet decided in the district court." *Loumiet v. United States*, 828 F.3d 935, 946, 949 (D.C. Cir. 2016) ("*Loumiet IV*"). Following remand, the Court ordered the parties to brief these and any other pertinent legal issues. Sept. 29, 2016 Order, ECF No. 61.

Pending before the Court are the Individual Defendants' [62] Motion to Dismiss and the United States' [63] Motion to Dismiss. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court **GRANTS IN PART AND DENIES IN PART** the Individual Defendants' [62] Motion to Dismiss, and **GRANTS IN PART AND DENIES IN PART** the United States' [63] Motion to Dismiss. Plaintiff's First Amendment *Bivens* claim for retaliatory prosecution shall proceed against Defendants Rardin, Schneck, and Sexton. Plaintiff's Fifth Amendment *Bivens* claim, and all claims against Defendant Straus are **DISMISSED WITHOUT PREJUDICE**. Pursuant to the Westfall Act, the state-law tort claims against the Individual Defendants are **CONVERTED** to FTCA claims against the United States. Plaintiff's FTCA claims against the United States may proceed, except that the abuse of process (Count III) and malicious prosecution (Count IV) claims are **DISMISSED WITHOUT PREJUDICE**, leaving only the claims for intentional infliction of emotional distress (Count I), invasion of privacy (Count II), negligent supervision (Count V), and civil conspiracy (Count VIII).

## I. BACKGROUND

The Court previously detailed the factual background of this matter in its prior

---

[1] The Court's consideration has focused on the following documents:

- Individual Defs.' Mot. to Dismiss and Statement of P&A in Supp., ECF No. 62 ("Ind. Defs.' Mem.");
- United States' Mot. to Dismiss and Statement of P&A in Supp., ECF No. 63 ("U.S. Mem.");
- Carlos Loumiet's Opp'n to the Individual Defs.' Mot. to Dismiss under Fed. R. Civ. P. 12(b)(6) and the United States' Mot. to Dismiss under Fed. R. Civ. P. 12(b)(6) and 12(b)(1), ECF No. 64 ("Opp'n Mem.");
- Reply Mem. of P&A in Supp. of the Defs.' Mot. to Dismiss, ECF No. 66 ("Reply Mem.").

rulings, familiarity with which is assumed.[2] *See Loumiet v. United States*, 968 F. Supp. 2d 142, 145 (D.D.C. 2013) (*Loumiet I*). To the extent particular factual allegations are relevant to the Court's analysis of the pending motions, they are detailed below.

## II. LEGAL STANDARD

### A. Motion to Dismiss for Lack of Subject-Matter Jurisdiction

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), Plaintiff bears the burden of establishing that the Court has subject-matter jurisdiction over its claims. *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007); *Ctr. for Arms Control & Non-Proliferation v. Redd*, No. CIV.A. 05-682 (RMC), 2005 WL 3447891, at *3 (D.D.C. Dec. 15, 2005). In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (internal quotation marks omitted); *see also* 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1350 (3d ed. 2017) (noting the "wide array of cases from the four corners of the federal judicial system involving the district court's broad discretion to consider relevant and competent evidence on a motion to dismiss for lack of subject matter jurisdiction to resolve factual issues"). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a

---

[2] The full sequence of decisions is as follows: *Loumiet v. United States*, 968 F. Supp. 2d 142 (D.D.C. 2013) (*Loumiet I*); *Loumiet v. United States*, 65 F. Supp. 3d 19 (D.D.C. 2014) (*Loumiet II*); *Loumiet v. United States*, 106 F. Supp. 3d 219 (D.D.C. 2015) (*Loumiet III*); *Loumiet v. United States*, 828 F.3d 935 (D.C. Cir. 2016) ("*Loumiet IV*"). In addition, the D.C. Circuit previously ruled on Plaintiff's application for attorney fees under the Equal Access to Justice Act ("EAJA") in connection with his defense before the OCC, *Loumiet v. Office of Comptroller of Currency*, 650 F.3d 796, 798 (D.C. Cir. 2011) ("*Loumiet EAJA*").

motion to dismiss pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (internal quotation marks omitted).

### B. Motion to Dismiss for Failure to State a Claim

Defendants also move to dismiss the Complaint for "failure to state a claim upon which relief can be granted" pursuant to Federal Rule of Civil Procedure 12(b)(6). "[A] complaint [does not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Rather, a complaint must contain sufficient factual allegations that, if accepted as true, "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In deciding a Rule 12(b)(6) motion, a court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint," or "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Ward v. District of Columbia Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (internal quotation marks omitted). The court may also consider documents in the public record of which the court may take judicial notice. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

# III. DISCUSSION

The Court's analysis below proceeds as follows. *First*, the Court finds it appropriate to recognize a First Amendment *Bivens* claim for retaliatory prosecution under the particular factual circumstances of this case. *Second*, the Court finds that Plaintiff has plausibly alleged such a First Amendment *Bivens* claim against Defendants Rardin, Schneck, and Sexton, and that they are not entitled to absolute prosecutorial or qualified immunity at this procedural juncture. Nonetheless, the Court finds that Defendant Straus is entitled to absolute prosecutorial immunity, and that any non-immunized conduct fails to state a First Amendment retaliatory prosecution *Bivens* claim against him. *Third*, the Court concludes that Plaintiff's Fifth Amendment *Bivens* claim must be dismissed for failure to state a claim. *Fourth*, the Court converts the state-law tort claims against the Individual Defendants to FTCA claims against the United Stated. In sum, this means that the only claims surviving with respect to the Individual Defendants are Plaintiff's First Amendment *Bivens* claims against Defendants Rardin, Schneck, and Sexton.

Turning to the FTCA claims against the United States, the Court finds *first*, that discretionary-function immunity is vitiated under the circumstances of this case because Plaintiff has plausibly alleged that the tortious conduct at issue violated a clearly established First Amendment right against retaliatory prosecution; *second*, that Plaintiff's malicious prosecution and abuse of process claims must be dismissed because the OCC employees at issue in this case are not "investigative or law enforcement officers" as defined by the FTCA; and *third*, that Plaintiff's invasion of privacy claim may proceed. Accordingly, Plaintiff's surviving FTCA claims are for intentional infliction of emotional

distress (Count I), invasion of privacy (Count II), negligent supervision (Count V), and civil conspiracy (Count VIII).

### A. The Court Recognizes a First Amendment *Bivens* Claim in this Action

In *Bivens*, the Supreme Court of the United States created an implied cause of action for money damages stemming from an alleged Fourth Amendment violation at the hands of federal officials. 403 U.S. at 397. "Since *Bivens*, the Supreme Court has proceeded cautiously in implying additional federal causes of action for money damages." *Meshal v. Higgenbotham*, 804 F.3d 417, 421 (D.C. Cir. 2015). The *Bivens* issues in this case must be assessed in two stages, and because the Fifth Amendment claim shall be dismissed for failure to state a claim, this analysis is limited to Plaintiff's claim of retaliatory prosecution in violation of his First Amendment right to free speech.

As an initial matter, the parties disagree on whether by permitting Plaintiff's *Bivens* claim to proceed, the Court would in effect recognize a cause of action unprecedented in *Bivens* case law. In other words, whether this case presents a "new context." If so, the Court would be required to ask and answer two follow-up questions. First, whether "Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Carlson v. Green*, 446 U.S. 14, 18–19 (1980); *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) ("In the first place, there is the question whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages."). Put differently, a *Bivens* remedy will generally not be available if a comprehensive statutory scheme already exists for a plaintiff

to seek redress of the alleged constitutional violation. Defendants concede that no such scheme exists here. *See* Reply Mem. at 6.

As a result, the Court must turn to assess whether there are "any special factors counselling hesitation before authorizing a new kind of federal litigation." *Wilkie*, 551 U.S. at 550 (quoting *Bush v. Lucas*, 462 U.S. 367, 378 (1983)). One such special factor "that precludes creation of a *Bivens* remedy is the existence of a comprehensive remedial scheme." *Wilson v. Libby*, 535 F.3d 697, 705 (D.C. Cir. 2008). Unlike the first question—which asks whether there is a specific, equally effective alternative remedy to the implied cause-of-action—this "special factor" analysis is intended to isolate situations in which "the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration . . . ." *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988). As a result, the "comprehensive remedial scheme" need not provide "complete relief" for the specific violation at issue; rather, "the doctrine relates to the question of who should decide whether such a remedy should be provided." *Wilson*, 535 F.3d at 705 (internal quotation marks omitted). Consequently, it is "the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention." *Spagnola v. Mathis*, 859 F.2d 223, 227 (D.C. Cir. 1988). In sum, the doctrine reflects "an appropriate judicial deference to indications that congressional inaction has not been inadvertent." *Chilicky*, 487 U.S. at 423.

Both the D.C. Circuit and Supreme Court, at least impliedly, have recognized the existence of a *Bivens* implied cause-of-action for retaliatory prosecution in violation of the First Amendment guarantee of freedom of speech. *Hartman v. Moore*, 547 U.S. 250, 256

(2006) ("the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out"); *Moore v. Valder*, 65 F.3d 189, 196 (D.C. Cir. 1995) ("Moore's retaliatory prosecution claim, however, does allege the violation of clearly established law."); *Haynesworth v. Miller*, 820 F.2d 1245, 1255 (D.C. Cir. 1987) ("[w]e agree that the retaliatory prosecution constitutes an actionable First Amendment wrong"). Defendants, however, assert that this case presents a "new context" because "[n]o court has ever extended *Bivens* to the conduct of government officials engaged in oversight of the safety and soundness of the national banking system." Ind. Defs.' Mem at 7. The D.C. Circuit in *Meshal* noted the difficulty in distinguishing various *Bivens* actions on the basis of context: "viewed at a sufficiently high level of generality, any claim can be analogized to some other claim for which a *Bivens* action is afforded, just as at a sufficiently high level of particularity, every case has points of distinction." 804 F.3d at 424 (internal quotation marks omitted). Ultimately, *Meshal* defined "context" by reference to its common usage in law: the word "reflects[s] a potentially recurring scenario that has *similar* legal and factual components." *Id.* (emphasis added) (internal quotation marks omitted).

Although Defendants seek to distinguish the prosecutorial action in this case on the basis that it was directed by a Federal agency overseeing the banking industry, they have failed to explain *why* that distinction is at all relevant to the case law recognizing claims against Federal agents for retaliatory prosecution. For instance, there is no indication in the record that Plaintiff's prosecution was motivated out of a particular concern for the safety of the banking system. In fact, the allegations of the Complaint portray a prosecution that was levied against an individual with relatively little involvement in the perpetuation or

concealment of the illicit activity subject to the OCC's regulatory action, and was instead, according to the allegations, primarily motivated by Plaintiff's complaints regarding certain alleged racial comments made by OCC staff, and the aggressive nature of the OCC's investigation into Hamilton Bank. *See infra* at 26–27. Moreover, upon administrative review, the D.C. Circuit found that the record did not support a finding that Plaintiff's prosecution was justified. *See Loumiet EAJA*, 650 F.3d at 800. Accordingly, while the fact that the retaliatory prosecution was brought by a banking regulator is a point of distinction, the salient legal and factual matters are similar to those at issue in the controlling Supreme Court and D.C. Circuit cases regarding retaliatory prosecution. As in *Hartman* and *Moore*, the allegations here suggest that employees of a Federal entity (there, the United States Postal Service), in reprisal for speech critical of the Federal entity, directed a meritless investigation and prosecution (there, the trial court determined that there was a "complete lack of direct evidence" for the alleged crime, while here, the presiding Administrative Law Judge ("ALJ"), the Comptroller, and the D.C. Circuit found that the enforcement action was unwarranted, *see Loumiet EAJA*, 650 F.3d at 799–800).

In sum, the conduct at issue, although allegedly perpetuated by banking regulators, plainly fits the mold of the controlling authorities wherein a *Bivens* cause of action has been recognized for retaliatory prosecution at the behest of Federal officials. No doubt, the banking regulatory arena is complex and of immense importance to the American economy, but it can hardly be said that any Federal agency does not administer an important facet of the American economy or society. And while the D.C. Circuit has on several occasions refused to afford a *Bivens* remedy in certain sensitive policy areas, the decisions pressed by Defendants are limited to the national security and intelligence context. *See*

Reply Mem. at 3; *see, e.g., Klay v. Panetta*, 758 F.3d 369 (D.C. Cir. 2014). Certainly, it is conceivable that a factual context related to the banking industry could present circumstances that distinguish it from other cases in which a *Bivens* remedy for retaliatory prosecution has been recognized. The essential point here, however, is that Defendants have not shown how their status as banking regulators is relevant to the question of whether a *Bivens* remedy should be recognized under the particular factual circumstances of this case, wherein any banking law or regulatory issues seem, accepting the allegations as true, completely peripheral to the challenged conduct (i.e., the bringing of the enforcement action).

Even assuming that this case presents a "new context," however, the special factor analysis does not preclude a *Bivens* remedy for Plaintiff's retaliatory prosecution claim. Defendants contend that the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), pursuant to which the OCC took enforcement action against Plaintiff, is a "comprehensive remedial scheme" that counsels against finding an implied cause-of-action under the factual circumstances of this case. As an initial matter, however, there is no clear indication that Plaintiff was properly the subject of a FIRREA enforcement action. As relevant here, that statutory scheme applies to an "institution-affiliated party" ("IAP"), which is defined to include: "[A]ny independent contractor (including any attorney, appraiser, or accountant) who knowingly or recklessly participates in . . . any unsafe or unsound practice, which caused or is likely to cause more than a minimal financial loss to, or a significant adverse effect on, the insured depository institution." 12 U.S.C. § 1813(u)(4). The D.C. Circuit, in reviewing the denial of Plaintiff's request for attorney fees in connection with the enforcement action, concluded that the administrative record was

devoid of evidence linking Plaintiff's allegedly illicit actions (drafting two investigative reports) with a "significant adverse effect on the Bank." *Loumiet EAJA*, 650 F.3d at 799. This accorded with the decision of the Comptroller dismissing the action against Plaintiff, which found that the "administrative record lacked sufficient evidence that the two reports prepared by [Plaintiff] caused, or were likely to cause, harm to the Bank that satisfies the 'effect' requirement." *Id*. at 800. As such, the D.C. Circuit concluded that the record did not demonstrate that the OCC's "litigating position was justified, let alone 'substantially' so." *Id*. Consequently, this case is brought in a posture wherein both the D.C. Circuit and the Comptroller determined that Plaintiff did not qualify under the statutory test that determines whether a party like Plaintiff is subject to FIRREA.

Beyond this, the case at bar is readily distinguishable from the controlling authorities that have declined to establish a *Bivens* remedy due to the existence of a comprehensive remedial scheme. In each such case, there was a statutory scheme that provided relief for similarly-situated plaintiffs, but happened not to provide relief for the litigant, either due to the particular factual circumstances, or the nature of the relief sought. Given the existence of the complex ameliorative scheme, however, the reasonable inference to draw in these cases was that Congress weighed competing policy goals and fashioned a system of remedies that reflected its policy-based determinations. Consequently, while the remedial scheme may have not afforded complete relief to the particular plaintiff at bar, judicial deference to Congressional law-making called for hesitation before creating a remedy through judicial fiat under circumstances where the evidence showed that Congress had intentionally declined to do so.

In *Bush v. Lucas*, the Supreme Court addressed a putative First Amendment claim by a Federal employee who had allegedly been terminated for making critical public remarks regarding his agency. 462 U.S. at 369. Following a review of the pertinent regulatory landscape, the Court determined that "Federal civil servants are now protected by an elaborate, comprehensive scheme that encompasses substantive provisions forbidding arbitrary action by supervisors and procedures—administrative and judicial— by which improper action may be redressed." *Id*. at 385. Although recognizing that the current system would not provide "complete relief" to the petitioner, the Court declined to recognize a *Bivens* remedy under the circumstances given the existence of an "an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations . . . ." *Id*. at 388. This system and other factors, in the Court's view, evidenced that "Congress is in a far better position than a court to evaluate the impact of a new species of litigation between federal employees on the efficiency of the civil service." *Id*. at 389. Similarly, in *Chilicky*, petitioners sought money damages under *Bivens* stemming from the denial of their Social Security benefits. 487 U.S. at 419. The Supreme Court declined to recognize a *Bivens* remedy under the circumstances, holding that "[w]hen the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies." *Id*. at 423. In the Court's view, the Social Security system evidenced such a design, and "while respondents ha[d] not been given a remedy in damages for emotional distress or for other hardships suffered because of delays in their receipt of Social Security benefits[,] . . . Congress . . . ha[d] not failed to provide meaningful safeguards or remedies for the rights of persons

situated as respondents were." *Id.* at 425. Based on these precedents, the D.C. Circuit in *Wilson* declined to recognize a *Bivens* remedy against the Vice President and others for injuries allegedly suffered by the revelation of plaintiff's employment with the Central Intelligence Agency. 535 F.3d at 702. The D.C. Circuit determined that the disclosure of personal information by Federal officials, the crux of the complaint, was governed by the Privacy Act, and the Act was a "comprehensive scheme" that precluded a *Bivens* remedy. Although the Act did not provide a cause of action against the three defendants, because it excluded the Offices of the President and Vice President, that exclusion was not inadvertent and thus did not weigh in favor of granting *Bivens* relief; rather, the legislative history of the Act showed that the exclusion was intentional. *Id.* at 708. *See also Davis v. Billington*, 681 F.3d 377, 383 (D.C. Cir. 2012) (defining "comprehensive remedial scheme" as "when Congress has put in place a comprehensive system to administer public rights, has not inadvertently omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies" (quoting *Spagnola*, 859 F.2d at 228) (internal quotation marks omitted)).

FIRREA was enacted in response to the savings-and-loan crisis of the 1980s to "enhance the regulatory enforcement powers of the depository institution regulatory agencies to protect against fraud, waste, and insider abuse." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 741 (D.C. Cir. 1995). FIRREA applies both to banks and, as relevant here, institution-affiliated parties. If the OCC determines that an IAP has engaged in actionable misconduct, it may institute a "cease-and-desist" proceeding, and if it does so, must provide the IAP with a notice of charges and an administrative hearing. 12 U.S.C. § 1818(b). The OCC may also seek civil monetary penalties, which are likewise

subject to an administrative hearing. 12 U.S.C. § 1818(i)(2)(H). The hearing must be conducted before an ALJ in accordance with the Administrative Procedure Act ("APA"), and the IAP may choose to be represented by counsel, and may present evidence and cross-examine witnesses. 12 U.S.C. § 1818(h)(1); 12 C.F.R. §§ 19.35, 19.36. In short, the hearing is "a full adversarial proceeding." Ind. Defs.' Mem. at 9. Following the hearing, the ALJ issues a written recommendation for the Comptroller, who reviews the decision, the administrative record, and any objections by the IAP, and issues a final written decision. 12 U.S.C. § 1818(h)(1); 12 C.F.R. §§ 19.38–19.40. The IAP may then seek review of the final decision before a United States Court of Appeals. 12 U.S.C. § 1818(h)(2).

Succinctly stated, Defendants' position is that "the comprehensive remedial scheme of the FIRREA, coupled with judicial review under the APA, is a special factor that counsels hesitation against authorizing a *Bivens* remedy in this case." Reply Mem. at 6. In support, Defendants press *Sinclair*, a decision by the United States Court of Appeals for the Eighth Circuit ("Eighth Circuit"), as dispositive of FIRREA's status as a "comprehensive remedial scheme" that precludes the recognition of a *Bivens* claim under the particular factual circumstances of this case. In *Sinclair*, the proprietor of Sinclair National Bank ("SNB") brought a putative *Bivens* claim against OCC employees for a series of adverse regulatory actions, which plaintiff claimed were retaliatory and motivated by racial animus. These culminated in the OCC declaring the bank insolvent and appointing the Federal Deposit Insurance Corporation ("FDIC") as a receiver, which promptly sold the assets of SNB to another bank. *Sinclair v. Hawke*, 314 F.3d 934, 938 (8th Cir. 2003). The Eight Circuit declined to recognize a *Bivens* remedy for this allegedly retaliatory regulatory action against SNB, finding that Congress had "been establishing and

extensively regulating national banks for over two hundred years." *Id*. at 940. In their view, FIRREA was simply a further expansion of the already immense regulatory powers afforded to Federal bank regulators such as the OCC and FDIC, and all of the "adverse regulatory actions at issue fell within the OCC's express statutory powers to regulate national banks . . . ." *Id.* at 942. Importantly, regulatory action was subject to judicial review via the APA, and to the "extent these APA remedies are limited, the long history of congressional regulation of national banks confirms that the limitations are not inadvertent. Rather, Congress has repeatedly adjusted, and at times overhauled, these statutory remedies in a continuing effort to resolve . . . a difficult and delicate problem of reconciling conflicting interests . . . ." *Id*. As such, the Eighth Circuit concluded that it was "for Congress to decide whether the public interest in a sound national banking system would be furthered by a cause of action requiring bank regulators to pay damages personally unless they can convince a jury that their conduct in aggressively regulating a national bank was not the product of an unconstitutional motive." *Id*.

The analogy between this case and *Sinclair*, while appealing, is ultimately specious. As an initial matter, the D.C. Circuit in *Munsell* expressed skepticism with precisely the sort of analysis pressed by *Sinclair*; namely, that APA review precludes a *Bivens* remedy. In that case, the D.C. Circuit assessed a claim that Federal Food Safety and Inspection Service "officials used USDA enforcement powers to retaliate against [plaintiff] for statements he made concerning USDA's handling of an *E. coli* outbreak in 2002." *Munsell v. Dep't of Agric.*, 509 F.3d 572, 589 (D.C. Cir. 2007). In so doing, the court reviewed another decision by the Eight Circuit, *Nebraska Beef*, which, in reliance on the holding in *Sinclair*, concluded that when "Congress has created a comprehensive regulatory regime,

the existence of a right to judicial review under the APA is sufficient to preclude a *Bivens* action." *Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005) (citing *Sinclair*, 314 F.3d at 940). The D.C. Circuit noted that the decision in "*Nebraska Beef* leaves some weighty issues unanswered[,]" and that it was "unaware of any Supreme Court decision holding that APA review *alone* is sufficient to eliminate the need for a *Bivens* remedy." *Munsell*, 509 F.3d at 590. Moreover, the D.C. Circuit opined that even "assuming, *arguendo*, that the existence of APA review might factor into a determination as to whether a *Bivens* remedy is available, its relevance would be minimal in a case involving claimants who are ineligible for relief under the APA." *Id.*

Whatever the significance of APA review may have been in *Sinclair*, it does little here to obviate the need for a *Bivens* remedy. In *Sinclair*, the OCC successfully engaged in regulatory action that could have been challenged in court pursuant to the APA. Here, the presiding ALJ and the Comptroller ultimately declined to take any enforcement action against Plaintiff. As a result, there was no final decision to review, and Defendants have not proffered any explanation of how Plaintiff, under the particular factual circumstances of this case, could have sought relief through the amalgam of FIRREA and the APA. However, while this distinction is important, it does not end the inquiry. As recounted above, the failure of a putative "comprehensive remedial scheme" to afford "complete relief" is not dispositive if the absence of such relief is the product of intentional Congressional policy making. In this vein, the *Sinclair* court determined that regulatory action pursuant to FIRREA was limited to APA review as a result of Congressional balancing of competing policy interests: those of banks, who would benefit from additional review, against those of depositors, who would benefit from the ability of banking

regulators to take prompt ameliorative action. As such, the absence of a remedy equivalent to what would be available under *Bivens* was not accidental, but a product of that intentional balancing of competing interests. This reasoning is consistent with that of the Supreme Court and D.C. Circuit authorities discussed earlier, each of which concluded that although the pertinent remedial scheme was limited as applied to the plaintiff at bar, that limitation was the product of Congressional choice in an area subject to Congressional law-making, and consequently counseled against the recognition of a judicially created remedy.

In order to press a similar argument in this case, Defendants would need to show that the absence of a remedy for Plaintiff under the circumstances of this case was the intentional product of how Congress constructed the administrative review procedures under FIRREA. But Defendants have completely failed to furnish any legislative or other evidence that Congress intentionally excluded claims similar to Plaintiff's from FIRREA. Nor does the statute itself indicate an intent to exclude such claims. While it may be sensible for review of regulatory action to be limited to what is available under the APA, that conclusion does not flow so readily for prosecutorial action that is alleged to have been wholly *ultra vires*. In fact, Defendants have pointed to no mechanism under FIRREA for review of prosecutorial abuse, other than the APA review that generally applies to a final decision of the Comptroller. Consequently, the question at hand ultimately reduces to whether the absence of APA review for Plaintiff's claim is the product of intentional Congressional policymaking in constructing FIRREA.

On this point, however, no evidence has been proffered, nor does such intent seem likely. The absence of APA review in this case stems from the fact that the presiding ALJ and the Comptroller ultimately determined that the enforcement action against Plaintiff had

to be dismissed. As a result, to agree with Defendants, the Court would need to conclude that Congress intended to limit review of retaliatory prosecution claims within the confines of FIRREA to only those cases where the OCC rendered a final decision (i.e., where the allegedly improper prosecution is successful), regardless of the length of the prosecution and its toll on plaintiff, and the practical reality that the most meritless prosecutions are the ones that are most likely to prove unsuccessful when subject to the review of a neutral arbiter. Absent some affirmative evidence, the Court declines to conclude that Congress intended this odd result. *See Munsell*, 509 F.3d at 591 ("Thus, in a case of this sort, were the possibility of APA review deemed sufficient to foreclose a *Bivens* remedy, the very success of the unconstitutional conduct in removing [Plaintiff] from the regulated arena would make APA review unavailable and insulate the conduct entirely from judicial review. That would make little sense."). Moreover, this determination comports with the recognition of a *Bivens* claim for retaliatory prosecution in the criminal context, given that in those cases further review was plainly available via the appeals process (although, like here, only for retaliatory prosecutions that proved successful); and this determination also comports with other district court decisions that have allowed *Bivens* claims to proceed under similar circumstances. *See Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 69 (D.D.C. 2009) (recognizing *Bivens* remedy despite the availability of APA review), *aff'd sub nom. Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011); *Zherka v. Ryan*, 52 F. Supp. 3d 571, 580 (S.D.N.Y. 2014) (recognizing *Bivens* claim for retaliation by employees of the Internal Revenue Service, despite the availability of administrative review as provided by the Internal Revenue Code, and also noting that "[l]eaving plaintiff to pursue administrative remedies through the very agency he asserts has targeted him for

retaliatory investigation would be, in essence, no remedy at all"). Accordingly, for all of the foregoing reasons, the Court concludes that FIRREA is not a "comprehensive remedial scheme" that counsels against the recognition of a *Bivens* remedy under the particular factual circumstances of this case.

Defendants' remaining "special factor" argument is that recognizing a *Bivens* claim here would have a "chilling effect" on the willingness of banking regulators like the OCC employees at issue "to aggressively attack unsafe banking practices." Ind. Defs.' Mem. at 11 (citing *Sinclair*, 314 F.3d at 939). As such, Defendants contend that "there is more than a reasonable fear that a general *Bivens* cure would be worse than the disease." *Id*. (citing *Wilkie*, 551 U.S. at 561). The Court disagrees. First, this case treads on familiar ground, as its salient facts are not substantially dissimilar from the controlling authorities that have recognized the existence of a *Bivens* claim for retaliatory prosecution. Second, the factual circumstances of this case are unique in the context of regulatory enforcement actions undertaken by banking regulators like the OCC. Plaintiff alleges that he was prosecuted without cause, in connection with a matter in which he had little substantive involvement, solely for statements he made against the prosecuting agency. *See infra* at 26–27. Although these allegations may, on their own, seem self-serving, the Court is also guided by the practical reality that the presiding ALJ and the Comptroller determined that the prosecution should be dismissed, and that the D.C. Circuit later concluded that the prosecution was not "justified" by the administrative record. *Loumiet EAJA*, 650 F.3d at 800. Based on these allegations, which must be taken as true for purposes of the pending motions, the case at bar is plainly not a run-of-the-mill lawsuit in which the subject of adverse regulatory action, unhappy with the result, sues the responsible government officials. Rather, this case

presents a unique constellation of factual allegations—most importantly that neutral authorities have expressed skepticism at the propriety of the challenged prosecution—that are unlikely to be present in other cases. Consequently, given the uniqueness of the allegations in this case, in this Court's view, allowing Plaintiff to proceed with his First Amendment *Bivens* claim is unlikely to have a chilling effect on the proper regulatory activities of banking regulators like the Individual Defendants. Accordingly, no special factor pressed by Defendants counsels against the recognition of a *Bivens* remedy in this case for Plaintiff's claim of retaliatory prosecution by the Individual Defendants in violation of his First Amendment right to freedom of speech. As such, Plaintiff's First Amendment claim is cognizable under *Bivens*, and the Court proceeds to assess whether Plaintiff has stated viable claims against each of the Individual Defendants to whom such a claim could attach.

**B. Plaintiff Has Stated a Plausible First Amendment *Bivens* Claim Against Defendants Rardin, Schneck, and Sexton, But Not Straus**

Before assessing whether the allegations of the Complaint state a plausible First Amendment claim against each of the Individual Defendants, the Court surveys the legal framework of two doctrines that could potentially preclude such a claim: absolute prosecutorial immunity, and qualified immunity.

*1. Absolute Immunity*

Federal prosecutors enjoy absolute immunity for "initiating a prosecution and in presenting the State's case . . . ." *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). This principle has been extended by the Supreme Court to agency officials who perform tasks under administrative auspices that are equivalent to that of a prosecutor in a court of law. *Butz v. Economou*, 438 U.S. 478, 515 (1978) ("agency officials performing certain

functions analogous to those of a prosecutor should be able to claim absolute immunity with respect to such acts"). Consequently, "those officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision." *Id*. at 516; *see also Gray v. Poole*, 243 F.3d 572, 577 (D.C. Cir. 2001) (extending absolute immunity to a government attorney for initiating a civil child neglect action). Nonetheless, an act is not immune merely because it is performed by a prosecutor; for instance, absolute prosecutorial immunity does not extend to "investigative functions normally performed by a detective or police officer[,]" which are generally only afforded qualified immunity. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

In *Hartman*, the Supreme Court explained the effect of absolute immunity in the context of a First Amendment *Bivens* claim for retaliatory prosecution. There, the Court instructed that a *Bivens*

> action for retaliatory prosecution will not be brought against the prosecutor, who is absolutely immune from liability for the decision to prosecute . . . . Instead, the defendant will be a nonprosecutor, an official, like an inspector here, who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute.

*Hartman*, 547 U.S. at 261–62. Thus, in light of absolute prosecutorial immunity, the focus of a retaliatory prosecution claim is primarily on the non-prosecuting officials who induced the allegedly improper prosecution, and not the prosecutors themselves, unless they perform non-immunized tasks that likewise engender the improper prosecution. *Id*. at 262 n.8 (noting that "[a]n action could still be brought against a prosecutor for conduct taken in an investigatory capacity," and noting that plaintiff's complaint "charged the prosecutor with acting in an investigative as well as in a prosecutorial capacity, . . . but dismissal of

the complaint as against the prosecutor was affirmed . . . , and no claim against him is before us now").

The Court addresses whether any of the Individual Defendants are entitled to dismissal on the basis of absolute prosecutorial immunity below, in connection with its assessment of whether Plaintiff has stated a plausible claim for retaliatory prosecution.

### 2. *Qualified Immunity*

The Individual Defendants also contend that they are shielded from litigation by the doctrine of qualified immunity, which "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). In order for a complaint to counter an assertion of qualified immunity, a plaintiff must plead "facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted). With respect to the second element, "though in the light of pre-existing law the unlawfulness of the officer's conduct must be apparent, there is no need that the very action in question have previously been held unlawful." *Navab-Safavi*, 637 F.3d at 317 (internal quotation marks and alterations omitted) (declining to remand on the basis of qualified immunity because it "cannot be gainsaid that a person expressing her viewpoint is exercising an established constitutional right"); *Ashcroft*, 563 U.S. at 735 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). Put differently, qualified immunity does not attach simply because the factual circumstances

of the present case are in some sense unique. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("officials can still be on notice that their conduct violates established law even in novel factual circumstances"). Rather, the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001).

Defendants contend that they did not violate a "clearly established" right because when the OCC initiated its enforcement action against Plaintiff in November 2006, there "was no law establishing that the initiation of a civil administrative proceeding—as opposed to a criminal prosecution—can support a retaliatory prosecution claim." Ind. Defs.' Mem. at 18. The Court notes that this is the only instance in their briefing on the pending motions where Defendants seek to distinguish the OCC's enforcement action from other retaliatory prosecution cases on the basis that the prosecution here proceeded under administrative auspices (for example, they do not argue that this case presents a new *Bivens* context on that basis). This position is also somewhat at odds with Defendants' claim of absolute prosecutorial immunity. In any event, the argument is of no avail.

The D.C. Circuit has stated unequivocally that it "clearly established in 1988 . . . the contours of the First Amendment right to be free from retaliatory prosecution." *Moore v. Hartman*, 704 F.3d 1003, 1004 (D.C. Cir. 2013). More generally, in *Hartman*, the Supreme Court stated that "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out . . . ." 547 U.S. at 256. As support for that general proposition, the Supreme Court relied upon two earlier decisions, *Crawford*,

issued in 1998, and *Perry*, issued in 1972. *Id.*; *Crawford–El v. Britton*, 523 U.S. 574, 588, 592 (1998) ("the general rule has long been clearly established [that] the First Amendment bars retaliation for protected speech"); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (noting that the government may not punish a person or deprive him of a benefit on the basis of his "constitutionally protected speech"). Based on these precedents, it has been clearly established, long before the OCC instituted the enforcement action against Plaintiff, that retaliatory action by Federal officials against protected speech is unconstitutional. And this general principle was further crystalized by authorities which held that retaliatory prosecutions were a particular example of this sort of unconstitutional behavior. That these cases did not involve an administrative proceeding is ultimately a distinction without a difference. The pertinent question is whether the general constitutional principle was sufficiently established that it should have been clear to the Individual Defendants that their conduct, if the allegations prove true, was unlawful. Here, the case law had clearly established the unlawfulness of retaliatory conduct generally, and retaliatory prosecutions more specifically. The OCC's enforcement powers, by Defendants' own admission, are immense and may be exercised in an administrative hearing with all the hallmarks of full court proceeding. *See supra* at 14. Moreover, the possible sanctions, albeit not criminal, are no less severe than what could face a criminal defendant. Plaintiff, in particular, faced a $250,000 fine and exclusion from the banking industry, and by extension, his chosen legal practice.[3] Compl. ¶ 80.

_____

[3] These factual circumstances distinguish this case from the non-controlling authority pressed by Defendants: *Bank of Jackson County v. Cherry*, 980 F.2d 1362 (11th Cir. 1993). *See* Ind. Defs.' Mem. at 18–19. There, the United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit") affirmed a grant of summary judgment on the basis of qualified immunity for a *Bivens* suit in which plaintiff, a small bank, alleged that it was "debarred"

Given the gravity of the enforcement action, and the established case law just recounted, if the allegations are substantiated, it should have been clear to the Individual Defendants that using their immense enforcement powers as a means to retaliate against Plaintiff for his protected speech was unconstitutional. Accordingly, the Court concludes that the right against retaliatory prosecution was clearly established at the time the Individual Defendants initiated the enforcement action. As a result, the Individual Defendants are not entitled to dismissal on the basis of qualified immunity so long as Plaintiff has stated a plausible claim that they violated this right, an issue addressed in the following section.

### 3. *Plaintiff Has Stated a Plausible Claim Against Defendants Rardin, Schneck, and Sexton, But Not Straus*

The "essential elements" of a retaliatory prosecution claim are

> [F]irst, that the conduct allegedly retaliated against or sought to be deterred was constitutionally protected, and, second, that the State's bringing of the criminal prosecution was motivated at least in part by a purpose to retaliate for or to deter that conduct. If the Court concludes that the plaintiffs have successfully discharged their burden of proof on both of these issues, it should then consider a third: whether the State has shown by a preponderance of the evidence that it would have reached the same decision as to whether to prosecute even had the impermissible purpose not been considered.

*Haynesworth*, 820 F.2d at 1257 n.93.[4]

---

from working with the Farmers Home Administration, a federal agency that guaranteed the bank's loans to farmers, in retaliation for a legal dispute with the agency. *Id*. at 1364–65. In relevant part, the Eleventh Circuit held that "[a]ny legal similarity between [the] debarment, on the one hand, and criminal prosecution, on the other, would not have been readily apparent to government officials attempting to do their jobs on a day-to-day basis." *Id*. at 1370. Here, for the reasons stated, the allegations suggest that the similarity was far more apparent.

[4] In *Hartman*, the Supreme Court added the additional requirement that plaintiffs bringing a retaliatory prosecution suit must plead and prove the absence of probable cause. 547 U.S.

Plaintiff alleges that Defendant Rardin was the examiner-in-chief ("EIC") in charge of Hamilton Bank from 2000 to 2001, and that he was "actively involved" in the OCC enforcement action against Plaintiff, Compl. ¶ 3; that Lee Straus "is an enforcement attorney at the OCC who was the lead counsel" in the enforcement action, *id.* ¶ 4; that Defendant Schneck "is Director of the Special Supervision and Fraud Division at the OCC [and] was actively involved in the OCC's various dealings with Hamilton from 2000 to 2001," as well as with the enforcement action, *id.* ¶ 5; and finally, that Defendant Sexton is "Assistant Director of the Enforcement and Compliance Division of the OCC," and was similarly "actively involved in the OCC's various dealings with Hamilton from 2000 to 2001," and the enforcement action, *id.* ¶ 6. Defendant Sexton, like Defendant Straus, is an "experienced Government enforcement lawyer." *Id.* Plaintiff alleges that the Individual Defendants were all "senior, influential employees of the OCC, with particularly strong say and influence on enforcement matters." *Id.* ¶ 7.

According to the Complaint, Plaintiff's critical statements toward the OCC caused severe embarrassment to OCC "officials who had been involved in the OCC behavior relating to Hamilton that those letters criticized, including prominently, and in senior roles, defendants Rardin, Schneck, and Sexton." *Id.* ¶ 52. According to Plaintiff, these same officials, "all embarrassed and angered by [Plaintiff's] whistle-blowing, began discussing how to retaliate against him for his temerity, [and] all three of these defendants were actively involved in the case brought by the OCC." *Id.* ¶ 61. Defendant Sexton, in

at 265. Defendants do not challenge the Complaint on the basis that it has failed to adequately plead the absence of probable cause (or its equivalent), an unsurprising result given the D.C. Circuit's determination that the enforcement action was not justified. In any event, the Court finds that Plaintiff has adequately pled the absence of probable cause, or its equivalent in the administrative setting in which the enforcement action was brought.

particular, is alleged to have said, in reference to the investigative reports prepared by Plaintiff, that Plaintiff had "gone too far," and that he and others "had to pay." *Id*. ¶ 64. Consequently, Plaintiff alleges that the decision to bring an enforcement action against him was "unduly influenced by defendants Rardin, Sexton and Schneck . . . ." *Id*. ¶ 72.

Taking the foregoing allegations as true and drawing all reasonable inferences in Plaintiff's favor, as the Court must at this procedural juncture, Plaintiff's allegations, taken as a whole, plausibly suggest that Defendants Rardin, Schneck, and Sexton used the fruits of their investigation into Hamilton Bank (i.e., their scrutiny of the investigative reports drafted by Plaintiff) to improperly induce an enforcement action against Plaintiff in reprisal for critical statements that he made against them and the OCC more generally. This view of the Complaint is corroborated by the fact that the ALJ, the Comptroller, and the D.C. Circuit ultimately concluded that the enforcement action was not meritorious. *Loumiet EAJA*, 650 F.3d at 800; *see also Hartman*, 547 U.S. at 261 ("[d]emonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution"). Moreover, Plaintiff has alleged that an action was brought against him—and not other advisors involved with the Hamilton Bank investigation—despite him having relatively less involvement with that investigation, *id*. ¶¶ 28, 84, and that the OCC ultimately concluded that Plaintiff's work product, which was the purported basis of the enforcement action, did not "cause[] more than a minimal financial loss to, or a significant adverse effect on [Hamilton Bank,]" *Loumiet EAJA*, 650 F.3d at 800. Taken as a whole, the foregoing suffices to state a claim of retaliatory prosecution against Defendants Rardin, Schneck, and Sexton.

Because the allegations against these three Defendants plausibly state that they induced the enforcement action against Plaintiff through their investigative conduct, and did not merely act as prosecutors who made the ultimate decision to prosecute, they are not entitled to absolute prosecutorial immunity at this procedural juncture. *See supra* at 19–20. Furthermore, because the Complaint plausibly alleges that they violated a right that the Court has concluded was clearly established at the time of the alleged violation, these three Defendants are also not entitled to qualified immunity at this procedural juncture. Nonetheless, further factual development may show that these Defendants are entitled to one or both of these immunities. The only allegations in the Complaint with respect to Defendant Straus, however, are that he was lead counsel of the enforcement action, and that he made certain comments to the press in the course of the prosecution that were critical of Plaintiff. Compl. ¶¶ 4, 78, 85. Of these two, the only actionable conduct is Defendant Straus' press commentary,[5] his prosecutorial conduct being entitled to absolute immunity, *see supra* 19–20. But the gravamen of a retaliatory prosecution claim is the decision to, or inducement of, prosecution, and consequently the statements that Defendant Straus allegedly made to the press *in the course of the prosecution* do not make out a claim of retaliatory prosecution. Accordingly, Plaintiff's First Amendment *Bivens* claim shall proceed against Defendants Rardin, Schneck, and Sexton, but shall be dismissed, without prejudice, against Defendant Straus on the basis of absolute immunity and for failure to state a claim.

---

[5] Defendants acknowledge that the press commentary alleged in the Complaint is not entitled to absolute prosecutorial immunity. Reply Mem. at 8 (citing *Buckley*, 509 U.S. at 278).

### C. Plaintiff Has Not Stated a Viable Fifth Amendment *Bivens* Claim

Plaintiff also alleges a Fifth Amendment due process claim against the Individual Defendants. The count in the Complaint alleging this claim merely mirrors the First Amendment count. *Compare* Compl. ¶¶ 140–142, *with id.* ¶¶ 137–139. Moreover, Plaintiff has not briefed whether a Fifth Amendment claim for retaliatory prosecution is cognizable under *Bivens*, or whether such a Fifth Amendment claim was sufficiently established to avoid dismissal on the basis of qualified immunity. To the extent Plaintiff's Fifth Amendment claim is intended to bring a substantive due process claim for the First Amendment violation already discussed at length, that is foreclosed by Supreme Court precedent. *Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (internal quotation marks omitted)).

However, in his opposition to the pending motions, Plaintiff seeks to restyle his Fifth Amendment claim as a "stigma plus" or "reputation plus" due process claim. Opp'n Mem. at 32. To bring such a claim in the D.C. Circuit, Plaintiff must plausibly allege that the Individual Defendants engaged in conduct that not only harmed Plaintiff's reputation, but that also either formally excluded Plaintiff from a chosen trade or profession, or caused "harms approaching, in terms of practical effect, formal exclusion from a chosen trade or profession . . . ." *Trifax Corp. v. District of Columbia*, 314 F.3d 641, 644 (D.C. Cir. 2003). "The key inquiry then is this: Has the government, by attacking personal or corporate reputation, achieved in substance an alteration of status that, if accomplished through formal means, would constitute a deprivation of liberty?" *Id.* Absent such "broad

preclusion" from a chosen trade or profession, a Fifth Amendment claim will not lie even if the government conduct would "impair [plaintiff's] future employment prospects . . . so long as such damage flows from injury caused by the defendant to a plaintiff's reputation." *Siegert v. Gilley*, 500 U.S. 226, 234 (1991). For example, in *Kartseva*, the D.C. Circuit remanded for the district court to determine whether the government conduct in that case had effectively precluded plaintiff "from pursuing her profession as a Russian language translator," or whether plaintiff had "merely lost one position in her profession but is not foreclosed from reentering the field," in which case her Fifth Amendment claim would not be viable. *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994).

Here, Plaintiff has not alleged that the conduct of the Individual Defendants has precluded him from engaging in his chosen career as a banking law practitioner. Rather, the Complaint alleges that Plaintiff's "practice—particularly in the banking field—largely evaporated," and that his "income dropped significantly," and that he "fell six partnership levels . . . ." Compl. ¶ 106. Although these allegations plausibly state that Plaintiff's employment prospects were impaired, that is not equivalent to him being precluded from practicing law as a banking attorney. Indeed, by the plain terms of the Complaint, he remained a partner at a law firm, and his practice only "largely" evaporated; it did not cease to exist. Accordingly, the Complaint does not state a plausible "reputation-plus" or "stigma-plus" Fifth Amendment *Bivens* claim, and Plaintiff has not presented any other theory of how his Fifth Amendment claim could proceed. As a result, the Fifth Amendment claim shall be dismissed.

## D. The State-Law Tort Claims Against the Individual Defendants are Converted to FTCA Claims Against the United States

Defendants contend that the state-law tort claims against the Individual Defendants for intentional infliction of emotional distress (Count I), invasion of privacy (Count II), abuse of process (Count III), malicious prosecution (Count IV), and conspiracy (Count VIII), are automatically converted to FTCA claims against the United States pursuant to the Westfall Act, 28 U.S.C. § 2679(d), which "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v. Haley*, 549 U.S. 225, 229 (2007). Pursuant to the Westfall Act, all that is required for conversion of the state-law claims against the Individual Defendants is a certification of a designee of the Attorney General that the Individual Defendants were "acting within the scope of [their] office or employment at the time of the incident out of which the claim[s] arose . . . ." 28 U.S.C. § 2679(d)(1). Here, such a certification has been provided by the Director of the Torts Branch of the Department of Justice's Civil Division, a designee of the Attorney General, and Plaintiff does not oppose the conversion in his opposition to the pending motions. Ind. Defs. Mem at 21, Ex. 1; *see FDIC v. Bender*, 127 F.3d 58, 67–68 (D.C. Cir. 1997) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."). Accordingly, the state-law tort claims against the Individual Defendants are converted to FTCA claims against the United States.

### E.  Plaintiff's FTCA Claim

#### 1.  *Discretionary-Function Exception*

The D.C. Circuit has instructed that "the discretionary-function exception does not categorically bar FTCA tort claims where the challenged exercise of discretion allegedly exceeded the government's constitutional authority to act." *Loumiet IV*,  828 F.3d at 939. The task for this Court on remand was to determine whether Plaintiff's "complaint plausibly alleges that the OCC's conduct exceeded the scope of its constitutional authority so as to vitiate discretionary-function immunity." *Id*. at 946. For the reasons discussed above, the Court has concluded that Plaintiff has plausibly alleged that Defendants engaged in conduct that violated a clearly established First Amendment right against retaliatory prosecution. *See supra* at 28. As Defendants make no other challenges on this point, the Court concludes that the United States may not make use of the discretionary-function exception of the FTCA under the circumstances of this case to shield itself from Plaintiff's state-law tort claims predicated on the OCC's allegedly retaliatory enforcement action.

#### 2.  *Plaintiff's Malicious Prosecution and Abuse of Process Claims Must be Dismissed*

The waiver of sovereign immunity afforded by the FTCA generally does not apply to claims of malicious prosecution or abuse of process, among a number of other intentional torts. 28 U.S.C. § 2680(h). Nonetheless, the Act contains an exception to this general rule, known as the Law Enforcement Proviso, which states that "with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the [FTCA] shall apply to any claim arising . . . out of . . . abuse of process, or malicious prosecution." *Id*. Accordingly, in order for Plaintiff to pursue these two claims, as he seeks to do in the

Complaint, he must establish that the OCC employees who engaged in the allegedly tortious activity were "investigative or law enforcement officers of the United States."

The FTCA defines "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* According to Plaintiff, OCC officials are vested with

> so-called "visitorial powers," which allows federal agents to (i) examine a bank; (ii) inspect a bank's books and records; (iii) regulate and supervise the bank; and (iv) enforce compliance with any applicable federal or state laws concerning those activities. The agents also are empowered to engage in comprehensive investigations, where they can command attendance at depositions, administer oaths, and depose officers, directors, employees, or agents of the bank under oath.

Opp'n Mem. at 35 (citing 12 U.S.C. §§ 481, 484, 1820). The officials are also empowered to "issue, revoke, quash, or modify subpoenas." *Id.* (citing 12 U.S.C. § 1818(n)). In the Court's view, however, these powers do not suffice to render OCC officials "investigative or law enforcement officers," as none of these rights amount to a power to execute searches, to seize evidence, or to make arrests. In a closely analogous case, another district court held that officials of the Office of Thrift Supervision ("OTS"), a bank regulator, were not investigative or law enforcement officers, as there was no "legal authority vested in the OTS to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Biase v. Kaplan*, 852 F. Supp. 268, 281 (D.N.J. 1994); *see also Saratoga Sav. & Loan Ass'n v. Fed. Home Loan Bank of San Francisco*, 724 F. Supp. 683, 689 (N.D. Cal. 1989) (finding that Federal bank examiners with the Federal Home Loan Bank were not "investigative or law enforcement officers"). In particular, the *Biase* court noted that while "OTS is empowered to examine bank documents and issue subpoenas therefor, . . . OTS

must make application to a district court to compel access to documents," which does not suffice to render such bank examiners law enforcement officers. 852 F. Supp. at 281 n.9 (collecting cases).

The same is true here. Of the various powers described above, the only one that potentially suffices to render the OCC officials subject to the Law Enforcement Proviso is the ability to subpoena evidence. Nonetheless, much like the OTS officials in *Biase*, the OCC officials in this case can only enforce witness and document subpoenas by application to a United States District Court. 12 U.S.C. § 1818(n) ("such agency . . . may apply to the United States District Court . . . for enforcement of any subpena or subpena duces tecum issued pursuant to this subsection"). Accordingly, OCC officials are not subject to the Law Enforcement Proviso merely by virtue of their subpoena powers. *See Art Metal-U.S.A., Inc. v. United States*, 577 F. Supp. 182, 185 (D.D.C. 1983) ("[o]btaining evidence by subpoena is the antithesis of obtaining it through search and seizure"), *aff'd*, 753 F.2d 1151 (D.C. Cir. 1985).

The other powers afforded to OCC officials—to review bank records and engage in regulatory activities—likewise do not constitute the types of powers to execute searches, seize evidence, or make arrests that were envisioned by the Law Enforcement Proviso. The Proviso was enacted by Congress "as a counterpart to the *Bivens* case and its progeny, in that it waives the defense of sovereign immunity so as to make the Government independently liable in damages under state law for the same type of conduct that is alleged to have occurred in *Bivens*[,]" which involved federal narcotics agents searching a residence and making arrests. *Denson v. United States*, 574 F.3d 1318, 1336 (11th Cir. 2009) (citing S. Rep. No. 93–588 (1974)) (alterations in original omitted). Consequently,

the bank examination functions of the OCC described above are plainly not equivalent to the type of law enforcement searches and seizures that Congress intended to waive immunity for with the passage of the Law Enforcement Proviso.

Finally, although Plaintiff requests that the Court permit discovery on this issue, which would be tantamount to jurisdictional discovery given that sovereign immunity implicates this Court's subject-matter jurisdiction,[6] he does not explain how that discovery would be helpful to the resolution of this issue. The FTCA makes clear that whether an official is an "investigative or law enforcement officer" depends on whether they are "empowered by law" to execute the functions enumerated in the statute. Here, the Court has reviewed the relevant law and found that the OCC officials are not so empowered. Furthermore, the two out-of-Circuit authorities relied upon by Plaintiff to seek discovery are not persuasive. First, in *Sutton*, the Fifth Circuit did not require the district court on remand to permit discovery, as Plaintiff contends, but rather required the court to make a determination as to whether the official at issue fit the Proviso. *Sutton v. United States*, 819 F.2d 1289, 1294 n.8 (5th Cir. 1987). And while Plaintiff seeks to equate the powers of the OCC officials here with those of the Postal Inspectors in *Sutton*, the Fifth Circuit expressly noted that the latter are empowered to "[m]ake arrests without warrant . . . ." *Id*. The other

---

[6] *See FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1094 (D.C. Cir. 2008) ("a request for jurisdictional discovery cannot be based on mere conjecture or speculation"); *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 53 (D.D.C. 2003) ("Where there is no showing of how jurisdictional discovery would help plaintiff discover anything new, it is inappropriate to subject defendants to the burden and expense of discovery." (internal quotation marks and alterations omitted)); *Williams v. ROMARM*, 187 F. Supp. 3d 63, 72 (D.D.C. 2013), *aff'd sub nom. Williams v. Romarm, SA*, 756 F.3d 777 (D.C. Cir. 2014) ("[W]hen requesting jurisdictional discovery, a plaintiff must make a detailed showing of what discovery it wishes to conduct or what results it thinks such discovery would produce." (internal quotation marks and alterations omitted)).

authority relied upon by Plaintiff, *Pellegrino*, faced the question of whether "airport security screenings" by Transportation Security Agents constituted "searches" for purposes of the Law Enforcement Proviso. The *Pellegrino* court expressly noted the similarity between these "screenings" and the type of unlawful, warrantless searches that were the subject of *Bivens* and the Law Enforcement Proviso, and consequently permitted discovery to determine whether this conduct in fact amounted to a type of warrantless search subject to the Proviso. *Pellegrino v. U.S. Transp. Sec. Admin.*, 855 F. Supp. 2d 343, 356 (E.D. Pa. 2012). As already stated here, there is no indication in the applicable law, or any allegation in the Complaint, that OCC officials are empowered to engage in conduct that approximates the activities envisaged by the Law Enforcement Proviso. Accordingly, the Court finds that the OCC officials at issue were not "investigative or law enforcement officers," and that, as a result, Plaintiff's malicious prosecution and abuse of process claims shall be dismissed without prejudice.

### 3. Based on the Court's Prior Ruling, The Invasion of Privacy Claim Can Proceed

"Invasion of privacy is not one tort, but a complex of four, each with distinct elements and each describing a separate interest capable of being invaded." *Greenpeace, Inc. v. Dow Chem. Co.*, 97 A.3d 1053, 1061 (D.C. 2014) (internal quotation marks omitted). Of the four, the one relevant here is "public disclosure of private facts." *Id*. The elements of this claim are "(1) publicity, (2) absent any waiver or privilege, (3) given to private facts (4) in which the public has no legitimate concern (5) and which would be highly offensive to a reasonable person of ordinary sensibilities." *Wolf v. Regardie*, 553 A.2d 1213, 1220 (D.C. 1989). Plaintiff alleges that private facts were tortiously disclosed in two instances: the November 6, 2006 Notice of Charges, and an October 3, 2006 press

release issued by the OCC with respect to the enforcement action. Opp'n Mem. at 39–40. Both of these documents are subject to the Court's review as they are "public records and government documents available from reliable sources." *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56, 67 (D.D.C. 2014).

Although the Court agrees with Defendants that some of the statements in these documents do not appear to concern private facts and/or are matters of public concern (e.g., the results of the Hamilton Bank investigation), the amount of fees charged by Plaintiff and his firm, relayed by both documents, is a seemingly private fact, the public importance of which is not apparent, and the disclosure of which may be highly offensive to a reasonable person (much like one may be offended by the disclosure of his or her salary). As such, Plaintiff has stated a plausible claim for invasion of privacy, in particular, the public disclosure of private facts.

The remaining question is whether this claim is timely. On this, the Court previously ruled that the continuing tort doctrine tolled the statute of limitations with respect to Plaintiff's FTCA claims, all of which arose out of the allegedly retaliatory prosecution, until the "final disposition of the case." *Loumiet I*, 968 F. Supp. 2d at 154 (citing *Whelan v. Abell*, 953 F.2d 663, 674 (D.C. Cir. 1992)). Because Plaintiff brought an administrative action within two years of the cessation of the prosecution, the Court concluded that "Plaintiff's FTCA claims need not be dismissed on statute of limitations grounds." *Id*. at 155. Defendants point the Court's towards its later decision, which held that the statements underling the invasion of privacy claim did not warrant application of the continuing tort doctrine. *Loumiet III*, 106 F. Supp. 3d at 225–26. Importantly, this decision was rendered after the Court had determined that Defendants' decision to

prosecute was not actionable under the discretionary-function exception. *Id.* at 222. That decision has now been reversed, and accordingly, the Court's analysis reverts to its prior conclusion that the pendency of the prosecution constituted a continuing tort that tolled the statute of limitations for Plaintiff's FTCA claims. Accordingly, Plaintiff's invasion of privacy claim may proceed.

## IV. CONCLUSION

For all of the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** the Individual Defendants' [62] Motion to Dismiss, and **GRANTS IN PART AND DENIES IN PART** the United States' [63] Motion to Dismiss. Plaintiff's First Amendment *Bivens* claim for retaliatory prosecution shall proceed against Defendants Rardin, Schneck, and Sexton. Plaintiff's Fifth Amendment *Bivens* claim, and all claims against Defendant Straus are **DISMISSED WITHOUT PREJUDICE**. Pursuant to the Westfall Act, the state-law tort claims against the Individual Defendants are **CONVERTED** to FTCA claims against the United States. Plaintiff's FTCA claims against the United States may proceed, except that the abuse of process (Count III) and malicious prosecution (Count IV) claims are **DISMISSED WITHOUT PREJUDICE**, leaving only the claims for intentional infliction of emotional distress (Count I), invasion of privacy (Count II), negligent supervision (Count V), and civil conspiracy (Count VIII).

An appropriate Order accompanies this Memorandum Opinion.

Dated: June 13, 2017

                                        /s/
                                        COLLEEN KOLLAR-KOTELLY
                                        United States District Judge